UNITED STATES COURT OF APPEALS NOS. 25-400 & 25-408
DISTRICT COURT NOS. 2:24-CR-00091-ODW
& 2:24-CR-00702-ODW

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ALEXANDER SMIRNOV,
Appellant-Defendant,

vs.

UNITED STATES OF AMERICA,
Appellee-Plaintiff.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

**EXCERPTS OF RECORD**
Volume 1 of 1

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
Attorneys for Appellant
ALEXANDER SMIRNOV

# INDEX

Page

Amended Judgment,
Docket No. 223 & 42 (filed January 16, 2025) .................................................ER_003

Transcript of Sentencing Hearing on January 8, 2025,
Docket No. 219 & 38 (filed January 9, 2025) .................................................ER_009

Transcript of Change of Plea Hearing on December 16, 2024,
Docket No. 200 & 19 (filed December 20, 2024) .........................................ER_076

Plea Agreement for Defendant Alexander Smirnov,
Docket No. 195 & 9 (filed December 12, 2024) ...........................................ER_130

Indictment Case Number 2:24-CR-00702-ODW,
Docket No. 1 (filed November 21, 2024) .......................................................ER_154

Indictment Case Number 2:24-CR-00091-ODW,
Docket No. 1 (filed February 14, 2024)..........................................................ER_181

Defendant's Notice of Appeal,
Docket No. 225 & 46 (filed January 21, 2025) .............................................ER_218

Docket Report for Case Number 2:24-CR-00091-ODW .............................ER_222

Docket Report for Case Number 2:24-CR-00702-ODW .............................ER_246

# United States District Court
## Central District of California

### "AMENDED"

**UNITED STATES OF AMERICA vs.**

Docket No.    CR 24-00091-ODW/ CR 24-00702-ODW

**Defendant**    Alexander Smirnov

**akas:**

Social Security No.   5   7   8   5

(Last 4 digits)

| | MONTH | DAY | YEAR |
|---|---|---|---|
| In the presence of the attorney for the government, the defendant appeared in person on this date. | Jan. | 8, | 2025 |

**COUNSEL**     David Z Chesnoff/ Richard A Schonfeld/ Chad Nardiello, retained

(Name of Counsel)

**PLEA**    [X] **GUILTY,** and the court being satisfied that there is a factual basis for the plea.   [ ] **NOLO CONTENDERE**   [ ] **NOT GUILTY**

**FINDING**    There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of: **Count 2 (CR 24-91):** 18:1519: Creating a False and Fictitious Record; **(CR 24-702): Count 1** 26:7201 Evasion of Assessment; **Count 5:** 26:7201 Evasion of Assessment; **Count 8:** 26:7201 Evasion of Assessment

**JUDGMENT AND PROB/ COMM ORDER**    The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of:

**\*\*\*The sentence on Count 2 of the indictment in case number CR 24-00091 is 72 months. With respect to the indictment in case number CR 24-00702, as to Count 1, the sentence is 60 months. As to Count 5, the sentence is 60 months concurrent with Count 1. As to Count 8, the sentence is 12 months consecutive to the terms imposed on Counts 1 and 5 of that Indictment. The terms of imprisonment imposed in case number CR 24-00702 are to run concurrently with the terms of imprisonment imposed in CR 24-00091. As a result of the foregoing, the total term of imprisonment on both indictments, all four counts, is 72 months.\*\*\***

It is ordered that the defendant shall pay to the United States a special assessment of $400, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

It is ordered that the defendant shall pay restitution in the total amount of $675,502 pursuant to 18 U.S.C. §3663 in Docket No. 2:24CR00702.

The amount of restitution ordered shall be paid as follows:
Victim Amount
Internal Revenue Service $675,502
Restitution shall be paid in full immediately

The defendant shall comply with Second Amended General Order No. 20-04.

Pursuant to Guideline § 5E1.2(a), all fines are waived as the Court finds that the defendant has established an to pay any fine.

ER_003

(4 of 253), Page 4 of 253    Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 4 of 253
Case 2:24-cr-00091-ODW    Document 223    Filed 01/16/25    Page 2 of 6    Page ID
#:2887

USA vs.   Alexander Smirnov                              Docket No.:   CR 24-00091-ODW/ CR 24-00702-ODW

The Court recommends that the defendant be considered for participation in the Bureau of Prison's Residential Drug Abuse Program (RDAP).

Upon release from imprisonment, the defendant shall be placed on **supervised release for a term of One year**. **This term consists of One year on Count 2 of the Indictment in Docket No. CR 24-00091 and Counts 1, 5 and 8 of the Indictment in Docket No. CR 24-00702, all such terms to run concurrently** under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04, including the conditions of probation and supervised release set forth in Section III of Second Amended General Order 20-04.

2. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the Probation Officer.

3. The defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath or sweat patch testing, as directed by the Probation Officer. The defendant shall abstain from using alcohol and illicit drugs, and from abusing prescription medications during the period of supervision.

4. As directed by the Probation Officer, the defendant shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision. The defendant shall provide payment and proof of payment as directed by the Probation Officer.

5. During the period of community supervision, the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment.

6. The defendant shall cooperate in the collection of a DNA sample from himself.

7. The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any other expected or unexpected financial gains to the Court-ordered financial obligation.

8. The defendant shall truthfully and timely file and pay taxes owed for the years of conviction, and shall truthfully and timely file and pay taxes during the period of community supervision. Further, the defendant shall show proof to the Probation Officer of compliance with this order.

9. The defendant shall not be self-employed nor be employed in a position that does not provide regular pay stubs with the appropriate deductions for taxes, unless approved by the Probation Officer.

10. The defendant shall comply with the Internal Revenue Service's reporting requirements as they pertain to virtual currencies and shall provide proof of having done so to the Probation Officer.

(5 of 253), Page 5 of 253    Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 5 of 253
Case 2:24-cr-00091-ODW   Document 223   Filed 01/16/25   Page 3 of 6   Page ID
#:2888

USA vs.  Alexander Smirnov                          Docket No.:   CR 24-00091-ODW/ CR 24-00702-ODW

11. As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns and a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income, expenses, and liabilities of the defendant.

12. The defendant shall submit the defendant's person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

**The Court recommends defendant to be housed in a placement in Southern California to facilitate family visitation, preferably at Terminal Island.**

The Court authorizes the Probation & Pretrial Services Office to disclose the Presentence Report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency. Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of this Court.

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed, shall consider --
1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed -- a. To reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense;
b. To afford adequate deterrence to future criminal conduct;
c. To protect the public from further crimes of the defendant; and
d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3. The kinds of sentences available;
4. The guideline sentencing range;
5. Any pertinent policy statements issued by the Sentencing Commission;
6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7. The need to provide restitution to any victims of the offense.

USA vs.  Alexander Smirnov                                   Docket No.:   CR 24-00091-ODW/ CR 24-00702-ODW

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

January 16, 2025
_____                                    _____
Date                                                        U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

January 16, 2025                            By    Sheila English /s/
_____                          _____
Filed Date                                       Deputy Clerk

The defendant must comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant must not commit another federal, state, or local crime;
2. The defendant must report to the probation office in the federal judicial district of residence within 72 hours of imposition of a sentence of probation or release from imprisonment, unless otherwise directed by the probation officer;
3. The defendant must report to the probation office as instructed by the court or probation officer;
4. The defendant must not knowingly leave the judicial district without first receiving the permission of the court or probation officer;
5. The defendant must answer truthfully the inquiries of the probation officer, unless legitimately asserting his or her Fifth Amendment right against self-incrimination as to new criminal conduct;
6. The defendant must reside at a location approved by the probation officer and must notify the probation officer at least 10 days before any anticipated change or within 72 hours of an unanticipated change in residence or persons living in defendant's residence;
7. The defendant must permit the probation officer to contact him or her at any time at home or elsewhere and must permit confiscation of any contraband prohibited by law or the terms of supervision and observed in plain view by the probation officer;
8. The defendant must work at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons and must notify the probation officer at least ten days before any change in employment or within 72 hours of an unanticipated change;

9. The defendant must not knowingly associate with any persons engaged in criminal activity and must not knowingly associate with any person convicted of a felony, unless granted permission to do so by the probation officer. This condition will not apply to intimate family members, unless the court has completed an individualized review and has determined that the restriction is necessary for protection of the community or rehabilitation;
10. The defendant must refrain from excessive use of alcohol and must not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
11. The defendant must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12. For felony cases, the defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon;
13. The defendant must not act or enter into any agreement with a law enforcement agency to act as an informant or source without the permission of the court;
14. The defendant must follow the instructions of the probation officer to implement the orders of the court, afford adequate deterrence from criminal conduct, protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

☐   The defendant must also comply with the following special conditions (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant must pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment under 18 U.S.C. § 3612(f)(1). Payments may be subject to penalties for default and delinquency under 18 U.S.C. § 3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed before April 24, 1996. Assessments, restitution, fines, penalties, and costs must be paid by certified check or money order made payable to "Clerk, U.S. District Court." Each certified check or money order must include the case name and number. Payments must be delivered to:

    United States District Court, Central District of California
    Attn: Fiscal Department
    255 East Temple Street, Room 1178
    Los Angeles, CA 90012

or such other address as the Court may in future direct.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant must pay the balance as directed by the United States Attorney's Office. 18 U.S.C. § 3613.

The defendant must notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence address until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. § 3612(b)(l)(F).

The defendant must notify the Court (through the Probation Office) and the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution under 18 U.S.C. § 3664(k). See also 18 U.S.C. § 3572(d)(3) and for probation 18 U.S.C. § 3563(a)(7).

Payments will be applied in the following order:

    1. Special assessments under 18 U.S.C. § 3013;
    2. Restitution, in this sequence (under 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid):
        Non-federal victims (individual and corporate),
        Providers of compensation to non-federal victims,
        The United States as victim;
    3. Fine;
    4. Community restitution, under 18 U.S.C. § 3663(c); and
    5. Other penalties and costs.

## CONDITIONS OF PROBATION AND SUPERVISED RELEASE PERTAINING TO FINANCIAL SANCTIONS

As directed by the Probation Officer, the defendant must provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant must not apply for any loan or open any line of credit without prior approval of the Probation Officer.

When supervision begins, and at any time thereafter upon request of the Probation Officer, the defendant must produce to the Probation and Pretrial Services Office records of all bank or investments accounts to which the defendant has access, including any business or trust accounts. Thereafter, for the term of supervision, the defendant must notify and receive approval of the Probation Office in advance of opening a new account or modifying or closing an existing one, including adding or deleting signatories; changing the account number or name, address, or other identifying information affiliated with the account; or any other modification. If the Probation Office approves the new account, modification or closing, the defendant must give the Probation Officer all related account records within 10 days of opening, modifying or closing the account. The defendant must not direct or ask anyone else to open or maintain any account on the defendant's behalf.

The defendant must not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

USA vs.  Alexander Smirnov                                   Docket No.:   CR 24-00091-ODW/ CR 24-00702-ODW

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____  to  _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____  to  _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____     By  _____
Date                                          Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____     By  _____
Filed Date                                    Deputy Clerk

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed) _____          _____
                 Defendant                                                   Date

_____          _____
U. S. Probation Officer/Designated Witness                Date

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,      ) Case No. LA CR 24-00091-ODW
                                  )             LA CR 24-00702-ODW
5              Plaintiff,         )
                                  ) Los Angeles, California
6  vs.                            )
                                  ) Wednesday, January 8, 2025
7  ALEXANDER SMIRNOV,             )
                                  ) (10:31 a.m. to 11:28 a.m.)
8              Defendant.         ) (11:40 a.m. to 12:21 p.m.)
   _____)

9

10                     TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE OTIS D. WRIGHT, II
11                  UNITED STATES DISTRICT JUDGE

12

13  Appearances:                   See next page.

14  Court Reporter:                Recorded; CourtSmart

15  Courtroom Deputy:              Sheila English

16  Transcribed by:                Jordan Keilty
                                   Echo Reporting, Inc.
17                                 9711 Cactus Street, Suite B
                                   Lakeside, California 92040
18                                 (858) 453-7590

19

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

(10 of 253), Page 10 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 10 of 253
Case 2:24-cr-00091-ODW    Document 219    Filed 01/09/25    Page 2 of 67    Page ID
#:2808

2

```
 1  APPEARANCES:

 2  For the Plaintiff:          LEO J. WISE, ESQ.
                                DEREK E. HINES, ESQ.
 3                              United States Department of
                                  Justice
 4                              Office of Special Counsel
                                950 Pennsylvania Avenue, NW
 5                              Room B-200
                                Washington, D.C. 20530
 6                              (771) 217-6091

 7  For the Defendant:         RICHARD A. SCHONFELD, ESQ.
                                DAVID Z. CHESNOFF, ESQ.
 8                              Chesnoff & Schonfeld
                                520 South 4th Street
 9                              Las Vegas, Nevada 89101
                                (702) 384-5563
10
                                MARK A. BYRNE, ESQ.
11                              Byrne & Nixon, LLP
                                700 North Brand Boulevard
12                              Suite 1180
                                Glendale, California 91203
13                              (213) 620-8012

14                              CHAD D. NARDIELLO, ESQ.
                                1801 Century Park East
15                              Suite 1050
                                Century City, California 90067
16                              (310) 201-0123

17                              NASER J. KHOURY, ESQ.
                                Naser J. Khoury Law Offices
18                              14427 Sylvan Street
                                Van Nuys, California 91401
19                              (818) 654-0001

20

21

22

23

24

25
```

(11 of 253), Page 11 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 11 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 3 of 67   Page ID
#:2809

3

1   Los Angeles, California; Wednesday, January 8, 2025 10:31 am

2                              --oOo--

3                        (Call to Order)

4           THE CLERK:  Calling item one, CR 24-91 and CR 24-

5   702, United States of America versus Alexander Smirnov.

6           Counsel, may I have your appearances, please.

7           MR. WISE:  Good morning, your Honor.  Leo Wise and

8   Derek Hines for the United States.

9           THE COURT:  Mr. Wise.

10          MR. CHESNOFF:  May it please the Court, your

11  Honor, David Chesnoff, Richard Schonfeld, Naser Khoury,

12  Chard Nardiello and Mr. Byrne are present on behalf of Mr.

13  Smirnov.

14          THE COURT:  All right, Gentlemen.  Good morning.

15          ALL:  Good morning, your Honor.

16          THE COURT:  All right.  We're here for the

17  sentencing in this matter, this matter actually being --

18  matter of fact, these cases aren't consolidated.  I -- I

19  don't know what to call them.  But, anyway, both entitled

20  United States of America versus Alexander Smirnov, Case

21  Number 24-CR-00091 and 2 -- 24-CR-00702.

22          All right.  Because there have been objections to

23  the computation of the guidelines, I think it would probably

24  be best to start there, which isn't much of a deviation from

25  my normal practice of simply regurgitating the guidelines

*Echo Reporting, Inc.*

ER_011

(12 of 253), Page 12 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 12 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 4 of 67   Page ID
#:2810

4

1  calculations, asking if anyone has any objections, and then

2  going from there.  But we do have objections, and Mr.

3  Smirnov has objected to a couple of enhancements, one a

4  three-level enhancement because the offense caused a

5  substantial interference with the administrative --

6  administration of justice under Guideline Section

7  2J1.2(b)(2).  There is an objection to the use of that

8  particular provision to apply a three-level enhancement.

9       And a similar objection regarding specific offense

10  characteristics, that the offense involved destruction or

11  alteration of a substantial number of records and/or the

12  selection of especially probative records to alter.  And

13  this is 2J1.2(b)(3).  Again, this is a two-level

14  enhancement.

15       I guess the one that causes me the most concern is

16  the one dealing with the interference with the

17  administration of justice.  If I understand the objection, I

18  think the Defense is arguing that application of this

19  particular enhancement would constitute double counting,

20  that we were already applying an enhancement for

21  administration of justice and that this enhancement --

22  application of this enhancement would be double counting.

23  But I don't think that there has been a prior application

24  for interference with the administration of justice.  Maybe

25  I'm wrong.

5

1            Whichever one of you lawyers would like to address

2 this.

3            MR. SCHONFELD:  Thank you, your Honor.

4            As to that specific objection -- Richard Schonfeld

5 for the record.

6            THE COURT:  Um-hmm.

7            MR. SCHONFELD:  As to that specific objection, the

8 offense for which Mr. Smirnov pled guilty is effectively an

9 obstruction offense, and the guidelines that apply to the

10 offense in Count 2 in Case Number 91 are the obstruction of

11 justice guidelines.  And, therefore, we do believe it is

12 double counting because it's already included in the instant

13 offense.  For the Court to apply this particular

14 enhancement, there would have to be conduct separate and

15 apart from the underlying conduct that causes the

16 conviction, and there is no separate conduct in this case.

17            I would also note that the congressional hearings

18 for which the Government seeks to apply this enhancement

19 occurred many years after the false statement for which Mr.

20 Smirnov pled guilty, and in order to find this enhancement,

21 it would have to be the but for cause of the substantial

22 expenditure of resources, and that has not been established

23 by evidence in the record.

24            THE COURT:  But if -- if the manufacturing of this

25 particular tale or scenario is -- is what caused the

6

1  Government to -- to hire teams of investigators to -- to

2  investigate some of the claims that were made, seems to me

3  that's a but for, isn't it?

4          MR. SCHONFELD:  Well, your Honor, from a factual

5  standpoint, the investigation occurred and Mr. Smirnov's

6  false statement was brought into the investigation, but it

7  was not the but for cause of the investigation.

8          The Court may recall that special counsel was

9  actually appointed in the Hunter Biden case, and the

10  authority that they have, you know, pursued Mr. Smirnov

11  under was a derivation of the authority granted in that

12  case.

13          THE COURT:  But that's -- that --

14          MR. SCHONFELD:  So, it wasn't the cause.

15          THE COURT:  That's separate and apart from Mr.

16  Joseph accepting a $5 million bribe.

17          MR. SCHONFELD:  My point, your Honor, though, is

18  this wasn't the but for cause of the substantial government

19  resources being expended.

20          THE COURT:  Well, I guess reasonable minds can

21  differ.  Okay.

22          MR. SCHONFELD:  your Honor, may I address the

23  other enhancement?  I know your Honor --

24          THE COURT:  Yes.

25          MR. SCHONFELD:  Okay.  Your Honor, the other

*Echo Reporting, Inc.*

(15 of 253), Page 15 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 15 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 7 of 67   Page ID
#:2813

7

1  enhancement under 2J1.2(b)(3) is for the alteration or

2  destruction of essential or especially probative record.  In

3  this case, the allegation in Count 2 of the indictment is

4  that Mr. Smirnov caused the creation of a false record as

5  opposed to the destruction or alteration of an essential or

6  probative record.  And, therefore, that enhancement does not

7  apply.

8          And there's one last note that is separate from

9  that that I would like to address, which is the Government's

10  pursuit of an upward departure, not variance but an upward

11  departure under the Guidelines under USSG 3A1.2 for

12  "exceptionally high level official victim".

13          THE COURT:  Um-hmm.

14          MR. SCHONFELD:  The commentary to those guidelines

15  expressly state that this applies where the individual is

16  the President or the Vice President.

17          In the indictment, the false statement that Mr.

18  Smirnov was charged with and pled guilty to was made in June

19  of 2020, at a time where current President Biden was not

20  either the vice president of the United Stated.  And,

21  therefore, by definition, that upward departure does not

22  apply.

23      (Pause.)

24          THE COURT:  And if I -- if I'm hearing you

25  correctly, are you conceding the -- the objection regarding

8

1  this conduct causing a substantial interference with the

2  administration of justice?

3           MR. SCHONFELD:  No, your Honor.  That was the

4  first argument that I made.  We don't believe that Mr.

5  Smirnov's conduct was the but for cause of those

6  expenditures and it's double counting.

7           THE COURT:  Oh, actually, I was -- I was asking

8  whether or not Mr. Wise is basically --

9           MR. SCHONFELD:  Oh.  Sorry, your Honor.

10           THE COURT:  -- conceding that point to you.

11           MR. WISE:  Thank you, your Honor.

12           No.  Your Honor is right, counsel is confusing

13  2J1.2, which is the obstruction of justice guideline in

14  Chapter 2, with 3C1.1, which is an adjustment for

15  obstruction of justice in Chapter 3.  And the case law they

16  cite shows this confusion.  They cite the Hahn (phonetic)

17  case and the Fries (phonetic) case.  Those are both cases

18  where the obstruction of justice enhancement was applied

19  under 3C1.1.

20           In this case, 3C1.1 was not applied in the PSR.

21  Within the -- within -- so, there is no double counting.

22  And your Honor I think picked up on that right from the

23  start, and I don't know if counsel's -- I don't know why

24  they -- they didn't.

25           2J1.2 specifically has a provision for an

(17 of 253), Page 17 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 17 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 9 of 67   Page ID
#:2815

9

1    additional enhancement where there is substantial

2    expenditure of government resources.  Counsel chose only to

3    address the congressional oversight piece, and they make

4    this but for causation argument.  But there's nothing in the

5    guidelines that say that that's a requirement.

6            But, more importantly, they ignore -- and your

7    Honor also pointed this out -- that the FBI and the

8    Department of Justice expended substantial government

9    resources investigating the Defendant's false claims on not

10   one but two occasions.  They mentioned the more recent

11   investigation in 2023, but they ignore in 2020 that the FBI

12   in Pittsburgh and the Department of Justice out of the U.S.

13   Attorney's Office in the Western District of Pennsylvania

14   investigated the Defendant's specific claims, and we

15   submitted as Exhibit 5 to our sentencing memorandum a

16   document that was prepared at the time by the Department of

17   Justice, by the U.S. Attorney's Office that detailed the

18   steps that were taken to investigate the Defendant's claims.

19   So, there is evidence -- they make the argument there's no

20   evidence of substantial expenditure of resources.  Well,

21   that's just not true.  That document evidences substantial

22   expenditure of resources in 2020, and then obviously again

23   in 2023, after the 1023 became public, the FBI reexamined

24   it, and the Defendant has admitted to that, including the

25   interview he gave with a new team, a second team of FBI

(18 of 253), Page 18 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 18 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 10 of 67   Page ID
#:2816

10

1  investigators and the prosecutors at that time from the U.S.

2  Attorney's Office in the District of Delaware that

3  ultimately became the special counsel's office.  But all of

4  that was substantial expenditure of resources before you

5  even get to the congressional action which, as we provide in

6  our -- in our sentencing memo should be considered, and it

7  was extensive.  It extensively involved the Director of the

8  FBI himself and other senior officials.

9          So, for all those reasons, we think that

10 enhancement is appropriate.

11         As to their second argument --

12         THE COURT:  Before you leave that, was there a

13 separate investigation out of Wilmington that was

14 necessitated by the investigation or having to have an

15 investigation into some of these claims?

16         MR. WISE:  There was.  That's how -- that's how

17 this investigation began.

18         THE COURT:  Okay.

19         MR. WISE:  In the summer of 2023, the U.S.

20 Attorney's Office in Wilmington was asked to look at these

21 allegations because they involved Hunter Biden and obviously

22 Joseph Biden, and he was interviewed -- and -- and the

23 process began.  He was interviewed in September of 2023.  By

24 that point, the Attorney General had named the U.S. Attorney

25 in Delaware as the special counsel, and the Office of

(19 of 253), Page 19 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 19 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 11 of 67   Page ID
#:2817

11

1   Special Counsel was set up.

2           THE COURT:  Okay.

3           MR. WISE:  But, actually, as the indictment lays

4   out, the request came from the FBI in July of '23 to the

5   U.S. Attorney's Office in Delaware.  And, again, that was

6   separate and part from the work that the U.S. Attorney's

7   Office in Western Pennsylvania had done in 2020 and FBI

8   Pittsburgh had done in 2002.

9           THE COURT:  Okay.  All right.  Let's then go back

10  to the selection of or alteration of specific records, et

11  cetera.

12          MR. WISE:  Sure.  It would be nonsensical to say

13  that there's an enhancement for altering a record but not

14  for wholly creating one based on a fabricated story.  That's

15  just simply not linguistically defensible.  If -- if he had

16  altered an existing record, it would clearly -- it would

17  clearly qualify.  This is an especially probative record.

18  It is the -- the only place these allegations are

19  memorialized.  It's not like some other CHS made these

20  allegations and then he provided a little bit of color or

21  context or said, Oh, you know, I traveled at that time and

22  provided some record.  This was the heart -- this document

23  was the heart of the investigation into these claims.  So,

24  of course, it's an especially probative record, and -- and

25  the language -- you know, the language of the guidelines is

*Echo Reporting, Inc.*

(20 of 253), Page 20 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1 Page 20 of 253
Case 2:24-cr-00091-ODW Document 219 Filed 01/09/25 Page 12 of 67 Page ID
#:2818

12

1  meant to be read practically.  And, so, if -- if -- I mean,

2  creating one out of whole cloth is certainly more serious

3  than simply altering an existing one.  And, so, we think

4  that guideline also applies.

5       THE COURT:  All right.

6       MR. CHESNOFF:  May I respond to that?

7       THE COURT:  Yes.

8       MR. CHESNOFF:  Your Honor, Mr. Wise and the

9  special prosecutor should take that up with the Sentencing

10 Commission.  Defendants are entitled to rely on the language

11 of both legislation statutes and the guidelines.  And the

12 guidelines do not include Mr. Wise's theory.  We understand

13 his argument, but it doesn't apply because it's not the

14 language that a defendant would know about.  And, therefore,

15 creating an argument out of whole cloth when the actual

16 language of the guidelines does not specify what he's

17 arguing for is -- is a violation of due process.

18      THE COURT:  Okay.  I understand you.

19      The interesting thing about all of this is I don't

20 think we're looking at a guideline sentence here.  So, this

21 -- the outcome of these two objections is going to be of no

22 moment actually.

23    (Pause.)

24      THE COURT:  Were there any other objections that

25 -- after the submission of your memo that have dawned on

*Echo Reporting, Inc.*

(21 of 253), Page 21 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 21 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 13 of 67   Page ID
#:2819

13

1   you?

2          MR. CHESNOFF:  No, thank you, your Honor.

3          THE COURT:  Okay.

4          MR. WISE:  Your Honor, may --

5          THE COURT:  Um-hmm.

6          MR. WISE:  I have one --

7          THE COURT:  Sure.

8          MR. WISE:  -- after we received it.  So, the --

9   the PSR applies the zero point offender reduction.

10          THE COURT:  Yes.

11          MR. WISE:  And, respectfully, we don't believe it

12  applies in this case.  This is a -- a relatively new

13  guideline.

14          THE COURT:  Yes.

15          MR. WISE:  And it -- it doesn't address in the

16  commentary or application note a situation like the one we

17  have here were the Defendant is being sentenced on two

18  separate cases where the only common factor is the Defendant

19  himself.

20          And having cases -- the reason for the related

21  case rules is it promotes judicial efficiency and economy to

22  have a single judge hear the sentencing hearing because

23  obviously it's the same facts.  We have two -- you know, two

24  pre-sentence investigations that -- that accumulate the same

25  facts about his background and his finances and all that

(22 of 253), Page 22 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 22 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 14 of 67   Page ID
#:2820

14

1  stuff.  So, it makes -- it makes a lot of sense to have your

2  Honor hear both cases, but that shouldn't result in a

3  windfall for the Defendant.  And, so, if he were --

4         THE COURT:  If it were done one at a time, several

5  months apart, and the conviction in this case would result

6  in an offense level of whatever --

7         MR. WISE:  Exactly.

8         THE COURT:  -- and criminal -- and increase his

9  criminal history score, which it would be applied to the

10  subsequent case.

11         MR. WISE:  Exactly.

12         THE COURT:  You know, this isn't the first time

13  this has come up, and I continue to be frustrated by this.

14  I accept your argument.  I've made your argument.

15         At the end of the day, in a criminal case, unless

16  I am told specifically what I need to do in these cases, the

17  benefit of the doubt goes to -- so --

18         MR. WISE:  Understood, your Honor.

19         THE COURT:  That's where I end up there.

20         MR. WISE:  Thank you.

21         THE COURT:  And I think where we all are going to

22  end up is -- I think there's an assumption that we're going

23  to end up with an offense level of 21, yeah, and Criminal

24  History Category I, and the guidelines of 37 to 46, and then

25  we're going to go from there, unless someone suggests

(23 of 253), Page 23 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 23 of 253
Case 2:24-cr-00091-ODW Document 219 Filed 01/09/25 Page 15 of 67 Page ID
#:2821

15

1   something different.

2           MR. WISE:  And this is just -- just a lack of

3   familiarity with your Honor's practice.  I know in the

4   disclosure recommendation letter, which is ECF 34, Probation

5   recommended the additional two level upward departure that

6   we recommended for the exceptionally high official victim,

7   and counsel briefly addressed that.  I -- I can briefly

8   address that.

9           Obviously in --

10          THE COURT:  Wait.  Wait.  Wait.  Wait.  Let's make

11  sure we're both on --

12          MR. WISE:  Sure.

13          THE COURT:  You're talking about the disclosed

14  recommendation letter from Probation dated January 6th?

15          MR. WISE:  Yes, your Honor.  And at page seven,

16  this is where they -- they make the point most clearly.

17          THE COURT:  Okay.

18          MR. WISE:  Probation writes:

19              "Pursuant to application note five

20          to USSG 3A1.2" --

21          THE COURT:  Yes.

22          MR. WISE:  -- "if the official victim

23          is an exceptionally high level

24          official."

25          And, so, then in the middle of the paragraph:

*Echo Reporting, Inc.*

16

1          "The undersigned agrees with this

2          assessment based on public official

3          one's status and recommends an upward

4          departure equivalent to two levels."

5          -- which would take us to a 23, which results in

6 an advisory guideline range of 46 to 57 months, and then

7 Probation recommends a high end sentence of 57 months.

8          THE COURT:  Fifty-seven.

9          MR. WISE:  Counsel briefly addressed the

10 exceptional high level official.  And, as we said in our

11 sentencing memorandum, while the Vice President was not in

12 office in 2020, when the Defendant repeated his lies in

13 2023, which is relevant conduct which he's admitted to, he

14 was obviously at that point the President of the United

15 States.  And, so, we think the upward level departure does

16 apply.  So, that would, again, take us to a 23 with a range

17 of 46 to 57 months.

18          MR. CHESNOFF:  Most respectfully, your Honor --

19          THE COURT:  Sure.

20          MR. CHESNOFF:  -- he may have been the President,

21 but that's not what he was charged with.  He was charged

22 with 2020, and all of Mr. Wise's --

23          THE COURT:  Wait a minute.  Charged with 2020?

24          MR. CHESNOFF:  Count 2.

25          THE COURT:  Yes.

(25 of 253), Page 25 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 25 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 17 of 67   Page ID
#:2823

17

1          MR. CHESNOFF:  The comments made in 2020, not

2  comments made in 2023.

3          THE COURT:  Okay.

4          MR. CHESNOFF:  So, all of the nuances that Mr.

5  Wise raises may be things that he wants to address in the

6  future with the Guideline Commission, but the actual wording

7  of the guidelines and the case law makes it clear that he

8  had to be the President at the time of the offense for which

9  he has pled guilty, not the relevant conduct argument that

10  Mr. Wise made.  That doesn't appear in any case law.  it

11  doesn't appear in the guidelines.  It's an argument by Mr.

12  Wise which can be addressed either with Congress or the

13  Sentencing Commission but certainly shouldn't be decided in

14  a courtroom when someone's being sentenced, again, another

15  due process problem, your Honor.

16          MR. WISE:  I mean, that's clearly not the case.

17  Relevant conduct is used to apply guidelines in sentencings

18  all the time, and -- and to say that relevant conduct

19  somehow doesn't apply here simply ignores all of that.

20      (Pause.)

21          THE COURT:  What do you think of the relevant

22  conduct point?

23          MR. CHESNOFF:  That was just stated, your Honor,

24  what do I think of it?  I think that if he said something

25  today, Mr. Wise would argue that it's relevant conduct.  The

(26 of 253), Page 26 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 26 of 253
Case 2:24-cr-00091-ODW    Document 219    Filed 01/09/25    Page 18 of 67    Page ID
#:2824

18

1  fact is that the conduct that he was convicted of, your

2  Honor, is for statements made in 2020.  And nowhere in our

3  agreement have we agreed or stipulated that what was said in

4  '23 was relevant conduct.

5         THE COURT:  Some of these statements were made

6  again.  I don't know how you make a distinction.  It's the

7  same subject matter, same -- same claim.

8         MR. WISE:  And -- and the parties agreed that both

9  sides could argue for enhancements.  We agreed on the base

10 offense level, but counsel says we didn't stipulate to that.

11 We don't have to stipulate that it's relevant conduct.  It

12 clearly is.  And, just like they've made objections and

13 arguments about enhancements, so can we, and we think this

14 one clearly applies.

15      (Pause.)

16         THE COURT:  Wouldn't it be faster if counsel just

17 made his points to the Court?

18         MR. SCHONFELD:  Your Honor, I would just like to

19 bring up what is really an inconsistency.  So, on the one

20 hand, the Government's arguing expenditure of substantial

21 government resources through the congressional hearings and

22 things of that nature, which occurred before the alleged --

23         THE COURT:  Oh, it wasn't just the hearings.  It

24 was the investigations --

25         MR. SCHONFELD:  Right.

(27 of 253), Page 27 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 27 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 19 of 67   Page ID
#:2825

19

1          THE COURT:  -- by the FBI.

2          MR. SCHONFELD:  Those occurred before the second

3   false statement or relevant conduct.  The indictment itself

4   expressly states in Count 2, which is only I believe, off

5   the top of my head, two paragraphs, that in June of 2020,

6   Mr. Smirnov made the false statement which created the FD

7   1023.  That's what he's pled guilty to.  But now the

8   Government wants to expand it even further to say, Oh, well,

9   he repeated the false statement in 2023 after all of this is

10  already being accounted for.  So, let's just hit him with

11  another enhancement on top of that.  But, if you look at

12  what is actually expressly stated in the indictment and you

13  look at the guidelines where it specifically says definition

14  of high level victim or official victim is Vice President or

15  President --

16          THE COURT:  Right.

17          MR. SCHONFELD:  -- at the time that the false

18  statement for which Mr. Smirnov was indicted for and for

19  which he pled guilty to was made, it doesn't meet the

20  definition of high level official victim.

21          MR. WISE:  In the plea agreement, the Defendant

22  specifically admitted he made the false statement in 2023 as

23  well.  That's part of the factual statement.  It's also in

24  the indictment.  It's also in --

25          THE COURT:  It's in the indictment.

(28 of 253), Page 28 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 28 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 20 of 67   Page ID
#:2826

20

1       MR. WISE:  And it's also in paragraph 27 of the

2  PSR which they haven't objected to.  So, it is -- they've

3  admitted he made the false statement.  The legal question of

4  whether it's relevant conduct we think is -- is clear, and

5  the President was -- Joe Biden was the President in 2023

6  when he repeated, as your Honor has pointed out, the false

7  claims he had made earlier in 2020.

8       And the last thing counsel just said, there's no

9  inconsistency.  The reason we were interviewing him in 2023

10 was because substantial government resources were being

11 expended in the second investigation of his false claims.

12 It was right at the -- right in the middle of that.

13      MR. CHESNOFF:  Which would not have occurred if

14 the deal with Hunter Biden hadn't blown up.

15      MR. WISE:  That's ridiculous.  It's completely

16 ridiculous.  You know, when they lose on the facts and the

17 law, they do the old trick of attacking the prosecutors.

18 That's -- that's the -- the last play in the play book, and

19 I'm not even going to dignify it by responding to it.

20   (Pause.)

21      THE COURT:  Well, while I enjoy this tremendously,

22 this two points that we're arguing over, we're talking about

23 a difference of guidelines of 37 to 46 versus 46 to 57, and

24 I am not contemplating a sentence anywhere near either of

25 those ranges.  So, like I say, this is an interesting point,

(29 of 253), Page 29 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 29 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 21 of 67   Page ID
#:2827

21

1  but it isn't going to affect the outcome here, okay.  And I

2  can say that with some confidence.

3       Whether I like it or not, whether I like being

4  constrained by the parties' agreements or not, I have agreed

5  to be constrained by the parties' agreement, and that's what

6  I intend to do, and the resolution of this particular

7  argument that we're having now is not going to affect that

8  at all because you all agreed to a range, and I held my

9  nose, and I agreed to accept that deal and apply the top end

10 of that range.

11      So -- so, would anyone else like to say anything

12 on the record before we get to providing Mr. Smirnov with an

13 opportunity to address the Court on the issue of his

14 sentence?

15      MR. CHESNOFF:  Court's indulgence, please.

16    (Pause.)

17      MR. CHESNOFF:  Your Honor, I just had a --

18      THE COURT:  Yes.

19      MR. CHESNOFF:  I was going to make some comments

20 in mitigation, if the Court would permit me.

21      THE COURT:  I imagine it's going to be a

22 repetition of those, what is it, eight or so letters that

23 I've seen.

24      MR. CHESNOFF:  Well, I would hope not, your Honor,

25 because --

(30 of 253), Page 30 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 30 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 22 of 67   Page ID
#:2828

22

1          THE COURT:  What -- I'm sure it's not going to be

2   something that --

3          MR. CHESNOFF:  It was really mostly --

4          THE COURT:  -- we're just --

5          MR. CHESNOFF:  -- about the 12 years of service to

6   the United States that Mr. Smirnov performed.

7          THE COURT:  I wouldn't -- well, okay.  You can do

8   whatever you want.

9          MR. CHESNOFF:  Your Honor, the Government, before

10  we began, agreed that I could address some of the things

11  that were covered by the protective order.  So, I want to

12  have that on the record, and I will make some comments if I

13  may, your Honor.  Thanks.

14         THE COURT:  Sure.

15         MR. CHESNOFF:  May it please the Court, it's

16  difficult to argue for mitigation when you kind of have an

17  idea of the position the Court's taken.  The only thing I

18  would ask you in listening to me, your Honor, is that you

19  consider a sentence below the 72 months that's at the top.

20         THE COURT:  Um-hmm.

21         MR. CHESNOFF:  The reason we gave a range was that

22  we had an argument in our minds for the 48 months, which is

23  more consistent with the findings of the Probation Office in

24  the PSR than the 72 months which the Government will ask you

25  for.

23

1    Mr. Smirnov, born in Ukraine, grew up in Israel,
2 served in the military. From the military, he worked for
3 another agency within the Israeli government. He came to
4 the United States. He was involved with someone from Health
5 and Human Services, a special agent, in helping to uncover
6 healthcare fraud. So, he worked as a informant on behalf of
7 this agent and successfully. He did that out of a -- a
8 desire to serve and also, quite candidly, because some of
9 the people that he was providing information about had --
10 had wronged him.

11    From that point in time, your Honor, he became a
12 CHS for the FBI. Most of my experience, your Honor, has
13 been cross examining people who are confidential informants,
14 but in this case I learned a lot. I learned that someone
15 could be a confidential source that did it for the reasons
16 that were reflected year after year after year after year by
17 the FBI agent who was his handler, that Mr. Smirnov did it
18 for reasons of patriotism and public service.

19    There are 12 years of reports from the handler who
20 dealt with Mr. Smirnov which every year validate every level
21 of veracity, truthfulness, hard work, and effort on behalf
22 of -- by Mr. Smirnov on behalf of the United States
23 Government.

24    Most handlers only handle a confidential human
25 source for five years. This FBI agent, because of the

(32 of 253), Page 32 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 32 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 24 of 67   Page ID
#:2830

24

1  success that he had with Mr. Smirnov, kept him for 12 years.

2  Most FBI agents who get reassigned to another office, field

3  office, don't take their CHS with them.  In this case, the

4  FBI agent took Mr. Smirnov with him, contrary to the normal

5  policy of the FBI.

6             THE COURT:  And why was this?

7             MR. CHESNOFF:  Excuse me, your Honor?

8             THE COURT:  Why?

9             MR. CHESNOFF:  Because of the effectiveness of Mr.

10 Smirnov.

11            THE COURT:  And that's what the handler said?

12            MR. CHESNOFF:  Yes.

13            THE COURT:  That that's why he took him along with

14 him and that's why he --

15            MR. CHESNOFF:  Yes.

16            THE COURT:  -- hung onto him for --

17            MR. CHESNOFF:  Yes.

18            THE COURT:  -- over five years?

19            MR. CHESNOFF:  Yes.

20            THE COURT:  Okay.

21            MR. CHESNOFF:  And he developed a personal

22 relationship with him.  they socialized together.  He went

23 to Mr. Smirnov's house.  He met his family.  He met his

24 relatives, which is kind of peculiar and a little bit

25 contrary to FBI policy, but because of the relationship that

(33 of 253), Page 33 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 33 of 253
Case 2:24-cr-00091-ODW    Document 219    Filed 01/09/25    Page 25 of 67    Page ID
#:2831

25

1  the handler developed with Mr. Smirnov, that's the

2  relationship they developed.

3          THE COURT:  I'm beginning now to question this

4  handler.

5          MR. CHESNOFF:  Well, if he had testified, we

6  probably would have been questioning him too, your Honor.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  Most importantly, your Honor, he

9  was involved with information for multiple field offices of

10  the FBI throughout the United States.  He was involved in at

11  least 50 to 100 investigations.  He was given permission at

12  risk to himself to wear recording devices in order to

13  infiltrate organized crime, money laundering organizations,

14  major fraud organizations, and he did all of this at the

15  direction and with the assistance of the handler who year

16  after year wrote reports to his superiors about Mr. Smirnov

17  and his effectiveness.  And those people then would sign off

18  on Mr. Smirnov, and then those above them would sign off on

19  Mr. Smirnov.  At no time during the 12 years, other than as

20  a result of what occurred in this case, did anybody ever

21  question Mr. Smirnov's honesty or veracity.

22          Another interesting thing, your Honor, is in the

23  indictment it talks about Mr. Smirnov having an animus

24  towards the President.  Interestingly, in the materials that

25  we've reviewed, we have reviewed text messages from the

(34 of 253), Page 34 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 34 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 26 of 67   Page ID
#:2832

26

1  handler to Mr. Smirnov, which, unlike Mr. Smirnov's about

2  perhaps Mr. Biden, the handler would regularly ridicule

3  President Trump.  So, that's the kind of relationship they

4  had, and that's what went on during their relationship.  So,

5  this wasn't a one way street, your Honor.

6        You've seen the letters.  The letter from his

7  sister is a beautiful letter.  He took care of his stepson

8  who was a -- a Marine who now works for the U.S. Government.

9  He cared for him, as a father would, even though he was not

10 his real father.

11        Your Honor also knows about the terrible eye

12 condition that he suffers from.  And I remember in the

13 beginning the Court made the comment to me that you would

14 not want to see him suffer.  He has.  They've done what they

15 can short of surgery while in the custody of the Marshals,

16 but the fact is he is now legally blind, and that's been

17 defined by the doctor who's treated him for years who

18 reviewed the records that have occurred since he's been in

19 custody, and he's -- he's now legally blind.

20        What I want to tell you about that is this, your

21 Honor.  I've had a lot of clients over the years.  Mr.

22 Smirnov has never once been what I would describe as a

23 whiner or a complainer or even get angry.  He understood the

24 circumstances he was in and ultimately made a decision to

25 accept responsibility for the one transgression that

(35 of 253), Page 35 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 35 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 27 of 67   Page ID
#:2833

27

1  occurred in all these years that he was serving the country.

2         Normally, your Honor, when you're doing a

3  sentencing of someone who's been in a confidential

4  informant, the Government is asking for a departure, a 5K.

5  This is a de facto request for a 5K from us.  This is a de

6  facto request for us to say to you, your Honor, if somebody

7  does what he did over all this period of time, regardless of

8  the fact that ultimately he did something that the

9  Government finds offensive and which people find offensive

10 in terms of President Biden, the fact is, your Honor,

11 nothing was done about his improper statement for three

12 years after it was allegedly made, and they all worked with

13 him for three more years.

14        Now, the Government's going to say they didn't

15 know about it.  They had every opportunity to investigate

16 him in 2020 when the statement was made.  Why it wasn't

17 done?  Perhaps the handler, perhaps his supervisors didn't

18 think it was as consequential as it ultimately became.  But

19 it's an irony, your Honor, kind of a sad irony that the

20 whole investigation would not have occurred but for the

21 investigation of Hunter Biden who now has been pardoned,

22 faces no punishment, and Mr. Smirnov is the one facing a

23 punishment even though he is a tangential part of that

24 investigation.  So, again, your Honor, we're asking you to

25 mitigate based on the entire circumstances here, and that

(36 of 253), Page 36 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 36 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 28 of 67   Page ID
#:2834

28

1   will tell the American people that if your dad isn't the

2   President, you still may get some relief in the justice

3   system.  But right now, the President's son gets away with

4   it, and Mr. Smirnov is sitting here facing 48 to 72 months.

5          THE COURT:  Okay.  Are you saying Hunter Biden lie

6   to the FBI regarding bribes?

7          MR. CHESNOFF:  No.  He lied to the ATF about his

8   drug use and purchasing a weapon.  So, he's a liar.

9          THE COURT:  That's a separate deal, isn't it,

10  besides what we're talking about, the circumstances --

11         MR. CHESNOFF:  It is, your Honor.  And I'm not

12  saying --

13         THE COURT:  Well, don't --

14         MR. CHESNOFF:  -- that --

15         THE COURT:  -- don't start conflating things,

16  because I'm trying to follow your argument.  I'm trying to

17  follow the rationale within your argument.

18         MR. CHESNOFF:  Okay.  I'm just trying to tell you

19  that it doesn't seem very fair to the general public that

20  one guy gets away with it and he gets left holding the bag.

21  That's all I'm trying to say.

22         THE COURT:  There's something I want to say, but

23  something tells me just leave it alone.

24         MR. CHESNOFF:  All right.

25         THE COURT:  Talk about disparate treatment.  Okay.

(37 of 253), Page 37 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 37 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 29 of 67   Page ID
#:2835

29

1            MR. CHESNOFF:  All right.  That's fine.

2            THE COURT:  All right.

3            MR. CHESNOFF:  Your Honor, the guidelines are

4   advisory, but the --

5            THE COURT:  Yes.

6            MR. CHESNOFF:  -- 3553 factors aren't.

7            THE COURT:  Yes.

8            MR. CHESNOFF:  You must consider those.

9            THE COURT:  Yes.

10            MR. CHESNOFF:  No prior criminal record, service

11   to the -- the country, paid now in full the tax bill that he

12   had as a result of the second case.

13            THE COURT:  Okay.

14            MR. CHESNOFF:  So, he's done things to mitigate,

15   and he's done things to show the Court that he is accepting

16   responsibility for his conduct.

17            THE COURT:  You said he was in the military.  What

18   -- whose military was he in?

19            MR. CHESNOFF:  IDF, Israeli Defense --

20            THE COURT:  Israeli?

21            MR. CHESNOFF:  Yes.

22            THE COURT:  For how long was he in the IDF?

23            MR. CHESNOFF:  Short period of time when he was

24   recruited to do something else for the Israeli government.

25            THE COURT:  What short period of time?  What does

(38 of 253), Page 38 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 38 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 30 of 67   Page ID
#:2836

30

1   that mean?

2           MR. CHESNOFF:  I don't know the exact amount, but

3   I don't think it was more than months.

4           THE COURT:  And then he was recruited to --

5           MR. CHESNOFF:  Perform other --

6           THE COURT:  -- assist Israel in another function?

7           MR. CHESNOFF:  Right.

8           THE COURT:  Okay.

9           MR. CHESNOFF:  Which is secret.

10          THE COURT:  Okay.  Fine.

11          MR. CHESNOFF:  Your Honor, he assisted 10 field

12  offices of the FBI during those 12 years.  He helped with

13  the apprehension of institutional, international

14  transnational money launderers.  He was responsible for

15  multiple convictions.  He was involved in fighting against

16  organized crime at the direction of his handler.  All of

17  those things are the kind of things that if we were here on

18  a 5K, an Article III judge like yourself would say,

19  Absolutely require me to reduce and mitigate the punishment.

20  So --

21          THE COURT:  You know what?  But the thing is in

22  such a case, there'd be a defense attorney like you that

23  would be arguing against believing anything that this

24  Defendant said because he's a -- he's an out and out career

25  crook.  And then my response is, How do you expect to ever

*Echo Reporting, Inc.*

31

1  get embedded into some of these criminal organizations

2  without being a crook?  I can't present myself to one of

3  these organizations and -- and claim to be -- and try to be

4  a party to that -- their enterprise.  I can't.  I don't have

5  the pedigree.  So --

6           MR. CHESNOFF:  He did it at the direction of the

7  FBI, your Honor.

8           THE COURT:  It doesn't matter.

9           MR. CHESNOFF:  He didn't --

10          THE COURT:  I -- I -- the FBI can direct me to

11  infiltrate, I don't know, MS-13, right.

12          MR. CHESNOFF:  He didn't.

13          THE COURT:  I can't.

14          MR. CHESNOFF:  But, your Honor --

15          THE COURT:  I don't have the wherewithal.

16          MR. CHESNOFF:  -- their responsibility was to

17  determine whether he was breaking the law doing what he was

18  doing for them, and at no time in the 12 years did the FBI

19  ever determine that he did anything that was illegal.

20          He wasn't working off the case, your Honor.  He

21  did this voluntarily at the request of his handler and the

22  FBI.  He was a vital source of assistance to the FBI.  He's

23  multilingual.  He's a very charismatic person and he was

24  able to make connections that the FBI could not have made

25  without him, but he wasn't doing it to work off a case.  He

*Echo Reporting, Inc.*

(40 of 253), Page 40 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 40 of 253
Case 2:24-cr-00091-ODW  Document 219  Filed 01/09/25  Page 32 of 67  Page ID
#:2838

32

1  was doing it because he was serving the country.

2          THE COURT:  Hmm.

3          MR. CHESNOFF:  Well, it's the fact, your Honor.

4          THE COURT:  Okay.  All right.

5          MR. CHESNOFF:  Okay.  In any event, your Honor, I

6  would ask you in considering his contributions and

7  considering his lack of violent history and considering his

8  contributions as a CHS, to mitigate the sentence and not to

9  give him the 72 months.

10          THE COURT:  Okay.  We don't have to talk about and

11  you don't -- you know --

12          MR. CHESNOFF:  Okay.

13          THE COURT:  No one has talked about it.  No one's

14  brought it up, about the falsehoods to the Court when he was

15  initially arrested and everyone is making arguments for

16  release on -- on bond or bail, and everyone's saying, I

17  don't know, he's only got like $1500.  So -- --

18          MR. CHESNOFF:  Well, you need to understand the

19  context of that, your Honor.

20          THE COURT:  Yeah, the context was --

21          MR. CHESNOFF:  He -- he didn't lie.

22          THE COURT:   -- we were looking for some basis

23  upon which to assure his appearance in court, and, you know,

24  a pretty hefty bail might do that, might provide that

25  incentive, and he says, "Well, I've only got" -- you know,

33

1   it was a little over a thousand dollars.  And that was the

2   representation to the Court, correct?

3            MR. CHESNOFF:  The question was, "What do you

4   personally have," and he represented what he personally had.

5   he did not represent what companies had that he had a

6   position in.

7            THE COURT:  Okay.

8            MR. CHESNOFF:  But that was because this was done

9   immediately upon his arrest, and at no time did anybody ever

10  say to him, Please describe to me what LLCs you may be a

11  part of, and it happened at the moment.

12           But you got to remember this too, your Honor.  He

13  was out for two days.  He didn't go anywhere.  All he did

14  was come to our office to go to work.  So, the idea that

15  somehow he was a flight risk, he disproved that.  So, I

16  understand the Court's concern, but I don't really believe

17  he lied to the Court.

18           THE COURT:  Okay.

19           MR. CHESNOFF:  And, with that, I thank you.

20           THE COURT:  Thank you, sir.

21           MR. CHESNOFF:  When do you want Mr. Smirnov to

22  allocute, your Honor?

23           THE COURT:  Trust me, I'll be able to make that

24  invitation as I do every sentencing.

25           MR. CHESNOFF:  Okay.  He asked me.  That's why I

*Echo Reporting, Inc.*

(42 of 253), Page 42 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 42 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 34 of 67   Page ID
#:2840

34

1    asked, your Honor.

2            THE COURT:  Who asked who?

3            MR. CHESNOFF:  Mr. Smirnov asked me.

4            THE COURT:  Oh, tell him to sit tight.  It's

5    coming.

6            MR. WISE:  So, just picking up on your Honor's --

7    on the last point, you know, we -- what the tax case

8    revealed was that he was using these other accounts as his

9    personal piggy bank.  So the idea that he's asked what kind

10   of resources do you have access to and he says a thousand

11   dollars when he's got $6 million in these various accounts

12   was a lie.  And we've maintained that from the beginning,

13   and it was why we, among other factors, believed he was a

14   flight risk.

15           I'll briefly address some of what counsel has

16   said, and obviously I'm not going to repeat what's in our

17   sentencing memorandum.  I don't want to waste the Court's

18   time, but I'll -- I'll put on the record our position.

19           You know, the -- the question this case raises is

20   how did the Defendant repay the United States for the

21   generosity it showed him.  And the way he repaid it was by

22   lying to it.  Now, the -- the United States welcomed the

23   Defendant many years ago and had offered him security and

24   prosperity and freedom, and in 2015, it bestowed on him one

25   of the most precious gifts our government can give, and

*Echo Reporting, Inc.*

(43 of 253), Page 43 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 43 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 35 of 67   Page ID
#:2841

35

 1  that's citizenship.  And in the case of the Defendant, the

 2  security America afforded him was real, and we know that

 3  given that the two countries in which he's lived are at

 4  ward.  And the prosperity that America afforded him was also

 5  real and has -- as the Government learned, he made more than

 6  $2 million in 2020 and 2021 and 2022 alone.

 7           Now, our country imposes very few positive

 8  obligations on its citizens.  In many countries, military

 9  service is compulsory but not here.  In many countries,

10  voting is compulsory, but not here.

11           So, what are the obligations that are imposed on

12  citizens?  Well, jury service, the important work that goes

13  on in these courtrooms, and really taxes.  And, so, how did

14  the Defendant meet his obligations?  He didn't.  And this is

15  something that was completely absent from counsel's

16  argument.  He said one transgression, one transgression.

17  Well, he lied and cheated on his taxes for years.  He filed

18  -- he lied about the millions of dollars he made.  He filed

19  false tax returns.  He even claimed credits for poor people

20  and people struggling to make ends meet, for instance, the

21  Earned Income Tax Credit and Pandemic Rebate, all the while

22  living in luxury in California and Las Vegas, driving a

23  Bentley, spending hundreds of thousands of dollars on

24  clothes and accessories for himself and his longtime

25  girlfriend.

(44 of 253), Page 44 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 44 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 36 of 67   Page ID
#:2842

36

1        The Defendant stands before your Honor today not

2   because of a single transgression, a single bad decision, a

3   mistake or a momentary lapse in judgment.  He's here because

4   he engaged in multiple crimes and different crimes over a

5   period of years, and it's those crimes that reflect his

6   character.

7        And the common theme that runs through these

8   crimes is lies.  He lied on his taxes to evade his

9   responsibility to pay his fair share, and -- and, most

10  importantly, he lied to the FBI about the most important

11  thing he ever told them, that the former Vice President of

12  the United States who was then a candidate for President and

13  the presumptive nominee of one of the two major parties had

14  taken bribes, and he did this to influence the outcome of

15  the presidential election of that year, as evidenced by the

16  messages he sent to his FBI handler that are included in the

17  indictment and in our sentencing memo.  That's how he repaid

18  the generosity of the United States, by lying to the federal

19  -- by lying to federal law enforcement in an attempt to

20  influence a presidential election.

21        And, so, counsel's main argument at the podium

22  here and then in their sentencing memorandum for why he

23  deserves a sentence at the low end of the range, a four-year

24  sentence, as opposed to a sentence at the high end, the six

25  years, which is what the Government believes is appropriate,

(45 of 253), Page 45 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 45 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 37 of 67   Page ID
#:2843

37

1 is to point to his work as an informant and to

2 mischaracterize that works as service to the FBI, and they

3 say this again -- again and again in their -- in their

4 memorandum.  In the very first sentence, the write:

5              "The Defendant effectively and

6              faithfully served the FBI for over a

7              decade."

8         But, of course, that's not true because in 2020,

9 he lied to them.  And, to be clear, informants don't serve

10 the FBI.  They're paid for the information they provide.

11 Counsel said he did this voluntarily.  He got $300,000 for

12 this.  And much of the information that informants provide

13 is not useful.  Some of it is, and that was certainly the

14 case here.

15         In sum and substance, he had a transactional

16 relationship with the FBI.  He's not like a cooperator in a

17 case working off time.  He was paid for his time and his

18 information.

19         And informants are, as your Honor pointed out, by

20 definition, people who are involved in crime or have

21 relationships with people who are involved in crime.  They

22 are not and this Defendant is not people of good character.

23         And in support of their inaccurate claim -- and

24 this is in their -- this is in their sentencing memo -- that

25 the Defendant effectively and faithfully served the FBI for

*Echo Reporting, Inc.*

(46 of 253), Page 46 of 253   Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 46 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 38 of 67   Page ID
#:2844

38

1   over a decade, they write -- and this is a quote:

2              "His FBI handling agent also

3         documented Mr. Smirnov's reporting was

4         honest and forthright."

5        That's on page 12 of their memorandum.  But they

6   omit -- they omit what comes next in the report that they

7   quote, and what comes next is -- and this is -- first, this

8   is the part they quote:

9              "Generally -- generally, the

10        handling agent believes reporting to be

11        honest and forthright.  However, the

12        handling agent notes that the Defendant

13        has shown some reluctance to provide

14        specifics concerning friends and family

15        residing in Israel and Russia who are

16        providing various -- with various

17        subsource reporting.  The Defendant also

18        has close friends in the U.S. who are

19        engaged in various criminal activities,

20        has reported some of these activities,

21        but the handling agent expressed that

22        they may have been minimized."

23        So, even their central claim that he was honest

24   and forthright is qualified.  But then they double down on

25   this, and they go on to say:

39

1              "Mr. Smirnov's reporting accuracy

2              and honesty was never once questioned by

3              his government handlers."

4         Well, that again is not true based on what I just

5    read, but it's also not true based on the last report that

6    they quote, the last validation report that covers him where

7    there's various concerns expressed.  In fact, the ultimate

8    conclusion the FBI recommended, their validation unit

9    recommended, was that the Defendant should not be continued

10   for operations.  They recommended that FBI Seattle take

11   steps to determine whether the Defendant is involved in any

12   criminal activity such as money laundering, bribery or

13   impersonating an FBI agent.  And if they determined that he

14   did, the FBI should consult with the highest level of FBI's

15   leadership.  The validation unit recommended that FBI

16   Seattle suspend operations and taskings for the Defendant

17   until completing additional vetting measures to ascertain

18   whether Defendant is fully under FBI Seattle's control, and

19   all of this was before he was charged.  So, it is not the

20   case -- it is not the case that no one ever questioned him.

21        But the hyperbole ramps up even further, and in

22   addressing the 3553(a) factors, they write that:

23             "The public (that is, the grateful

24             United States citizens who Mr. Smirnov

25             helped by serving as their effective

*Echo Reporting, Inc.*

(48 of 253), Page 48 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 48 of 253
Case 2:24-cr-00091-ODW    Document 219    Filed 01/09/25    Page 40 of 67    Page ID
#:2846

40

1        CHS) will not need to be protected."

2        Grateful United States citizens.  You mean the

3   people that paid their taxes when the Defendant cheated on

4   his and the voters who would have been manipulated if the

5   Defendant's lies had become public in 2020 or when they did

6   become public in 2023?  And while the Defendant wasn't

7   paying his taxes, he was getting $300,000 worth of taxpayer

8   money for the information he was providing.  And, so, at the

9   end of the day, the American public doesn't owe this man

10  anything.

11       As we lay out in our memorandum, your Honor, the

12  3553(a) factors support a 72-month sentence.

13       As to the 3553(a)(1) factors, the nature and

14  circumstances of Count 1 of the obstruction indictment, the

15  Defendant decided in 2020 to exploit the position of trust

16  he enjoyed with the FBI in order to provide false

17  information about one of the candidates for President of the

18  United States in an attempt to influence the outcome of the

19  election.  The information he provided which was

20  memorialized in a 2020 1023 was detailed and specific and

21  was clearly designed to deceive the FBI into pursuing a

22  public investigation into the then candidate, and the FBI

23  did investigate the Defendant's allegations but closed the

24  investigation without it becoming public.  And the false

25  2020 1023 ultimately did become public in the summer of 2023

(49 of 253), Page 49 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 49 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 41 of 67   Page ID
#:2847

41

1  and again threatened to influence a U.S. Presidential

2  election when the FBI chose to reexamine it.  And it's the

3  indictment in this case that resulted from that second

4  investigation.  Thus, his false statements in 2020 which

5  caused the creation of that document threatened the

6  integrity of not one but two U.S. Presidential elections.

7          As to the nature and circumstances of the tax

8  offenses, those are described in detail.  He earned a

9  substantial amount of money.  Instead of paying taxes he

10  owed as an American citizen, he instead filed multiple false

11  returns over a three-year period in his name, in another

12  person's name, and in the name of a business.

13          As to the history and characteristics of the

14  Defendant, the Defendant may have provided information to

15  the FBI that was not false in connection with other

16  investigations, but that is not a mitigating factor.  It led

17  -- it directly contributed to the crime he committed.  It

18  led to the position of trust that he exploited in 2020.  Put

19  another way, the FBI investigated the allegations leveled by

20  the Defendant in the 2020 1023 in 2020 and again in 2023

21  precisely because they trusted him, and they trusted him

22  because some of the information the Defendant had previously

23  provided had proven to be accurate.

24          Now, in various pretrial filings in this case,

25  defense counsel has again claimed that Defendant served the

*Echo Reporting, Inc.*

(50 of 253), Page 50 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 50 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 42 of 67   Page ID
#:2848

42

1  Government.  And, again, he didn't.  He was paid for his

2  information, and that was the extent of his relationship.

3          He was a sophisticated -- he is a sophisticated

4  individual, sophisticated enough to generate more than $2

5  million in income but also to know to file all of these

6  false returns in order to cover his tracks.

7          And, finally, these crimes were not, again, an

8  aberration, a single bad decision.  They were -- they were

9  carried out over -- over years.

10          As to the factors under 3553(a)(2), those -- that

11  portion of the statute requires the Court to consider the

12  need for a sentence to reflect the seriousness of the

13  offense, to promote respect for the law, to provide just

14  punishment, and to afford adequate deterrence and to protect

15  the public.  And, again, we -- we submit a sentence of 72

16  months is sufficient but not greater than necessary to meet

17  those factors.

18          As we cite in our sentencing memorandum, tax

19  crimes are indisputably serious.  That's the Tomco case.

20  And the guidelines themselves talk about how tax crimes such

21  as this one with significant hidden income is more serious

22  and should be treated as such.

23          As to the -- as to causing the creation of the

24  false 2020 1023, interfering in a U.S. Presidential election

25  by falsely accusing a candidate of one of the two major

43

1  parties of corruption is among the most serious kinds of

2  election interference one can imagine, and the fact that the

3  Defendant's false accusations were investigated not one but

4  during two successive presidential elections effectively

5  doubled the severity of his crime.  In each election cycle,

6  America's adversaries attempt and in some cases successfully

7  spread misinformation.  And sentencing the Defendant to 72

8  months of incarceration will deter messengers like him of

9  such misinformation by demonstrating that if they are

10  caught, they will be punished.

11          Finally, the -- the public must be protected from

12  activities designed to distort our elections through the

13  introduction of misinformation, a further reason for a

14  sentence of 72 months.

15          With that, I'll end, your Honor, unless the Court

16  has any questions, and thank you for your time and

17  consideration.

18          THE COURT:  Thank you, sir.

19          Does any other defense counsel wish to make any

20  remarks?

21          MR. CHESNOFF:  No, thank you, your Honor.

22          THE COURT:  All right.  Mr. Smirnov, by statute,

23  you are permitted to address the Court at this time on the

24  subject of your sentencing.  Now is the time.  I'll say

25  this.  It's not necessarily a part of this proceeding, but

44

1  it happens to be my practice that I cannot make a decision

2  with respect to sentencing until I have heard from the

3  Defendant because up until this point, I hear from everyone

4  but the Defendant, and I know very little about the

5  Defendant, and I don't feel comfortable imposing any kind of

6  punitive outcome on someone that I just don't know at all.

7           I would like to hear from you.  I would like to

8  get to know as much about you as I possibly can.  Otherwise,

9  I'm pretty much left to dealing with you as a number.  I

10  wouldn't want that.  I'm sure you don't want it.  I don't

11  want to be a party to that.  So, I hope you will take

12  advantage of this opportunity to -- to address the Court.

13          Now, you've heard a number of questions being

14  raised.  You can choose to address these questions or not.

15  That's completely up to you.  Okay.

16          MR. CHESNOFF:  Your Honor, may we -- may we -- not

17  knowing that that's how you proceed, may we have a short

18  recess to talk to Mr. Smirnov?

19          THE COURT:  Sure.

20          MR. CHESNOFF:  Thank you.

21          THE COURT:  All right.  Ten minutes.

22      (Proceedings recessed briefly.)

23          THE COURT:  All right.  Let's go back on the

24  record, which will reflect that all counsel and the

25  Defendant are present.

(53 of 253), Page 53 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 53 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 45 of 67   Page ID
#:2851

45

1          All right.  We had just reached the part where the

2     Defendant was invited to allocute if he so desired.

3          MR. CHESNOFF:  And, your Honor, based on your

4     comment that you wanted to get to know him, Mr. Smirnov

5     offered to do that in a CIPA setting so that he could really

6     talk to you about what he's done and where he comes from,

7     and I believe that that  was relayed to you as a request,

8     and I'm assuming -- based on what I understand, the Court

9     did not want to do that.

10          THE COURT:  No, I don't.  We've had -- well, the

11    Court's been exposed to confidential information.  We've had

12    our hearings, in camera hearings, including this morning,

13    and I've taken all of these things into consideration, and I

14    can understand why Mr. Smirnov would like to say the same

15    thing but in his own words, make sure that his audience

16    understands, you know, his point of view, and I think I've

17    got a grasp of his position on this and his position as to

18    the value of his -- his service as a confidential human

19    source.  I -- I think I've got it, and this is not my --

20    well, okay, maybe it's my second case involving informants

21    and how that mechanism works and what those folks are like

22    and what their bona fides generally are and have to be

23    demonstrated.  I think I understand.  And defense counsel

24    has done superb job of characterizing their client and their

25    client's role, and I think I've got it.  I can't imagine

*Echo Reporting, Inc.*

(54 of 253), Page 54 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 54 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 46 of 67   Page ID
#:2852

46

1   that I'm going to learn anything new.

2           MR. CHESNOFF:  He -- he just didn't want you to

3   continue with the perception that somehow all of his

4   involvement was because he was some kind of a crook or a

5   criminal, and he wanted to talk to you privately with the

6   Government present to express to you the history of his

7   involvement with them and to explain that, despite the

8   Government saying that 12 years of service is somehow

9   disrespectful to the American public, he wanted to tell you

10  the real relationship that he had with the FBI handler and

11  how he did this out of patriotism.

12          THE COURT:  Oh, oh.  That's going to be a hard

13  sell, okay.

14          MR. CHESNOFF:  That's why he wanted to --

15          THE COURT:  That's a hard sell because I -- I've

16  never seen a case where someone working in that undercover

17  capacity, working in the underworld goes to work every day

18  waving the flag.  Okay.  What they're actually waving is a

19  get out of jail free card or a -- some credits, hoping that

20  a prosecutor will step in and make some recommendations with

21  the sentencing court, but it -- it is not out of patriotism.

22  It is not altruism.  It is not charity, not by a long shot.

23          MR. CHESNOFF:  Your Honor, he wasn't working --

24          THE COURT:  It's about self-interest.

25          MR. CHESNOFF:  -- off the case.

(55 of 253), Page 55 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 55 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 47 of 67   Page ID
#:2853

47

1          THE COURT:  Pardon me?

2          MR. CHESNOFF:  He was never working off a case.

3          THE COURT:  I know that's what you said.

4          MR. CHESNOFF:  Well, it's true.

5          THE COURT:  Okay.

6          MR. CHESNOFF:  That's a fact.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  And, so, the Court's con --

9          THE COURT:  I've got I believe another set of

10 facts.

11          MR. CHESNOFF:  Well, I understand, but they're not

12 based in facts.  They're based in a perception that you

13 have.

14          THE COURT:  I know.

15          MR. CHESNOFF:  Which is an inaccurate on.

16          THE COURT:  I know, and you would not mislead the

17 Court.  Okay.

18          Now, what I --

19          MR. CHESNOFF:  No, I would not, your Honor.

20          THE COURT:  -- need to know at this point -- what

21 I need to know at this point is whether or not your client

22 desires to allocute or should we just move on.

23          MR. CHESNOFF:  He has something he'd like to read

24 to you, your Honor.

25          THE COURT:  Did he write it?

*Echo Reporting, Inc.*

48

1          MR. CHESNOFF:  With my assistance.

2          THE COURT:  That's what I thought.

3          MR. CHESNOFF:  Well, your Honor --

4          THE COURT:  Go ahead.

5          MR. CHESNOFF:  -- that is not uncommon for a

6  criminal defense lawyer to assist his client in structuring

7  what to say to an Article III judge.

8          THE COURT:  Okay.  Go ahead.  It's just -- all I'm

9  saying is it tends to be more effective when it comes from

10  the Defendant.

11          MR. CHESNOFF:  And that's why he wanted to talk to

12  you privately.

13          THE COURT:  Let's go.

14          THE INTERPRETER:  He's not going to read anything,

15  your Honor.

16      (Pause.)

17          THE COURT:  Go ahead, sir.

18          MR. SCHONFELD:  Your Honor, our client has changed

19  his mind.  He's going to --

20          THE COURT:  I'm not surprised.  All right.  Any

21  reason the Court cannot now proceed with the imposition of

22  sentence?

23          MR. WISE:  Not from the United States, your Honor,

24  no.

25          MR. CHESNOFF:  No, your Honor.

*Echo Reporting, Inc.*

(57 of 253), Page 57 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 57 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 49 of 67   Page ID
#:2855

49

1        THE COURT:  And no cause to the contrary appearing

2   to the Court and having considered the sentencing factors

3   enumerated at 18 U.S.C. Section 3553(a), including the

4   advisory guidelines range which I have just changed --

5        (Pause.)

6        THE COURT:  -- advisory guidelines range of 46 to

7   57 months based on an offense level of 23 and a Criminal

8   History Category I, it is ordered that the Defendant shall

9   pay to the United States a special assessment of $400, which

10  is due immediately.  Any unpaid balance shall be due during

11  the period of imprisonment at the rate of not less than $25

12  per quarter and pursuant to the Bureau of Prisons Inmate

13  Financial Responsibility program.

14       It is ordered that the Defendant shall pay

15  restitution in a total amount of $675,502 pursuant to 18

16  U.S.C. Section 3663 in Docket Number 24-CR-00702.

17       The amount of restitution ordered shall be paid to

18  the victim, Internal Revenue Service, and it shall be paid

19  in full immediately.

20       Defendant shall comply with the Second Amended

21  General Order 20-04.  Pursuant to guideline Section

22  5E1.2(a), all fines are waived as the Court finds that the

23  Defendant has established an inability to pay a fine.

24       Pursuant to the Sentencing Reform Act of 1984, it

25  is the judgment of the Court that Defendant, Alexander

50

1  Smirnov, is hereby committed on Count 2 of the indictment in

2  Case Number 24-CR-00091 and Counts 1, 5 and 8 of the

3  indictment in Case Number 24-CR-00702 to the custody of the

4  Bureau of Prisons for a term of 72 months.  This term

5  consists of 72 months on each of Count 2 of indictment 91

6  and Counts 1, 5 and 8 of indictment 702 to be served

7  concurrently.

8          The Court also recommends that the Defendant be

9  considered for participation in the Bureau of Prisons

10 Residential Drug Abuse Program.  That's PRDAP.  Upon his

11 release from imprisonment, he shall be placed on supervised

12 release for a term of two years.  This term consists of two

13 years on each --

14         MR. CHESNOFF:  Excuse me, your Honor.  The

15 stipulation in the plea agreement was for one year of

16 supervision.  That was part of the Rule 11 plea.

17         THE COURT:  Okay.  And if I don't do that and I

18 impose an additional year of supervised release, the deal's

19 off?

20         MR. CHESNOFF:  He would be permitted to withdraw

21 his plea.

22         THE COURT:  I know what he's permitted to do.

23         MR. CHESNOFF:  Okay.

24         THE COURT:  I'm asking you is he going to exercise

25 that.

*Echo Reporting, Inc.*

(59 of 253), Page 59 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 59 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 51 of 67   Page ID
#:2857

51

1        MR. CHESNOFF:  We'd have to talk to our client

2   because we're surprised that that's happened.

3        (Pause.)

4        MR. CHESNOFF:  May we talk to our client?

5        THE COURT:  Yeah.

6        (Pause to confer.)

7        MR. CHESNOFF:  Your Honor, may the Government and

8   I approach you at sidebar?

9        THE COURT:  Yes.

10        (Sidebar discussion off the record.)

11        (Pause to confer.)

12        THE COURT:  All right.  Okay.

13        (Pause.)

14        THE COURT:  All right.  Let me pick up where I

15   left off, and then I'm going to go back and discuss the --

16   the sentence.  Let me -- I left off with the supervised

17   release, and I am imposing one year of supervised release on

18   each count.  That's one year on Count 2 of indictment 91 and

19   one year on Counts 1, 5, and 8 of indictment 702,

20   concurrently, and the supervised release with respect to

21   Counts 1, 5 and 8 of indictment 702 shall be served

22   concurrently with the one year supervised release on

23   indictment 91.

24        All right.  Now, back to the -- to the -- the

25   Counts -- Count 2 of indictment 91, the sentence on Count 2

(60 of 253), Page 60 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 60 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 52 of 67   Page ID
#:2858

52

1  is 72 months.

2         With respect to indictment 702, Count 1 of that

3  indictment is a sentence of 60 months.  Count 5 of

4  indictment 702 is also a term of imprisonment of 60 months,

5  concurrently with the term of 60 months on Count 1.  Count 8

6  on indictment 702 is 12 months, and that will be consecutive

7  to the terms imposed on Counts 1 and 5 of indictment 702.

8  And the terms imposed on indictment 702 are to run

9  concurrently with the terms of imprisonment imposed in 91.

10         In the final analysis, the total term of

11  imprisonment on both indictments, all four counts, is 72

12  months.

13         Now, with respect to supervised release and the

14  various conditions of supervised release, Defendant shall

15  comply with the rules and regulations of the United States

16  Probation and Pretrial Services Office and Second Amended

17  General Order 20-04, including the condition of probation

18  and supervised release as set forth in Section 3 of that

19  general order.

20         Two, Defendant shall refrain from any unlawful use

21  of a controlled substance.  Defendant shall submit to one

22  drug test within 15 days of release from custody and at

23  least two periodic drug tests thereafter, not to exceed a

24  test per month as directed by the Probation Officer.

25         Three, Defendant shall participate in an

*Echo Reporting, Inc.*

53

1  outpatient substance abuse treatment and counseling program

2  that includes urinalysis, breath or sweat patch testing as

3  directed by the Probation Officer.

4          Defendant shall abstain from using alcohol and

5  using illicit drugs and from abusing prescription

6  medications during the period of supervision.

7          Four, as directed by the Probation Officer,

8  Defendant shall pay all or part of the cost of the court-

9  ordered treatment to the aftercare contractors during the

10  period of community supervision.  Defendant shall provide

11  payment and proof of payment as directed by the Probation

12  Officer.

13          Five, during the period of community supervision,

14  Defendant shall pay the special assessment and restitution

15  in accordance with this judgment's orders pertaining to such

16  payment.

17          Six, Defendant shall cooperate in the collection

18  of a DNA sample from himself.

19          Seven, Defendant shall apply all moneys received

20  from income tax refunds, lottery winnings, inheritance,

21  judgments and any other expected or unexpected financial

22  gains to the court-ordered financial obligations.

23          Eight, Defendant shall truthfully and timely file

24  and pay taxes owed for the years of conviction and shall

25  truthfully and timely file and pay taxes during the period

*Echo Reporting, Inc.*

(62 of 253), Page 62 of 253  Case: 25-400  04/25/2025, DktEntry: 11.1, Page 62 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 54 of 67   Page ID
#:2860

54

1  of community supervision.

2          Further, Defendant shall show proof to the

3  Probation Officer of compliance with this order.

4          Nine, Defendant shall not be self-employed nor be

5  employed in a position that does not provide regular pay

6  stubs with the appropriate deductions for taxes unless

7  approved by the Probation Officer.

8          Ten, Defendant shall comply with the Internal

9  Revenue Service's reporting requirements as they pertain to

10  virtual currencies and shall provide proof of having done so

11  to the Probation Officer.

12          Eleven, as directed by the Probation Officer,

13  Defendant shall provide to the Probation Officer, one, a

14  signed release authorizing credit report inquiries, two,

15  Federal and State Income Tax Returns and a signed release

16  authorizing their disclosure, and, three, an accurate

17  financial statement with supporting documentation as to all

18  assets, income, expenses and liabilities of the Defendant.

19          Twelve, Defendant shall submit his person,

20  property, house, residence, vehicle, papers, computers, cell

21  phones, other electronic communications or data storage

22  devices or media, email accounts, social media accounts,

23  Cloud storage accounts or other areas under Defendant's

24  control to a search conducted by a United States Probation

25  Officer or a law enforcement officer.  Failure to submit to

*Echo Reporting, Inc.*

55

1  a search may be grounds for revocation.  Defendant shall

2  warn any other occupants that the premises may be subject to

3  searches pursuant to this condition.  Any search pursuant to

4  this condition will be conducted at a reasonable time and in

5  a reasonable manner upon reasonable suspicion that Defendant

6  has violated a condition of his supervision and that the

7  areas to be searched contain evidence of this violation.

8          The Court authorizes the Probation and Pretrial

9  Services Office to disclose the Presentence Report to the

10 substance abuse treatment provider in order to facilitate

11 Defendant's treatment for narcotic addition or drug

12 dependency.  Further redisclosure of the Presentence Report

13 by the treatment provider is prohibited without the consent

14 of this Court.

15         Now, pursuant to 18 U.S.C. Section 3553(a), the

16 Court is obligated to impose a sentence that is sufficient

17 but not greater than necessary to comply with the purposes

18 of 3553(a)(2).  The Court in determining the particular

19 sentence to be imposed has considered the nature and

20 circumstances of the offense and the history and

21 characteristics of the Defendant.  The Court has recognized

22 the need for the sentence imposed to reflect the seriousness

23 of the offense, that it should promote respect for the law

24 and provide just punishment for the offense.  It should

25 afford adequate deterrence to future criminal conduct and

56

1   protect the public from further crimes of the Defendant and

2   provide the Defendant with needed correctional treatment in

3   the most effective manner.

4        The Court has considered the various kinds of

5   sentences available and the guideline sentencing range.  The

6   Court also has recognized the need to avoid unwarranted

7   sentence disparities among defendants with similar records

8   who have been found guilty of similar conduct, and the Court

9   also recognizes the need to provide restitution to the

10  victims of the offense.

11       Before the Court is Alexander Smirnov, a 44-year-

12  old Defendant who pleaded guilty to two separate dockets.

13  In one docket he pleaded guilty to one count charging

14  falsification of records in a federal investigation -- and

15  that's Docket 91 -- while in the other docket, he pleaded

16  guilty to three counts charging tax evasion.  That's Docket

17  702.

18       Regarding the falsification of records charge, Mr.

19  Smirnov was a confidential human source with the Federal

20  Bureau of Investigation where he provided information to the

21  FBI and was admonished about being truthful on many

22  occasions.  However, Smirnov provided false statements

23  regarding Public Official 1 in 2020 who was the former Vice

24  President of the United States and a candidate for President

25  of the United States, now the current President of the

*Echo Reporting, Inc.*

(65 of 253), Page 65 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 65 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 57 of 67   Page ID
#:2863

57

1  United States.

2          These statements were memorialized by the FBI and

3  were fabrications.  When interviewed by the FBI, Smirnov

4  repeated some of the false claims and promoted a new

5  falsehood about the son of Public Official 1.  According to

6  information provided by the Government, the FBI and the

7  United States Department of Justice assigned investigators

8  to assess the truth of the allegations made by Smirnov and

9  included a congressional oversight process.

10          Also in 2020, Smirnov sent his handler a series of

11 messages that expressed bias against Public Official 1.

12 These messages were sent electronically via messaging

13 platforms or applications.

14          Regarding the tax evasion charges from 2020 to

15 2022, Smirnov received income from multiple sources that he

16 used to pay for personal expenses related to himself and his

17 domestic partner.  He concealed these earnings by filing

18 false tax forms for himself and his domestic partner as well

19 as the business Goldman Investment Group.  According to the

20 Government, Smirnov owes the Internal Revenue Service a

21 total outstanding tax of $675,502, which is broken down as

22 follows for the following tax years:

23          $458,744 for the year 2020, $145,171 for the tax

24 year 2021, and $71,587 for the tax year 2022.

25          Aside from the instant dockets, Smirnov has no

(66 of 253), Page 66 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 66 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 58 of 67   Page ID
#:2864

58

1  prior convictions.  He was assessed with zero criminal

2  history points and placed into Criminal History Category I.

3  Under the current Sentencing Guidelines Manual, Smirnov

4  appears to be eligible for the zero point offender

5  reduction.

6          The advisory guidelines have accounted for the

7  facts of the case, including the counts of conviction, the

8  substantial interference with the administration of justice,

9  the especially probative document involved, the victim being

10 a former government officer at the time of the offense, the

11 abuse of a position of trust, the amount of tax lost, the

12 sophisticated means used for the tax evasion, the multiple

13 count adjustment, Smirnov's acceptance of responsibility and

14 the zero point offender reduction.

15         By pleading guilty, Smirnov has accepted

16 responsibility.  By participating in an interview, Smirnov

17 has complied with the Probation Officer.

18         He was raised by his mother and stepfather.  He

19 was raised by them in the Soviet Union until he was 11 years

20 old when he moved to Israel.  Smirnov's basic necessities

21 were met as a child.  He suffered from no financial

22 hardships.  He was close to his family and spent time with

23 his family by traveling and going to the movies.

24         He notes having a normal upbringing.  He maintains

25 relationships with his mother, stepfather, and sister who

(67 of 253), Page 67 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 67 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 59 of 67   Page ID
#:2865

59

1  are supportive of him.  Smirnov maintains a minimal contact

2  with his father and has contact with him only once yearly.

3         Regarding his physical health, Smirnov reports

4  that he has glaucoma in both of his eyes and has had many

5  surgeries that he cannot recall the number of.  He currently

6  legally -- he is currently legally blind in both eyes.

7  Smirnov reports that he has to take medications and several

8  eye drops to prevent further deterioration of his eyesight.

9         Smirnov further reports that he has had tetanus in

10 his heart for the past few weeks while he has been in

11 custody and was transported to a hospital.  He has been

12 referred to a cardiologist which is currently pending.

13        Regarding his mental health, Smirnov reports that

14 he has no history of mental or emotional health problems and

15 no history of treatment for such problems.  He also reports

16 the he has no gambling problems.

17        Regarding his substance abuse, he reports that he

18 has used alcohol, marijuana, opiates and cocaine during his

19 lifetime.  His preferred substances are marijuana and

20 cocaine.  He indicates that both of these substances have

21 caused him the most problems.

22        Smirnov was not under the influence of illicit

23 substances or alcohol during the offense, and these

24 substances did not contribute to the commission of the

25 offense.  Smirnov has no history of substance abuse

(68 of 253), Page 68 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 68 of 253
Case 2:24-cr-00091-ODW Document 219 Filed 01/09/25 Page 60 of 67 Page ID
#:2866

60

1  treatment but is interested in receiving it.

2      Regarding his education, Smirnov reports that he

3  received his high school diploma in Israel. He also reports

4  that he served in the Israeli Defense Force or IDF in June

5  of 1998 for four days but was recruited into other

6  government service for four years. He declined to discuss

7  further details regarding this service due to

8  confidentiality issues.

9      Smirnov reports that his usual occupation is as a

10 confidential human source or CHS for the FBI. Smirnov also

11 reports owning and having employment history related to two

12 companies, Avalon Group, Inc., a cryptocurrency company, and

13 Goldman, an investment company. In the future, Smirnov

14 desires to attend college and obtain a degree in history.

15    (Pause.)

16      THE COURT: All right, sir, you have the right to

17 appeal your conviction if you believe that your guilty plea

18 was somehow unlawful or involuntary or if there was some

19 other fundamental defect in the proceedings that was not

20 waived.

21      MR. CHESNOFF: Excuse me -- excuse me, your Honor.

22 Before you get to that, you -- would you please state on the

23 record that he gets credit for time served on both cases

24 from February 14th, 2024 as was agreed in the agreement and

25 as permitted so that --

(69 of 253), Page 69 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 69 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 61 of 67   Page ID
#:2867

61

1          THE COURT:  Let's save your -- no.  This will be

2  determined by the Bureau of Prisons.  I do not get involved

3  in that.  Okay.

4          MR. CHESNOFF:  But it's -- it's part of the --

5          THE COURT:  I don't care about what kind of an

6  understanding you have with these gentlemen sitting over

7  here.

8          MR. CHESNOFF:  You accept --

9          THE COURT:  Calculation or computation of credits

10  is up to the Bureau of Prisons.

11          MR. CHESNOFF:  Your Honor, you --

12          THE COURT:  I'm not getting involved in that.

13          MR. CHESNOFF:  Your Honor, you accepted the

14  conditional plea, and that's part of the conditional plea.

15          THE COURT:  I'm not saying I reject the plea.  I'm

16  saying I'm not getting involved in the computation of his

17  credits.

18          MR. CHESNOFF:  I'm not asking you to compute it.

19  I'm asking you to state for the record, most respectfully,

20  your Honor, that he gets concurrent time on both cases

21  beginning on February 14th, 2024 as that is part of the

22  binding plea agreement that the Court accepted.

23          THE COURT:  Is it necessary for me to repeat

24  myself?

25          MR. CHESNOFF:  No, your Honor, but --

(70 of 253), Page 70 of 253   Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 70 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 62 of 67   Page ID
#:2868

62

1          THE COURT:  Good.  Let's move on.

2          MR. CHESNOFF:  I would like to make a record then

3   so that if I have to get a transcript to provide to --

4          THE COURT:  Go ahead.  Make -- make your record so

5   I can conclude the --

6          MR. CHESNOFF:  The plea -- the plea agreement

7   requires the Court to order that.  That's my record.

8          THE COURT:  You also have the right to appeal your

9   sentence under some circumstances, particularly if you

10  believe your sentence is contrary to the law.  However, a

11  defendant may waive those rights as part of a plea

12  agreement, and you've entered into a plea agreement that

13  waives some or all of your right to appeal the sentence

14  itself.  Such waivers are generally enforceable.

15          If you believe your waiver is unenforceable, you

16  may present that theory to the Court of Appeals.  With few

17  exceptions, a notice of appeal must be filed within 14 days

18  of judgment being entered.

19          Do you understand that, sir?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  If you are unable to afford a

22  transcript of the record in this case, one will be provided

23  at Government expense.  If you are unable to pay the cost of

24  an appeal or the filing fee, you may apply within 14 days

25  for a waiver.  If you do not have counsel to act on your

*Echo Reporting, Inc.*

(71 of 253), Page 71 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 71 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 63 of 67   Page ID
#:2869

63

1  behalf and if you request it, the clerk of the court will

2  prepare and file a notice of appeal on your behalf.  But,

3  again, you must make the request within 14 days.

4          The notice of appeal must designate the judgment

5  or order appealed from and the fact that you are appealing

6  to the Court of Appeals.  It should also designate the

7  portion of the proceedings not already on file that you deem

8  necessary for the reporter to include.

9          Also in its consideration, the Court has evaluated

10  the sentencing guidelines as required by 18 U.S.C. Section

11  3553(a)(4) and finds the calculations of suggested sentence

12  therein for this Defendant under the present circumstances

13  to be reasonable.  The Court, therefore, sentences the

14  Defendant as previously stated, which is in accordance with

15  the binding plea agreement entered into by the parties under

16  Federal Rules of Criminal Procedure 11(c)(1)(C).

17          Per request of the Defendant, the Court will also

18  make the recommendation to the Bureau of Prisons that he be

19  assigned to or at least evaluated for inclusion in the

20  Bureau of Prisons Residential Drug Abuse Program.

21          MR. CHESNOFF:  Also --

22          THE COURT:  Is there anything else?  Was there

23  anything else?

24          MR. CHESNOFF:  Yeah, Terminal Island, your Honor.

25          THE COURT:  Yes, Terminal Island, right.  Anything

*Echo Reporting, Inc.*

(72 of 253), Page 72 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1, Page 72 of 253
Case 2:24-cr-00091-ODW  Document 219  Filed 01/09/25  Page 64 of 67  Page ID
#:2870

64

1  else?

2          MR. CHESNOFF:  Will you -- you'll recommend that

3  the Bureau of Prison place him at Terminal Island?

4          THE COURT:  Yes.

5          MR. CHESNOFF:  Okay.

6          MR. SCHONFELD:  Your Honor, the Government needs

7  to move to dismiss the remaining counts.

8          MR. WISE:  Yes, your Honor.  We were just getting

9  prepared to do that.

10          THE COURT:  I know.

11          MR. WISE:  The United States moves to dismiss

12  Count 1 in indictment 91 and Counts 2 through 4, 6 and 7 and

13  9 and 10 in indictment 702.

14          THE COURT:  All right.  Count 1 of indictment 91

15  is dismissed in the interest of justice, and Counts 2, 3, 4,

16  6, 7, 9 and 10 of 702 are also dismissed on motion of the

17  Government in the interest of justice.

18          All right.  Anything else we need to deal with?

19          MR. CHESNOFF:  Court's indulgence.

20          MR. WISE:  Not from the United States, your Honor.

21      (Pause.)

22          THE COURT:  Whatever it is you guys are talking

23  about, does that involve the U.S. Marshals?

24          MR. CHESNOFF:  Yes.

25          MR. SCHONFELD:  yes.

65

1        (Pause for counsel to confer.)

2            UNIDENTIFIED SPEAKER:  Your Honor, can we have a

3   sidebar?

4            THE COURT:  We're done.  Sidebar for what?

5            MR. CHESNOFF:  We'll explain it with the Court's

6   permission.

7        (Sidebar discussion off the record.)

8            THE COURT:  All right.  Back on the record.

9            MR. CHESNOFF:  Thanks, your Honor.  Your Honor, on

10  behalf of Mr. Smirnov and in pursuit of my responsibilities

11  to render effective assistance of counsel under the Sixth

12  Amendment, I would ask the Court to state on the record that

13  which is stated in the binding plea agreement which the

14  Court accepted, that the parties agree that the Defendant is

15  entitled to credit in both Criminal Number 24-91 and 24-702

16  for the period of his pretrial detention since the day of

17  his arrest and that credits that the Bureau of Prisons may

18  allow under 18 U.S.C. 3585(b) may be credited against the

19  stipulated sentence including credit under Sentencing

20  Guideline Section 5G1.3.

21            I would at least ask the Court to affirm that.

22            THE COURT:  I think the -- the agreement speaks

23  for itself.  I am not going to calculate anything, and I'm

24  not going to certify that he has been in custody for any

25  particular period of time beginning on any particular date.

*Echo Reporting, Inc.*

(74 of 253), Page 74 of 253   Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 74 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 66 of 67   Page ID
#:2872

66

1   Now, that's the last time I'm going to --

2          MR. CHESNOFF:  Will --

3          THE COURT:  -- discuss that.

4          MR. CHESNOFF:  Will you at least say, your Honor,

5   that he's entitled to credit on both cases?

6          THE COURT:  He is entitled to credits as earned.

7          MR. CHESNOFF:  On both --

8          THE COURT:  As determined by the Bureau of

9   Prisons.

10         MR. CHESNOFF:  On both cases since the day he was

11  arrested.

12         THE COURT:  On any case.

13         MR. CHESNOFF:  All right.  Thank you, your Honor.

14     (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

(75 of 253), Page 75 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 75 of 253
Case 2:24-cr-00091-ODW   Document 219   Filed 01/09/25   Page 67 of 67   Page ID
#:2873

67

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty_____     1/09/2025_____
    Transcriber                         Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
    /s/L.L. Francisco_____
9   L.L. Francisco, President
    Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

(76 of 253), Page 76 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 76 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 1 of 54   Page ID
#:2346

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,     ) Case No. LA CR 24-00091-ODW
                                 )           LA CR 24-00702-ODW
5           Plaintiff,           )
                                 ) Los Angeles, California
6  vs.                           )
                                 ) Monday, December 16, 2024
7  ALEXANDER SMIRNOV,            )
                                 ) (8:04 a.m. to 9:14 a.m.)
8           Defendant.           )
_____)

9

10              TRANSCRIPT OF CHANGE OF PLEA
         BEFORE THE HONORABLE OTIS D. WRIGHT, II
11             UNITED STATES DISTRICT JUDGE

12

13 Appearances:                   See next page.

14 Court Reporter:                Recorded; CourtSmart

15 Courtroom Deputy:              Sheila English

16 Transcribed by:                Jordan Keilty
                                  Echo Reporting, Inc.
17                                9711 Cactus Street, Suite B
                                  Lakeside, California 92040
18                                (858) 453-7590

19

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

(77 of 253), Page 77 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 77 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 2 of 54   Page ID
#:2347

2

```
1   APPEARANCES:

2   For the Plaintiff:            LEO J. WISE, ESQ.
                                  DEREK E. HINES, ESQ.
3                                 SEAN F. MULRYNE, ESQ.
                                  United States Department of
4                                    Justice
                                  Office of Special Counsel
5                                 950 Pennsylvania Avenue, NW
                                  Room B-200
6                                 Washington, D.C. 20530
                                  (771) 217-6091
7
    For the Defendant:           RICHARD A. SCHONFELD, ESQ.
8                                 DAVID Z. CHESNOFF, ESQ.
                                  Chesnoff & Schonfeld
9                                 520 South 4th Street
                                  Las Vegas, Nevada 89101
10                                (702) 384-5563

11                                MARK A. BYRNE, ESQ.
                                  Byrne & Nixon, LLP
12                                700 North Brand Boulevard
                                  Suite 1180
13                                Glendale, California 91203
                                  (213) 620-8012
14
                                  CHAD D. NARDIELLO, ESQ.
15                                1801 Century Park East
                                  Suite 1050
16                                Century City, California 90067
                                  (310) 201-0123
17

18

19

20

21

22

23

24

25
```

*Echo Reporting, Inc.*

(78 of 253), Page 78 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 78 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 3 of 54   Page ID
#:2348

3

1    Los Angeles, California; Monday, December 16, 2024 8:04 a.m.

2                          --o0o--

3                     (Call to Order)

4         THE CLERK:  Calling Item 1, CR 24-91 and CR 24-

5    702, United States of America versus Alexander Smirnov.

6         Counsel, may I have your appearances, please.

7         MR. WISE:  Good morning, your Honor.  Leo Wise,

8    Derek Hines and Sean Mulryne for the United States.

9         THE COURT:  Good morning, Gentlemen.

10        MR. CHESNOFF:  May it please the Court, your

11   Honor, David Chesnoff, Nasser Khoury, Chad --

12        MR. NARDIELLO:  Nardiello, your Honor.

13        MR. CHESNOFF:  -- Nardiello, and Mark Byrne, our

14   local counsel, your Honor.

15        THE COURT:  Good morning, Gentlemen.

16        ALL:  Good morning, your Honor.

17        THE COURT:  I hope you all realize this is just

18   fraught with opportunities to screw it up, but apparently --

19   well, I'm going to proceed as though you know that that's

20   what you're doing, you know that this is going to be tough

21   to keep straight, and you're going to proceed in this

22   fashion in spite of that.  We're going to try to do -- take

23   pleas on both cases, two unrelated cases.  I will do my

24   best.

25        Okay.  There's quite a bit of cross-over.  So, I'm

(79 of 253), Page 79 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 79 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 4 of 54   Page ID
#:2349

4

1  not going to repeat that twice, but -- oh, well.  Let's see

2  what happens.  I'll be surprised.

3          All right.  Mr. Chesnoff, it's my understanding

4  that your client is desirous of entering a plea of guilty to

5  Count 2 of the indictment in Case Number 24-CR-00091.  Is

6  that correct?

7          MR. CHESNOFF:  Yes, your Honor.

8          THE COURT:  Just in case I don't -- well, it's

9  also my understanding that your client is also interested in

10 entering a guilty plea in Case Number 24-CR-00702 to Counts

11 1, 5, and 8 of that indictment.  Correct?

12         MR. CHESNOFF:  Yes, your Honor.

13         THE COURT:  All right.  Mr. Smirnov, before I can

14 take your pleas, first I need to be certain that you have

15 been informed of and understand your various constitutional

16 rights and that you understand the rights that you would be

17 giving up by entering pleas of guilty in either or both of

18 these cases and that you understand that you can insist on

19 putting the Government to the burden and the test of proving

20 your guilt beyond a reasonable doubt in both of these cases

21 to all of the causes of action and that by pleading guilty,

22 you are waiving or giving up your right to a trial and a

23 right to put the Government to its burden of proof, and

24 you're simply admitting your guilt, and the only thing that

25 will remain is the imposition of sentence.

(80 of 253), Page 80 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 80 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 5 of 54   Page ID
#:2350

5

1          Do you understand that, sir?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Now, pull the mic closer.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.  The way this is going to

6   proceed is I'm going to be making a number of statements to

7   you, and I'm also going to be asking you a series of

8   questions, questions to which I will expect a truthful

9   response for, indeed, you will be placed under oath

10  momentarily by Ms. English, and that will obligate you to be

11  truthful in your response to the Court's questions.

12          If it is later determined that you have been

13  willfully false in your answers to the Court's questions,

14  that may subject you to a future prosecution for perjury or

15  for making a false statement.

16          Do you understand that?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  If at any time during the course of

19  this hearing you don't understand anything that I say,

20  please let me know, and I will rephrase it or repeat it or

21  do whatever is necessary to see to it that you understand

22  precisely what is going on.

23          Will you do that?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Okay.  Also, during the course of this

*Echo Reporting, Inc.*

(81 of 253), Page 81 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 81 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 6 of 54   Page ID
#:2351

6

1  hearing, if you wish to speak with your attorney, you may do

2  so, and you don't have to ask for permission.  That's what

3  your attorney is here for.  If anything is said or done that

4  is not clear to you, please seek clarification from your

5  attorney or you can seek clarification from me.

6           One of the things I don't want to happen here --

7  and it happens all too often -- is that I speak with

8  defendants who have just recently come from a -- a court

9  hearing, and they cannot tell me what occurred.  That should

10 not be, and for something as important as this, I want you

11 to be able to articulate exactly what occurred this morning.

12 All right.  And if anything is unclear, please let me know.

13 Okay?

14           THE DEFENDANT:  I will, your Honor.

15           THE COURT:  All right.  The most important thing

16 here is that what -- what you intend to do -- I'm going to

17 assume that it is your intention to -- to enter pleas of

18 guilty to these four counts.  What's vitally important is

19 that this be the product of your free will.  I'm going to

20 ask you more than once as to whether or not you are pleading

21 guilty voluntarily and of your free will.  I don't think

22 anything about this hearing is more important than that.

23           So, tell me, has anyone threatened you or promised

24 you anything of value, any benefit in exchange for your plea

25 of guilty other than what is contained in the written plea

(82 of 253), Page 82 of 253, Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 82 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 7 of 54   Page ID
#:2352

7

1   agreement?  Is there anything else that is influencing your

2   decision to plead guilty?

3           THE DEFENDANT:  No, your Honor.

4           THE COURT:  Okay.  After you are placed under

5   oath, I'm going to ask you some questions which, admittedly,

6   are intrusive, and it's not because I care or that I really

7   want to know the answers.  The only thing I care about is

8   whether or not you are legally able to waive your

9   constitutional rights and plead guilty.  I need to know

10  whether or not you, for example, are intoxicated or heavily

11  medicated or even temporarily mentally incompetent.

12          So, the questions I'm going to put to you deal

13  with your mental competency, deal with your sobriety.  And,

14  again, not because I'm interested in that.  I'm not

15  interested in that.  I simply just want to establish a

16  record that you are legally competent to waive your

17  constitutional rights.

18          Do you understand?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  And then we will move away from that

21  sort of thing.  Okay.

22          Now, I also need to know whether or not you are

23  willing to waive your right to remain silent so that you may

24  answer my questions.  You still possess and will always

25  possess your Fifth Amendment right against self-

(83 of 253), Page 83 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 83 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 8 of 54   Page ID
#:2353

8

1  incrimination, but the answers to some of these questions

2  will certainly involve you incriminating yourself.  So, I

3  need to know whether or not for the purpose of this hearing

4  only are you willing to -- to waive your Fifth Amendment

5  rights against self-incrimination?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Counsel join?

8          MR. CHESNOFF:  Yes, your Honor.

9          THE COURT:  All right.  Thank you.

10         All right, sir, do you have any questions of me

11 before we get started?

12     (Pause.)

13         MR. CHESNOFF:  He asked you do you have any

14 questions for him.  Say no, your Honor.

15         THE DEFENDANT:  No, your Honor.

16         THE COURT:  Okay.  All right.  Sheila, go ahead

17 and swear him.

18          ALEXANDER SMIRNOV - DEFENDANT - SWORN

19         THE COURT:  All right, sir.  Would you please

20 state your full and correct name, please.

21         THE DEFENDANT:  Alexander Smirnov.

22         THE COURT:  How old are you, sir?

23         THE DEFENDANT:  Forty-four.

24         THE COURT:  Did you say 44?  Okay.

25         How many years of education have you completed?

*Echo Reporting, Inc.*

(84 of 253), Page 84 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 84 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 9 of 54   Page ID
#:2354

9

1          THE DEFENDANT:  High school.

2          THE COURT:  Okay.  Have you been treated recently

3   for any mental illness or addiction to narcotics of any

4   kind?

5          THE DEFENDANT:  No, your Honor.

6          THE COURT:  Are you presently under the influence

7   of any drug, medication or alcoholic beverage of any kind?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Have you had any drugs, medication or

10  alcohol within the last 24 hours?

11         THE DEFENDANT:  No, your Honor.

12         THE COURT:  Have you been prescribed any

13  medication which you have not taken?

14         THE DEFENDANT:  No, your Honor.

15         THE COURT:  Do you suffer from any mental

16  condition or disability that would prevent you from fully

17  understanding the charges against you or the consequences of

18  your guilty pleas?

19         THE DEFENDANT:  No, your Honor.

20         THE COURT:  Are you aware of any reason why we

21  should not go forward today and take your plea?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Okay.  Mr. Chesnoff, have you had an

24  opportunity to speak with your client about these

25  proceedings?

(85 of 253), Page 85 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 85 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 10 of 54   Page ID
#:2355

10

1    MR. CHESNOFF:  Yes, I have, your Honor.

2    THE COURT:  Do you have any reason to believe that

3 he is not in possession of his faculties and is competent to

4 proceed?

5    MR. CHESNOFF:  I have no such feelings, your

6 Honor.

7    THE COURT:  All right.  Based upon the statements

8 of the Defendant and his attorney, as well as my own

9 observations, I find that the Defendant is in full

10 possession of his faculties and is competent to proceed.

11    All right, sir.  Have you received -- arbitrarily

12 go into your 91 case.  Have you received a copy of the

13 indictment in the case 24-CR-91, the one charging the false

14 statement, the non-tax case?

15    THE DEFENDANT:  Yes, your Honor.

16    THE COURT:  Okay.  Have you seen the indictment?

17    THE DEFENDANT:  Yes.

18    THE COURT:  You're entitled to have that

19 indictment read to you, the entire indictment read to you at

20 this time.  Would you like the entire indictment read to you

21 now?

22    THE DEFENDANT:  No, your Honor.

23    THE COURT:  All right.  Thank you.

24    You are also entitled to the following

25 constitutional rights, rights that you would be giving up by

(86 of 253), Page 86 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 86 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 11 of 54   Page ID
#:2356

11

1  pleading guilty.

2          First, you have the right to plead not guilty to

3  any offense charged against you and to persist in that plea.

4          You have the right to a speedy and public trial.

5          You have the right to a trial by jury.  At trial

6  you would presumed to be innocent, and the Government would

7  have to prove your guilt beyond a reasonable doubt.  If both

8  you and the Government give up your right to a jury trial,

9  you have the right to be tried by the Court.

10          You have the right to the assistance of counsel

11  for your defense throughout the proceedings.  If you cannot

12  afford counsel, the Court will appoint counsel to represent

13  you free of charge and to assist you at trial and at every

14  other stage of the proceedings.

15          You have the right to confront and cross examine

16  the witnesses against you, that is, to see and hear all of

17  the witnesses testify and to have them questioned by your

18  lawyer.

19          You have the right to have witnesses subpoenaed

20  and compelled to come to court to testify on your behalf.

21          You have the right to testify yourself on your own

22  behalf.  But, conversely, you have the privilege against

23  self-incrimination, that is, you have the right not to

24  testify or incriminate yourself in any way.

25          If you went to trial and decided not to testify,

(87 of 253), Page 87 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 87 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 12 of 54   Page ID
#:2357

12

1  that fact could not be used against you.  But by pleading

2  guilty, you are giving up that right, and you are

3  incriminating yourself.

4          Lastly, you have the right to appeal your

5  conviction and your sentence if you go to trial and you are

6  convicted.

7          Have you been advised of all of these rights, sir?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Do you recall reading these rights in

10  your plea agreements?  Maybe I should establish that you

11  actually read the plea agreements.  Have you read them, sir?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And do you recall reading an entire

14  section in the plea agreements dealing with the waiver of

15  your constitutional rights?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  That addressed each of the rights that

18  I have just gone over?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Do you have any questions about any of

21  your constitutional rights?

22          THE DEFENDANT:  No, your Honor.

23          THE COURT:  Would you like a few moments to speak

24  with your lawyer about any of your constitutional rights?

25          THE DEFENDANT:  No, your Honor.

*Echo Reporting, Inc.*

(88 of 253), Page 88 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 88 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 13 of 54   Page ID
#:2358

13

1          THE COURT:  All right.  Counsel, are you satisfied

2    that his waivers are voluntarily, intelligently, and

3    knowingly made?

4          MR. CHESNOFF:  Yes, I am, your Honor.

5          THE COURT:  And do you join and concur in each of

6    these waivers?

7          MR. CHESNOFF:  Yes, I do, your Honor.

8          THE COURT:  All right.  Beginning with 91, you are

9    charged in Count 2 of the indictment ending in 91 with

10   causing the creation of a false and fictitious record in a

11   federal investigation, in violation of 18 U.S.C. Section

12   1519, hereinafter the obstruction of justice indictment.

13         Do you understand that?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Do you have any questions about that?

16         THE DEFENDANT:  No, your Honor.

17         THE COURT:  All right.  Mr. Wise, would you please

18   state the elements of the offense?  I'm sitting here

19   deciding how to proceed.  So, it's --

20         MR. WISE:  I'll proceed any way you tell me to,

21   your Honor.

22         The elements of the charge of 18 U.S.C. 1519 are

23   as follows:

24         First, the Defendant knowingly caused the making

25   of a false entry in an FBI Form 1023, a record and document,

(89 of 253), Page 89 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 89 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 14 of 54   Page ID
#:2359

14

1   and

2           Second, Defendant acted with the intent to impede,

3   obstruct or influence an actual or contemplated

4   investigation of a matter within the jurisdiction of the

5   United States Department of Justice, a department and agency

6   of the United States.

7           THE COURT:  Just so you know, I'm thinking about

8   getting them both out of the way.

9           All right, sir.  Do you have any questions about

10  what the prosecutor just said in terms of what would have to

11  be -- the facts that would have to be established beyond a

12  reasonable doubt in order to secure your conviction on Count

13  2 of the indictment in Case 91?  Do you have any questions?

14          THE DEFENDANT:  I don't, your Honor.

15          THE COURT:  Okay.  Unless someone's got a better

16  idea, because I'm not wed to any particular idea, then I

17  will go over the -- the same things with respect to the

18  other indictment.

19          Okay.  In the 702 indictment, there are three

20  charges alleged in Counts 1, 5 and 8, which charge the

21  Defendant with tax evasion for the tax years 2020, 2021,

22  2022.

23          Again, Mr. Wise, would you be so kind as to advise

24  of the charges and the facts that would have to be

25  established?

(90 of 253), Page 90 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 90 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 15 of 54   Page ID
#:2360

15

1          MR. WISE:  Yes, your Honor.  The Defendant

2  understands that for the Defendant to be guilty of the crime

3  charged in Counts 1, 5, and 8 in the tax evasion indictment,

4  in violation of 26 United States Code Section 7201, the

5  following must be true:

6          First, the Defendant owed more federal income tax

7  for the tax years 2020, 2021 and 2022 than was declared due

8  on the Defendant's income tax returns for each calendar

9  year;

10         Second, the Defendant knew that more federal

11  income tax was owed than was declared due on the Defendant's

12  income tax returns;

13         Third, the Defendant made an affirmative attempt

14  to evade or defeat such additional tax, including at least

15  one of the affirmative acts charged in the tax evasion

16  indictment and, fourth, in attempting to evade or defeat

17  such additional tax, the Defendant acted willfully.

18         THE COURT:  All right, sir.  Do you have any

19  questions about the facts that would have to be established

20  in the 7072 indictment in order for you to be convicted of

21  either Counts 1, 5, or 8?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Okay.  Next I'm going to ask the

24  prosecutor to go over the various penalties that you face.

25  We're going to talk about the maximum fine -- correction --

(91 of 253), Page 91 of 253 Case: 25-400 04/25/2025 DktEntry: 11.1 Page 91 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 16 of 54   Page ID
#:2361

16

1   the maximum term of imprisonment which could be imposed.

2   Again, let's -- let's one at a time, start with 91, the

3   maximum term of imprisonment which could be imposed, the

4   maximum fine which could be levied against you, the concept

5   of supervised release, and the various collateral

6   consequences which might follow the suffering of a felony

7   conviction.

8           Are you a United States citizen, sir?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Okay.  Then we can forego a discussion

11  of the immigration consequences.

12          All right.  Go ahead, Counsel.

13          MR. WISE:  Thank you, your Honor.

14          And this is at paragraph eight of the plea

15  agreement.  Defendant -- Defendant understands that the

16  statutory maximum sentence that the Court can impose for a

17  violation of 18 United States Code 1519 -- this is Count 2

18  of the --

19          THE COURT:  Yes.

20          MR. WISE:  -- obstruction of justice indictment --

21  is 20 years imprisonment, a three-year period of supervised

22  release, a fine of $250,000 and a mandatory special

23  assessment of $100.

24          THE COURT:  While we're at it, let's move right

25  into 702.

17

1            MR. WISE:  Thank you, your Honor.

2            For a violation of --

3            THE COURT:  Oh, wait a minute.  You're right.

4  You're right.

5            Sir, do you have any -- any questions about what

6  he said with respect to indictment 91?

7            THE DEFENDANT:  No, your Honor.

8            THE COURT:  Okay.  Any -- any objection to us

9  moving now into the next indictment, 702?

10           MR. CHESNOFF:  None, your Honor.

11           THE COURT:  Okay.  Go ahead, sir.

12           MR. WISE:  Thank you, your Honor.

13           For a violation of 26 United States Code 7201,

14 which is Counts 1, 5, and 8 of the tax evasion indictment,

15 the maximum sentence the Court can impose is a five-year

16 term of imprisonment per count, a three-year period of

17 supervised release, a fine of $250,000 or twice the gross

18 gain or gross loss resulting from the offense, whichever is

19 greatest, and a mandatory special assessment of $100.

20           THE COURT:  Supervised release, if you happen to

21 have it at hand.

22           MR. WISE:  Three years, your Honor.

23           THE COURT:  Okay.  Collateral consequences?  I

24 don't see that in the plea agreement.  That's troublesome.

25           MR. WISE:  So, your Honor, starting at paragraph

(93 of 253), Page 93 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 93 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 18 of 54   Page ID
#:2363

18

1  11, collateral consequences are described as --

2          THE COURT:  Thank you.

3          MR. WISE:  -- well as in additional paragraphs,

4  and I can read those.

5          THE COURT:  Yes.

6          MR. WISE:  So, starting in paragraph 11, Defendant

7  understands that by -- that by pleading guilty, Defendant

8  may be giving up valuable government benefits and valuable

9  civic rights such as the right to vote, the right to possess

10 a firearm, the right to hold office, and the right to serve

11 on a jury.

12         Defendant understands that he is pleading guilty

13 to a felony and that it is a federal crime for a convicted

14 felon to possess a firearm or ammunition.

15         Defendant understands that the convictions in this

16 case may also subject Defendant to various other collateral

17 consequences, including but not limited to revocation of

18 probation, parole, or supervised release in an other case

19 and suspension or revocation of a professional license.

20         Defendant understands that unanticipated

21 collateral consequences will not serve as grounds to

22 withdraw Defendant's guilty pleas.

23         And then at paragraph 15 -- and I think your Honor

24 has already asked if the Defendant is -- is a citizen --

25 there is a paragraph concerning immigration consequences

19

1  which I can read or not.

2          THE COURT:  We need not bother with that, but you

3  probably need to do 12, 13, and 14.

4          MR. WISE:  Got it.  At paragraph 12, Defendant

5  agrees to pay restitution to the Internal Revenue Service

6  for his federal individual income taxes in an amount to be

7  determined by the Court pursuant to 18 United States Code

8  Section 3663(a)(3).

9          And then at paragraph 13, Defendant agrees that

10  restitution to the IRS is due and payable immediately after

11  the judgment is entered and is subject to immediate

12  enforcement in full by the United States.

13          If the Court imposes a schedule of payments,

14  Defendant agrees that the schedule of payments is a schedule

15  of the minimum payment due and that the payment schedule

16  does not prohibit -- prohibit or limit the methods by which

17  the United States may immediately enforce the judgment in

18  full.

19          THE COURT:  All right, sir.  Do you have any

20  questions about anything that's been said so far?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  All right.  You should also understand

23  that parole has been abolished in the federal system, and if

24  you are sentenced to prison, you will not be released on

25  parole.

(95 of 253), Page 95 of 253  Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 95 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 20 of 54   Page ID
#:2365

20

1         Now, do you have any questions regarding the

2 potential sentence that you may receive if the Court accepts

3 your pleas of guilty?

4         THE DEFENDANT:  No, your Honor.

5         THE COURT:  All right.  Do you think you've

6 understood everything that's been said so far?

7         THE DEFENDANT:  Yes, your Honor.

8         THE COURT:  Any reason I should not continue with

9 these proceedings and take your plea?

10         THE DEFENDANT:  No, your Honor.

11         THE COURT:  All right, sir.  You will be sentenced

12 under the Sentencing Reform Act of 1984.  The United States

13 Sentencing Commission has issued guidelines which judges

14 must consult and take into account but are not required to

15 follow in determining the sentence in a criminal case.

16         Now, have you and your attorney talked about how

17 the sentencing guidelines might be employed in your case?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  During the course of those

20 discussions, did you have occasions to refer to a Sentencing

21 Table?

22         THE DEFENDANT:  Can you -- can you repeat?

23         THE COURT:  Does -- does this table look familiar

24 to you, sir?

25         THE DEFENDANT:  Yes.

(96 of 253), Page 96 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 96 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 21 of 54   Page ID
#:2366

21

1          THE COURT:  Okay.  You -- you went over the

2    Sentencing Table and --

3          THE DEFENDANT:  Yes.

4          THE COURT:  -- how it's read?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  You don't need me to go over it again?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  Okay.

9        (Pause.)

10         THE COURT:  You should understand that at this

11   particular stage that neither the Court nor your attorney

12   will be able to determine the guidelines range for your case

13   until after the Presentence Investigation Report has been

14   prepared by the Probation officer.

15         You should understand that both you and the

16   Government will have an opportunity to review that report

17   and to challenge the reported facts, as well as the

18   guidelines range calculated by the Probation officer and to

19   suggest that the Court consider other factors as well.

20         You should also understand that the sentence

21   imposed may be different from any estimate that your

22   attorney may have given you.  Matter of fact, let's talk

23   about this.

24         We have -- it's my understanding -- in fact,

25   indeed, it's -- it appears in the plea agreement that this

22

1  plea is pursuant to 11(c)(1)(C) of the Rules of Criminal

2  Procedure.  And what that means is if I accept the plea

3  agreement, I am being bound or I'm binding myself to impose

4  the sentence that the parties have agreed to, and in this

5  particular case, having looked at the -- the agreed upon

6  range of sentences that the parties have agreed upon in any

7  event, I am willing to tell you now that I agree with the --

8  the plea agreement and the -- the sentencing agreement that

9  the parties have stipulated to and that I agree to be bound

10 by that agreement in terms of the imposition of sentence in

11 this case.  So, that's off the table.

12         Has anyone made you any promises or

13 representations or guarantees of any kind other than what is

14 contained in the written plea agreement in order to get you

15 to enter a plea of guilty to either of these cases?

16         THE DEFENDANT:  No, your Honor.

17         THE COURT:  Has anyone told you that the Court

18 would impose any specific sentence in the event your guilty

19 pleas are accepted?

20     (Pause to confer.)

21         THE DEFENDANT:  Yes, between 48 and 72 months.

22         THE COURT:  Say that again?

23         THE DEFENDANT:  Whatever's written in the

24 agreement, 48 to 72 months.

25         THE COURT:  Oh, you're talking about the -- the

*Echo Reporting, Inc.*

(98 of 253), Page 98 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 98 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 23 of 54   Page ID
#:2368

23

1  potential sentencing range?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  Has anyone told you that the

4  Court would impose any specific sentence in the event your

5  guilty --

6          THE DEFENDANT:  No.

7          THE COURT:  -- plea is accepted?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Okay.  Has anyone attempted in any way

10  to threaten you, a family member or anyone close to you in

11  an effort to get you plead guilty in this case?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  Are you pleading guilty voluntarily

14  and of your own free will?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  All right.  Okay.  I want to talk

17  about your right of appeal, and this is somewhat disjointed

18  because it is.

19          These are the same in both cases.  So, I'll --

20  I'll just go over these now.  And the one that I'm going to

21  talk about deals with your waiver of your right to appeal

22  your conviction, and that is in paragraph 21 in both plea

23  agreements, and it's very short, but it actually contains

24  three separate provisions.

25          I'm going to just read the first sentence because

*Echo Reporting, Inc.*

24

1 it is clear.

2           "Defendant understands that with

3        the exception of an appeal based upon a

4        claim that Defendant's guilty pleas were

5        involuntary, by pleading guilty,

6        Defendant is waiving and giving up any

7        right to appeal Defendant's convictions

8        on the offenses to which he is pleading

9        guilty."

10      So that we understand what we were referring to by

11 convictions, toward the end of this hearing, I am going to

12 ask you how you plead to -- to Count 2 on Case Number 91 and

13 Counts 1, 5, and 8 of Case Number 702, and if -- solely by

14 way of example -- if you indicate that you are going to

15 plead guilty to any of those and if I accept your plea and

16 order that it be entered, then you will stand convicted on

17 that or those counts.  Okay.

18      All right.  So, what this is saying here is that

19 should you wish to challenge your conviction on appeal, the

20 one basis that you have reserved pursuant to the written

21 terms of this agreement, the one basis that you have

22 reserved upon which you can base an appeal is that your

23 guilty plea was involuntary.

24      You understand that?

25      THE DEFENDANT:  Yes, your Honor.

*Echo Reporting, Inc.*

(100 of 253), Page 100 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 100 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 25 of 54   Page ID #:2370

25

1        THE COURT:  All right.  I'll ask you again, are

2   you pleading guilty voluntarily and of your own free will?

3        THE DEFENDANT:  Yes, your Honor.

4        THE COURT:  Okay.  The next thing -- provision

5   that's contained in this one paragraph, you are giving up

6   your right to challenge that the statutes that you are

7   charged with having violated, you're giving up your right to

8   challenge that those statutes are unconstitutional.

9        Do you understand that?

10        THE DEFENDANT:  Yes, your Honor.

11        THE COURT:  Okay.  The last thing -- and this now

12   deals with a provision of the plea agreement itself.

13   There's a statement of facts contained in the plea

14   agreement.  And you are essentially acknowledging that the

15   statement -- well, let me put it this way.  You're giving up

16   your right to challenge the sufficiency of the statement of

17   facts to support a guilty plea.  You're not going to be able

18   to argue that there's something substantial or material

19   missing from the statement of facts that's set forth in the

20   plea agreement that it's insufficient to support a guilty

21   plea.  That's off the table, those three things.  Should you

22   wish to challenge your conviction on appeal, the only basis

23   open for you to do that, to assert that challenge, is that

24   your guilty plea was involuntary.

25        Second, you're not going to be able to challenge

26

1  the constitutionality of the statutes that you are allegedly

2  -- charged with having allegedly violated, and you're not

3  going to be able to challenge the statement of facts that's

4  set forth in the plea agreement to argue that it is

5  insufficient to support a guilty plea.

6          Understood?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Any questions?

9          THE DEFENDANT:  No, your Honor.

10         THE COURT:  Okay.  The next thing I want to deal

11  with is the next paragraph which -- paragraph 22, which

12  appears under the heading "Limited Mutual Waiver of Appeal

13  of Sentence."

14         A few moments ago, when the prosecutor, Mr. Wise,

15  went over the various penalties that you face, we talked

16  about the -- the maximum term of imprisonment which could be

17  imposed, the maximum fine which could be levied against you.

18  There's also a provision dealing with supervised release,

19  which is that period of community supervision that follows

20  the completion of your term of imprisonment.

21         These things are -- some of these things are

22  controlled by statute.  For example, the fines, the fines

23  are controlled by statute.  The term of supervised release,

24  that is controlled by statute.  Some of the conditions of

25  supervised release, a few of those are controlled by

27

1  statute, but largely, they must bear some relationship to

2  the crime of conviction.  There must be some relationship

3  there.  Okay.  For example, there couldn't be a prohibition

4  in your case.  There couldn't be a prohibition in there

5  against you gambling.  It's got nothing to do with -- with

6  the offenses here.

7         I'm trying to think of a situation here where this

8  is -- could likely come up, but this isn't something that is

9  normally -- it's not normally an issue that is raised in

10 terms of challenging provisions of your sentence.

11        In this particular case, you are agreeing to a

12 particular sentencing range.  The Court has indicated that

13 it is willing to go along with the agreement that you have

14 reached with the Government and impose a sentence that is

15 within that range.

16        We have entered into what's colloquially referred

17 to as a binding plea agreement.  I guess the only person

18 that's being bound is me.  All right.  And I agree to be

19 bound by the agreement that you all have reached.

20        Everything else is going to be controlled by

21 statute.  I can't impose a fine that's just outrageously

22 large.  I can't impose restitution that isn't supported by

23 the evidence in this case.  Now we're talking about the tax

24 case.

25        I don't -- I can't foresee of a situation where

(103 of 253), Page 103 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 103 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 28 of 54   Page ID
#:2373

28

1  this is likely to come up, but if it does, we got enough

2  lawyers in the room here that are apprised of the

3  circumstances that would certainly call it to the Court's

4  attention so that it would be corrected.  Okay.  I certainly

5  have no interest in imposing a sentence that is unlawful or

6  is in excess of what the parties have agreed to.  So, if

7  that should happen, it will get fixed, all right. But I just

8  want you to know that you do retain the right to -- to raise

9  on appeal -- in fact, raise -- raise it before the appeal.

10  Raise it now so it can be fixed, but you have the -- the

11  opportunity to raise on appeal anything that you feel is

12  improper about the sentence, even though -- I call this one

13  of those absolute agreements, it's not contingent upon

14  anything.  It doesn't matter.  If you feel that you've been

15  sentenced improperly, raise it.  We'll deal with it.  All

16  right.  Okay.

17        Let's see.  Oh, that's right.  Mr. Smirnov, I

18  don't know if you happen to have a copy of the plea

19  agreements in front of you, but --

20        MR. CHESNOFF:  We do, your Honor.

21        THE COURT:  Okay.  Would you take a look pages 13

22  and 14.  My question is whether or not your signature

23  appears on those pages.

24        THE DEFENDANT:  Yeah.

25        THE COURT:  All right.  And you read this entire

29

1  agreement before you signed it, is that correct?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  And you had an attorney available to

4  you to answer any questions you might have had at the time

5  you signed the agreement?

6          THE DEFENDANT:  Yes, your Honor, several

7  attorneys.

8          THE COURT:  Several attorneys.

9          THE DEFENDANT:  Yeah.

10          THE COURT:  You can never have too many attorneys.

11          All right.  And does the agreement -- the

12  agreement as it is written, as it stands before you, does it

13  represent the entire understanding between you and the

14  Government?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Okay.  Is there anything as far as you

17  can see that is missing from that agreement in terms of your

18  agreement with the Government?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  Okay.  Okay.  All right.  Mr.

21  Chesnoff, same thing, could you take a look at pages 13 and

22  14 of the agreement.  Is that your signatures next to the

23  date December 10th?

24          MR. CHESNOFF:  That's correct, your Honor.

25          THE COURT:  All right.  And you were available to

30

 1   -- well, I don't want to assume, but did your client sign

 2   the agreement in your presence?

 3            MR. CHESNOFF:  I was present with him, your Honor.

 4            THE COURT:  Okay.  So, you were available to him

 5   to answer any questions he might have had at the time he

 6   signed the agreement?

 7            MR. CHESNOFF:  I was, and I did.

 8            THE COURT:  All right.  Excellent.  And does this

 9   agreement represent the entire understanding between your

10   client and the Government?

11            MR. CHESNOFF:  Yes, it does, your Honor.

12            THE COURT:  And did you review the facts of this

13   case and all of the discovery provided by the Government?

14            MR. CHESNOFF:  Yes, sir.

15            THE COURT:  Did you review -- did you review those

16   facts and discovery with your client?

17            MR. CHESNOFF:  Yes, your Honor.

18            THE COURT:  Have you pursued with your client the

19   potential defenses he might have?

20            MR. CHESNOFF:  Yes, your Honor.

21            THE COURT:  And have you advised your client

22   concerning the legality or admissibility of any statements

23   or confessions or other evidence that the Government has

24   against him?

25            MR. CHESNOFF:  Yes, we did, your Honor.

31

1          THE COURT:  To the best of your knowledge, is your

2    client pleading guilty because of any illegally obtained

3    evidence in the possession of the Government?

4          MR. CHESNOFF:  No, your Honor.

5          THE COURT:  And did you and your client agree that

6    it was in his best interest to enter this plea?

7          MR. CHESNOFF:  Yes, your Honor.

8          THE COURT:  And do you believe that your client is

9    entering into this plea freely and voluntarily, with full

10   knowledge of the charges against him and the consequences of

11   his plea?

12         MR. CHESNOFF:  Yes, I do, your Honor.

13         THE COURT:  Okay.  Now, I want it to be thoroughly

14   understood that everything that we're doing pertains to --

15   to both cases, both 91 and 702.

16         MR. CHESNOFF:  I understand that, your Honor.

17         THE COURT:  All right.  And have there been any

18   promises, representations or guarantees made either to you

19   or to your client other than what is contained in the

20   written plea agreements and anything that may have been

21   stated here in open court?

22         MR. CHESNOFF:  No, your Honor.

23         THE COURT:  Other than a general discussion of the

24   guideline sentencing range and other sentencing

25   considerations, have you given any indication of what

32

1    specific sentence the Court would impose or convey to your

2    client any promise of a particular sentence in the event the

3    Court accepts his pleas of guilty?  This is to be

4    distinguished from the range which the Court has already

5    indicated that it will stay within.

6              MR. CHESNOFF:  No, your Honor.  I've told him that

7    the Court would, if agreed to accept the plea, would

8    sentence him on both cases for a total amount of time

9    between 48 and 72 months, that there was a joint

10   recommendation of one year of supervision and there was a

11   recommendation of no fine, and he understands he has to pay

12   his taxes.

13             THE COURT:  Thank you.

14             Do you -- have you come to any other

15   understanding, Mr. Smirnov?

16             THE DEFENDANT:  No, just those.

17             THE COURT:  Okay.

18             MR. CHESNOFF:  There was one additional thing,

19   your Honor.

20             THE COURT:  Sure.

21             MR. CHESNOFF:  The agreement notes that he gets

22   credit for time served on both cases from the date of his

23   arrest, your Honor.  And we believe that the Bureau of

24   Prisons would acknowledge and honor that, your Honor.

25             THE COURT:  Absolutely.  That's -- yeah.  They are

33

1  going to take care of that.  Okay.

2          MR. CHESNOFF:  Thank you.

3          THE COURT:  Considering everything that's been

4  discussed so far, do you know of any reason why the Court

5  should not accept your client's pleas on both cases?

6          MR. CHESNOFF:  I have no reason, your Honor.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  Your Honor, may I have a moment

9  with my client?

10         THE COURT:  Sure.  Of course.

11     (Pause to confer.)

12         MR. CHESNOFF:  No -- no -- most respectfully, your

13  Honor, please proceed.

14         THE COURT:  All right.  Mr. Wise, other than

15  stated here in open court and other than what is stated in

16  the written plea agreement, has the Government made any

17  promises, representations or guarantees either to the

18  Defendant or defense counsel?

19         MR. WISE:  No, your Honor.

20         THE COURT:  Does the Government waive jury trial?

21         MR. WISE:  Yes, your Honor.

22         THE COURT:  Thank you, sir.

23         Mr. Smirnov, are you satisfied with the

24  representation your lawyers have provided you so far?

25         THE DEFENDANT:  Can you please repeat?

34

1          THE COURT:  Did you ask me to repeat that?

2          MR. CHESNOFF:  Yes.

3          THE COURT:  Okay.  Are you satisfied --

4          THE DEFENDANT:  Yes.  I'm sorry.

5          THE COURT:  -- with the representation your

6  lawyers have provided to you so far?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Okay.  And have you told your lawyers

9  everything you know about your case, especially about any

10  statements or confessions or other evidence that you know

11  about that the Government has against you?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Do you believe that your lawyers have

14  fully considered any reasonable defense you may have to the

15  charges?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Do you believe your lawyers have fully

18  advised you concerning this matter?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Do you believe you've had enough time

21  to discuss this matter with your lawyers?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  Do you believe you understand the

24  consequences to you of this decision to plead guilty?

25          THE DEFENDANT:  Yes, your Honor.

(110 of 253), Page 110 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 110 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 35 of 54   Page ID
#:2380

35

1          THE COURT:  Do you know of any reason why the
2  Court should not accept your pleas of guilty?
3          THE DEFENDANT:  No, I don't, your Honor.
4          THE COURT:  Do you understand then that all that
5  is left in your case if I accept your pleas of guilty is the
6  imposition of sentence, which will include imprisonment?  Do
7  you understand that?
8          THE DEFENDANT:  Yes, your Honor.
9          THE COURT:  Mr. Smirnov, having in mind all that
10  we have discussed regarding your pleas of guilty, the rights
11  that you will be giving up and the maximum sentence -- the
12  maximum sentence you could receive, is it still your desire
13  to plead guilty?
14          THE DEFENDANT:  Yes to both cases.
15          THE COURT:  You did say yes to both cases.
16  Excellent.  Thank you, sir.
17          All right, sir.  I want you to listen carefully.
18  I'm going to ask Mr. Wise to state the facts that the
19  Government would be prepared to prove at trial, and then I'm
20  going to ask you some questions about what he is about to
21  say.  I assume we're going to read from the statement of
22  facts.
23          MR. WISE:  Yes, your Honor.
24          THE COURT:  Okay.  Great.  Thank you.
25          MR. WISE:  And this is at Exhibit B to both plea

(111 of 253), Page 111 of 253Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 111 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 36 of 54   Page ID
#:2381

36

1    agreements, the Statement of Facts in Support of Plea

2    Agreement for Defendant Alexander Smirnov.

3           Defendant, Alexander Smirnov, was a resident of

4    Los Angeles, California and a self-described consultant.

5           Defendant was born in the USSR and was naturalized

6    as a U.S. citizen on July 21st, 2015.

7           The following are specific facts as to United

8    States versus Alexander Smirnov, Criminal Number 2:24-CR-

9    00091-ODW.

10          Defendant was a confidential human source or CHS

11   with the Federal Bureau of Investigation or FBI.  As a CHS,

12   Defendant was assigned a handling agent, hereafter the

13   handler, who was a special agent on an FBI squad that

14   investigated violations of federal criminal law.

15          As a CHS, Defendant provided information to the

16   handler that was then used in various criminal

17   investigations conducted by the FBI.  Defendant knew that

18   information he provided was used in criminal investigations

19   because, among other reasons, the handler advised him that

20   he might have to testify in court based on the information

21   he provided on multiple occasions, including but not limited

22   to October 1st, 2010, May 17th, 2011, November 28th, 2012,

23   April 12th, 2013, August 29th, 2013, July 10th, 2015, and

24   March 11th, 2010.

25          Defendant also knew the information he provided

(112 of 253), Page 112 of 253ase: 25-400, 04/25/2025, DktEntry: 11.1, Page 112 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 37 of 54   Page ID
#:2382

37

1  was used in criminal investigations because Defendant

2  participated in a number of operations where he was

3  authorized to engage in criminal activity as part of an

4  ongoing criminal investigation.

5          Defendant was admonished by the handler that he

6  must provide truthful information to the FBI when he first

7  became a CHS in 2010 and on multiple occasions thereafter,

8  including but not limited to, and then there is a series of

9  dates between 2010 and 2013 which, if I may, I'll -- 2023, I

10 apologize -- which, if I may, I won't read into the record

11 but are contained in -- on paragraph 15.

12          In addition, when Defendant was authorized to

13 engage in illegal activity for investigative purposes, he

14 was further admonished that:

15              "Under no circumstances may the CHS

16              participate in an act that constitutes

17              obstruction of justice, for example,

18              perjury, witness tampering, witness

19              intimidation, entrapment or fabrication,

20              alteration or destruction of evidence,

21              unless such illegal activity has been

22              authorized."

23          When Defendant was given this admonishment, he

24 signed an FBI form that contained this statement, including

25 on dates in 2014, 2017, 2018, 2019 and 2020.

(113 of 253), Page 113 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 113 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 38 of 54   Page ID
#:2383

38

1          Despite repeated admonishments that he must

2 provide truthful information to the FBI and that he must not

3 fabricate evidence, Defendant provided false derogatory

4 information to the FBI about Public Official 1, an elected

5 official in the Obama/Biden administration who left office

6 in January 2017 and Business Person 1, the son of Public

7 Official 1, in 2020, after Public Official 1 became a

8 candidate for President of the United States of America.

9          In March 2017, Defendant reported to the handler

10 that he had a phone call with the owner of Ukranian

11 Industrial Conglomerate Burisma Holdings, Limited, hereafter

12 Burisma Official 1, concerning Burisma's interests in

13 acquiring a U.S. company and making an initial public

14 offering or IPO on a U.S. based stock exchange.

15          In reporting that conversation to the handler,

16 Defendant also noted that Business Person 1, Public Official

17 1's son, was a member of Burisma's board, a fact that was

18 publicly known.  Notably, Defendant did not report in 2017

19 that in the preceding two years, Burisma Official 1 admitted

20 to Defendant that he had paid Public Official 1 $5 million

21 when Public Official 1 was still in office as Defendant

22 later claimed.  That information was memorialized in an --

23 in an official record of the FBI on a Form 1023, which is

24 referred to hereafter as the 2017 1023.

25          Three years later, in May 2020, Defendant sent the

(114 of 253), Page 114 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 114 of 253
Case 2:24-cr-00091-ODW  Document 200  Filed 12/20/24  Page 39 of 54  Page ID
#:2384

39

1  handler a series of messages expressing bias against Public

2  Official 1 who was then a candidate for President of the

3  United States of America and the presumptive nominee of one

4  of the two major American political parties.

5          One month later, in June 2020, Defendant reported

6  for the first time two meetings in 2015 and/or 2016 during

7  the Obama/Biden administration in which he claimed

8  executives associated with Burisma, including Burisma

9  Official 1, admitted to him that they hired Business Person

10  1 to "protect us through his dad from all kinds of problems"

11  and later that they had specifically paid $5 million each to

12  Public Official 1 and Business Person 1 when Public Official

13  1 was still in office so that "Business Person 1 will take

14  care of all those issues through his dad," referring to a

15  criminal investigation being conducted by the then Ukranian

16  Prosecutor General into Burisma and to "deal with the then

17  Ukranian Prosecutor General".

18          Defendant was in Los Angeles, California at the

19  time he made these statements to the handler.

20          Defendant also reported in June 2020 two purported

21  phone calls between himself and Burisma Official 1 wherein

22  Burisma Official 1 stated that he had been forced to pay

23  Public Official 1 and Business Person 1 and that it would

24  take investigators 10 years to find records of illicit

25  payments to Public Official 1.

(115 of 253), Page 115 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 115 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 40 of 54   Page ID
#:2385

40

1        The information Defendant provided the handler was

2    memorialized on a Form 1023 which is hereafter referred to

3    as the 2020 1023, an official record of the FBI, which was

4    finalized on June 30th, 2020.

5        The events Defendant first reported to the handler

6    in June 2020 were fabrications.  In truth and fact,

7    Defendant had contact with executives from Burisma in 2017

8    after the end of the Obama/Biden administration and after

9    the then Ukranian Prosecutor General had been fired in

10   February of 2016, in other words, when Public Official 1

11   could not engage in any official act to influence U.S.

12   policy and when the Prosecutor General was no longer in

13   office.

14       Defendant transformed his routine and

15   unextraordinary business contacts with Burisma in 2017 and

16   later into bribery allegations against Public Official 1,

17   the presumptive nominee of one of the two major political

18   parties for President, after expressing bias against Public

19   Official 1 and his candidacy.

20       When he was interviewed by FBI agents in September

21   2023, Defendant repeated some of his false claims, changed

22   his story as to other of his claims, and promoted a new

23   false narrative about the son of Public Official 1 after he

24   had met with Russian intelligence officials.

25       The following are the facts that relate to United

(116 of 253), Page 116 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 116 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 41 of 54   Page ID
#:2386

41

1   States versus Alexander Smirnov Number 2:24-CR-00702-ODW.

2   Defendant received more than $2 million in income

3   from multiple sources in 2020, 2021, and 2022.  he used

4   these funds to pay personal expenses for himself and his

5   domestic partner, a woman that he had referred to as his

6   girlfriend and at other times his wife, although they are

7   not married.  These expenditures included a $1.4 million Las

8   Vegas condominium, a Bentley, and hundreds of thousands of

9   dollars of clothes, jewelry and accessories for himself and

10  domestic partner purchased a high-end retailers in Los

11  Angeles and Las Vegas.

12  Defendant directed the payors to wire the money to

13  (a) a Bank of America, hereafter BOA, account ending in

14  3928, held in the name of Avalon Group, hereafter referred

15  to as the Avalon account, which the Defendant controlled,

16  (b) a Wells Fargo account ending in 1356, held in the name

17  of domestic partner referred to hereafter as the domestic

18  partner account, which the Defendant controlled and into

19  which the Defendant also transferred approximately $1.8

20  million from the Avalon account and (c) a Wells Fargo

21  account ending in 1299 held in the name of Goldman

22  Investments Group, which the Defendant controlled and into

23  which he also transferred $150,000 from the Avalon account.

24  Avalon Group, Incorporated or Avalon is the

25  Defendant's alter ego.  Avalon was incorporated in the State

*Echo Reporting, Inc.*

(117 of 253), Page 117 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 117 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 42 of 54   Page ID
#:2387

42

1  of Delaware on January 22nd, 2020.  The Defendant identified

2  himself in a State of Delaware annual Franchise Tax Report

3  as the CEO of Avalon and its only officer and director.

4  According to bank account applications, the Defendant

5  identified himself as the President of Avalon.  On a

6  business credit card application dated June 18th, 2022,

7  Smirnov listed $60,000 in total annual income and $250,000

8  in gross business income, identified investment income as

9  the source of his income and listed his current position as

10 real estate.

11        Despite having an IRS tax filing requirement,

12 Avalon never filed a U.S. Corporate Income Tax Return on

13 From 1120.

14        In 2020, 2021, and 2022, Defendant received into

15 the Avalon account $1,534,000 from Company 1 and on page 19

16 of the plea agreements is a table that identifies the date

17 and the amount of wires from Company 1.

18        In 2021 and 2022, Defendant received into the

19 Avalon account $800,000 from Payor 1 and BCG, LLC, an entity

20 owned and controlled by Payor 1, including the payments

21 listed below, and a second table appears with payments from

22 BCG and Payor 1.

23        In 2020, 2021 and 2022, the Defendant transferred

24 more than $1.8 million from the Avalon account to the

25 domestic partner account.  The Defendant commingled these

43

1    funds with other funds in the domestic partner account.

2          The Defendant used unreported income he received

3    in the Avalon account and the domestic partner account to

4    pay various personal expenses for the Defendant and for

5    domestic partner.  The largest personal expense was the

6    purchase of a $1 million condominium where he and domestic

7    partner lived in Las Vegas in 2022.  The second largest

8    single expense occurred on October the 11th, 2022 when the

9    Defendant leased a Bentley using $122,360 in funds from the

10   domestic partner account.  The Defendant signed the check

11   made out to Bentley Financial Services for the lease.

12         From 2021 to 2024, more than $400,000 in personal

13   credit card debt on the Defendant's City credit card was

14   paid off from funds -- paid off from funds from the domestic

15   partner account.

16         In order to conceal the millions of dollars he

17   received in income in 2020, 2021, and 2022, the Defendant

18   created and filed false Forms 1040, U.S. Individual Income

19   Tax Returns for himself and in domestic partner's name and

20   included false and fictitious income and expenses.  The

21   Defendant used a professional tax return preparer to create

22   these returns.  The professional tax return preparer who

23   worked in Los Angeles used a tax preparation software to

24   create returns for the Defendant.  The Defendant provided

25   the professional tax return preparer with the income and

44

1    expense figures included in the returns filed on his own

2    behalf and the ones filed in domestic partner's name.  The

3    Defendant did not provide any documents that substantiated

4    any of these figures.  As a result, the professional tax

5    return preparer refused to sign the returns.  The Defendant

6    told the professional tax return preparer that he would not

7    disclose how he earned any income and that the professional

8    tax return preparer should not inquire about how he earned

9    his income.

10          The Defendant also instructed the tax return

11   preparer to delete any emails or messages with the

12   Defendant, which the professional tax return preparer did.

13   The professional tax return preparer advised the Defendant

14   that the Schedule C to a U.S. Individual Tax Return was the

15   most audited part of a tax return because it was often used

16   to cheat on taxes and that, as a result, the Defendant

17   should collect and maintain records that supported all the

18   income and expenses he instructed the professional tax

19   return preparer to include on Schedule C.

20          The Defendant provided income and expense numbers

21   to the professional tax return preparer both for his Form

22   1040 and the Form 1040 that he submitted in domestic

23   partner's name.  The professional tax return preparer never

24   spoke to or interacted with domestic partner in 2020, 2021

25   or 2022.

(120 of 253), Page 120 of 253Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 120 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 45 of 54   Page ID
#:2390

45

1        In addition, on or about March 19th, 2021, the

2    Defendant prepared and filed a false Form 1120S, U.S. Income

3    Tax Return for an S Corporation for Goldman Investments

4    Group in 2020.  This return included false and fictitious

5    income and expenses for Goldman Investments Group.  The

6    Defendant did not use the services of the professional tax

7    return preparer in the creation of this return.

8        Defendant filed false Forms 1040 U.S. Individual

9    Income Tax Returns for himself where he falsely claimed on

10   the Schedules C attached to each return that he received (a)

11   $40,000 in gross receipts for consulting in 2020, (b)

12   $40,000 in gross receipts for consulting in 2021, and (c)

13   $50,000 in gross receipts for consulting in 2022.  The

14   Defendant did not pay taxes on this -- on this fictitious

15   income.  Instead, on those schedules, he claimed factitious

16   expenses in the following amounts in the following tax

17   years, in 2020, $31,980, in 2021, $39,878, and in 2022,

18   $26,768.  As a result, the Defendant's -- the Defendant

19   falsely self-assessed owing the U.S. Treasury in 2020 only

20   $1,133 in taxes.

21        Defendant further reduced his tax obligations by

22   falsely claiming a $600 COVID 19 Pandemic Rebate for persons

23   who earned $75,000 or less and $538 in Earned Income Credit

24   or EIC, which he falsely claimed -- which he falsely claimed

25   entitled him to a refund of $5.

46

1          In 2021, zero in taxes.  Defendant again further

2     reduced his tax obligations by falsely claiming a $1,400

3     COVID 19 Pandemic Rebate for persons who earned less than

4     $80,000 and $19 in EIC, which he then claimed entitled him

5     to a refund in the amount of $1,419, and in 2022, only

6     $4,136 in taxes.

7          To further conceal the millions of dollars in

8     income he received and used to pay his and domestic

9     partner's personal expenses, including income deposited into

10    the domestic partner account from which his personal

11    expenses were paid, Defendant also prepared and filed false

12    Forms 1040 in the name of domestic partner in 2020, 2021 and

13    2022 where he falsely claimed on the Schedules C attached to

14    each return that domestic partner received (a) $40,000 in

15    gross receipts for consulting in 2020, (b) $40,000 in gross

16    receipts for consulting in 2021, and (c) $60,000 in gross

17    receipts for consulting in 2022.

18         Like his own Form 1040, Defendant claimed on those

19    Schedules C similar fictitious expenses in the following

20    amounts in the following tax years, in 2020, $31,314, in

21    2021, $36,689, and in 2022, $31,553.

22         As a result, the Defendant falsely assessed that

23    domestic partner owed the U.S. Treasury in 2020 $1,228.  The

24    Defendant further reduced any tax obligations by falsely

25    claiming that domestic partner was entitled to a $538 EIC

(122 of 253), Page 122 of 253ase: 25-400, 04/25/2025, DktEntry: 11.1, Page 122 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 47 of 54   Page ID
#:2392

47

1  which he claimed resulted in domestic partner owing the U.S.

2  Treasury only $690, in 2021, $468 in taxes.  The Defendant

3  again further reduced any tax obligations by falsely

4  claiming that domestic partners was entitled to $470 in EIC,

5  which he then claimed entitled her to a refund in the amount

6  of $2, and in 2022, $5,933 in taxes.

7           To further conceal the millions of dollars in

8  income he received into a bank account held in the name of

9  Goldman Investments Group, the Defendant filed a Form 1120S

10  U.S. Income Tax Return for an S Corporation in the name of

11  Goldman Investments Group in 2020.  The Defendant falsely

12  reported that Goldman had $89,282 in gross sales and $92,300

13  in total deductions.

14           In 2020, the Defendant signed his own -- in 2021,

15  I apologize.  In 2021, the Defendant signed his own false

16  return and the false returns he prepared in the name of

17  domestic partner and Goldman Investments Group for tax year

18  2020.

19           In 2022, the Defendant signed his own false Form

20  1040 and signed the false Form 1040 that he prepared for

21  domestic partner for tax year 2021.

22           Finally, in 2023, the Defendant prepared and filed

23  -- prepared a false and fictitious Form 1040 for domestic

24  partner, and while he signed his own false and fictitious

25  Form 1040, his signature did not appear on domestic

(123 of 253), Page 123 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 123 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 48 of 54   Page ID
#:2393

48

1  partner's return for tax year 2022.

2          THE COURT:  Mr. Smirnov, did you understand

3  everything that the -- that Mr. Wise just said?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Is everything he said about you and

6  your conduct in this matter true and correct?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Are you pleading guilty to the

9  allegations in indictment 91, as well as indictment 702

10 because they are indeed and in fact true and correct?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  Are you pleading guilty because you

13 are guilty, sir?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Does either counsel wish the Court to

16 make any further inquiry in terms of compliance with the

17 requirements of Rule 11(b)?

18         MR. WISE:  Not from the United States, your Honor.

19 Thank you.

20         MR. CHESNOFF:  No thank you, your Honor.

21         THE COURT:  All right.  Thank you, gentlemen.  In

22 case I didn't mention it before, the plea agreements and

23 Exhibit B are incorporated into and made a part of this

24 proceeding.

25         All right, sir.  I'm going to go through each of

*Echo Reporting, Inc.*

(124 of 253), Page 124 of 253
Case 2.24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 49 of 54   Page ID
#:2394

49

1  these four.  In connection with indictment 91, Count 2, how

2  do you plead to a violation of 18 U.S.C. Section 1519,

3  creating a false and fictitious record?  How do you plead,

4  sir?

5       (Pause to confer.)

6            THE DEFENDANT:  Guilty, your Honor.  I didn't

7  hear.

8            THE COURT:  That's what this --

9            MR. CHESNOFF:  He couldn't hear it, your Honor.

10           THE COURT:  I thought maybe he changed his mind.

11 Okay.  All right.

12           How do you plead, sir, with respect to indictment

13 702?

14           THE DEFENDANT:  Guilty, your Honor.

15           THE COURT:  Well, hang on.

16      (Pause to confer with clerk.)

17           THE COURT:  Okay.  If there's a -- let me go over

18 this again in case there's a lack of clarity.  First we did

19 91, okay.  And the question is how do you plead to Count 2

20 of that indictment charging a violation of 18 U.S.C. Section

21 1519, creation of a false and fictitious record?

22           THE DEFENDANT:  Guilty, your Honor.

23           THE COURT:  All right.  Now let's move on to

24 indictment 702, and I'll begin with Count 1, then I'll go to

25 Count 5 and then Count 8.  They're all the same.

50

1          All right.  Count 1 charges an evasion of an

2     assessment or filing a false return, in violation of Title

3     26 United States Code Section 7201, 7201.  How do you plead?

4               THE DEFENDANT:  Guilty, your Honor.

5               THE COURT:  How do you plead to that same charge

6     as alleged in Count 5 of indictment 702?

7               THE DEFENDANT:  Guilty, your Honor.

8               THE COURT:  Same charge as alleged in Count 8 of

9     the indictment 702, how do you plead?

10               THE DEFENDANT:  Guilty, your Honor.

11               THE COURT:  All right, sir.  I'm going to make

12     certain findings.  If you don't understand what I say or if

13     you disagree with what I say, please interrupt me right way

14     or ask one of your attorneys to -- to interrupt me.

15               In the matter of the United States of America

16     versus Alexander Smirnov, the Court, having questioned the

17     Defendant and his counsel on his offers of pleas of guilty

18     to Count 2 of the 91 indictment, a felony, and Counts 1, 5

19     and 8 of the 702 indictment, also all felonies, Defendant

20     and his counsel having advised the Court that they have

21     conferred concerning the offered pleas of guilty and all

22     aspects of the charges against him, as well as any defenses

23     he may have.

24          (Pause.)

25               THE COURT:  And the Court having observed the

*Echo Reporting, Inc.*

(126 of 253), Page 126 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 126 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 51 of 54   Page ID
#:2396

51

1   Defendant's intelligence, demeanor and attitude while

2   answering questions, and the Court having observed that the

3   Defendant does not appear to be under the influence of any

4   medicine, drug or other substance or factor that might

5   affect his actions or judgment in any matter, the Court

6   finds that the Defendant is fully competent and capable of

7   entering an informed plea, that he is aware of the nature of

8   the charges and the consequences of his plea.

9          The Court further finds that the pleas of guilty

10  are knowingly, voluntarily, and intelligently made with a

11  full understanding of the nature of those charges, the

12  consequences of his plea, his constitutional rights.

13         The Court further finds that the plea is supported

14  by an independent factual basis containing each of the

15  essential elements of the offenses.  The Court, therefore,

16  accepts the pleas and orders that they be entered.

17      (Pause.)

18         THE COURT:  Have we waived entirely Presentence

19  Reports?

20         MR. CHESNOFF:  My understanding, your Honor, is

21  that we were going to ask them to expedite --

22         THE COURT:  Oh, okay.  Expedited?

23         MR. CHESNOFF:  Yes.

24         THE COURT:  Thank you.  All right.

25         A written Presentence Report will be prepared by

*Echo Reporting, Inc.*

(127 of 253), Page 127 of 253Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 127 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 52 of 54   Page ID
#:2397

52

1   the Probation Office, and we will ask that that report --

2   the preparation of that report be expedited.

3          You, sir, will be asked to provide information for

4   that report, and your attorney may be present if you wish.

5   You and your attorney will be able to read the report and

6   file objections, if you have any, before the sentencing

7   hearing.  You and your attorney will be able to speak on

8   your behalf at that hearing, and I urge you to consult with

9   him throughout the process so that he may answer any

10  questions that you may have.

11         I will leave it to counsel to schedule the -- the

12  interview with the Probation officer for the preparation of

13  that report.

14         As it stands right now, sentencing is set for

15  January 8th of 2025 at 10:30 a.m. in this courtroom.  The

16  sentencing position papers by the Government and by the

17  Defendant should be on file with the Court two weeks in --

18  one week, on week in advance of the sentencing hearing.

19         Sir, you will remain where you are until the date

20  of sentencing.

21         Anything further from the Government?

22         MR. WISE:  No, your Honor.  Thank you.

23         MR. CHESNOFF:  No, your Honor.  Thank you.

24         THE COURT:  Okay.  All right, Gentlemen.  We will

25  see you in January.

(128 of 253), Page 128 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 128 of 253
Case 2:24-cr-00091-ODW   Document 200   Filed 12/20/24   Page 53 of 54   Page ID
#:2398

53

1          MR. CHESNOFF:  I thank the Government, your Honor,

2  for their professionalism.

3          THE COURT:  Well, if nothing else, they are always

4  professional.

5          THE CLERK:  Court is now in recess.

6      (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

```
1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty_____        12/19/2024_____
    Transcriber                             Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
    /s/L.L. Francisco_____
9   L.L. Francisco, President
    Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
    950 Pennsylvania Avenue NW, Room B-200
    Washington, D.C. 20530
    Telephone:  (771) 217-6091
    E-mail:      LJW@usdoj.gov, DEH@usdoj.gov
    E-mail:      SFM@usdoj.gov; CMR@usdoj.gov

Attorneys for Plaintiff

UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:24-CR-00091-ODW |
| Plaintiff, | No. 2:24-CR-00702-ODW |
| v. | PLEA AGREEMENT FOR DEFENDANT ALEXANDER SMIRNOV |
| ALEXANDER SMIRNOV, | |
| Defendant. | |

1.     This constitutes the plea agreement between ALEXANDER SMIRNOV ("defendant") and the Office of Special Counsel David C. Weiss (the "SCO-W") in the above-captioned cases. This agreement is limited to the SCO-W and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

RULE 11(c)(1)(C) AGREEMENT

2.     Defendant understands that this agreement is entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Accordingly, defendant understands that, if the Court determines that it will not accept this agreement, including but not limited to the sentencing agreements in paragraph 19, absent a breach of this agreement by defendant

1   prior to that determination and whether or not defendant elects to withdraw any guilty

2   pleas entered pursuant to this agreement, this agreement will, with the exception of

3   paragraph 26 below be rendered null and void and both defendant and the SCO-W will be

4   relieved of their obligations under this agreement.  Defendant agrees, however, that if

5   defendant breaches this agreement prior to the Court's determination whether or not to

6   accept this agreement, the breach provisions of this agreement, paragraphs 28 and 29

7   below, will control, with the result that defendant will not be able to withdraw any guilty

8   pleas entered pursuant to this agreement, the SCO-W will be relieved of all of its

9   obligations under this agreement, and the Court's failure to follow any recommendation

10  or request regarding sentence set forth in this agreement will not provide a basis for

11  defendant to withdraw defendant's guilty pleas.

**DEFENDANT'S OBLIGATIONS**

13      3.      Defendant agrees to:

14          a.      At the earliest opportunity requested by the SCO-W and provided by

15  the Court, appear and plead guilty to:

16              i.      Count Two of the indictment in <u>United States v. Alexander</u>

17  <u>Smirnov</u>, 2:24-CR-00091-ODW, which charges defendant with causing the creation of a

18  false and fictitious record in a federal investigation, in violation of 18 U.S.C. § 1519

19  (hereafter the "obstruction of justice indictment").

20              ii.      Counts One, Five and Eight, of the indictment in <u>United States</u>

21  <u>v Alexander Smirnov</u>, 2:24-CR-00702-ODW, which charges the defendant with tax

22  evasion for tax years 2020, 2021 and 2022, in violation of 26 U.S.C. § 7201 (hereafter the

23  "tax evasion indictment").

24          b.      Request that the Court sentence the defendant within 30 days of entry

25  of the entry of his guilty pleas, but not sooner than January 8, 2025.

26          c.      Not contest facts agreed to in this agreement.

27          d.      Abide by all agreements regarding sentencing contained in this

28  agreement.

2

e.     Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

f.     Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

g.     Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

h.     Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

<u>PAYMENT OF TAXES OWED</u>

4.     Defendant admits that he received unreported income in the amounts of $1,350,000 for tax year 2020, $500,000 for tax year 2021 and $300,000 for tax year 2022. Defendant agrees that:

a.     Nothing in this agreement forecloses or limits the ability of the Internal Revenue Service to examine and make adjustments to defendant's returns.

b.     Defendant will not file any claim for refund of taxes, penalties, or interest for amounts attributable to the to the subject matter of this plea agreement.

c.     Defendant may be liable for the fraud penalty imposed by the Internal Revenue Code, 26 U.S.C. § 6663, on the understatements of tax liabilities for 2020, 2021 and 2022.

d.     Defendant gives up any and all objections that could be asserted to the Examination Division of the Internal Revenue Service receiving materials or information obtained during the criminal investigation of this matter, including materials and information obtained through grand jury subpoenas.

<u>THE SCO-W'S OBLIGATIONS</u>

5.     The SCO-W agrees to:

a.     Not contest facts agreed to in this agreement.

3

b.   Request that the Court sentence the defendant within 30 days of the entry of his guilty pleas, but not sooner than January 8, 2025.

c.   Abide by all agreements regarding sentencing contained in this agreement and affirmatively recommend to the Court that it impose sentence in accordance with paragraph 20 of this agreement.

d.   At the time of sentencing, move to dismiss the remaining counts of the obstruction of justice indictment and tax evasion indictment against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

e.   Not further prosecute defendant for defendant's conduct described in the agreed-to factual basis set forth in Exhibit B, or otherwise known to the government and arising out of defendant's false statement and creation of a false and fictitious record, evasion of assessment, or false or fraudulent tax return.

<u>NATURE OF THE OFFENSES</u>

6.   Defendant understands that for defendant to be guilty of the crime charged in Count Two in the obstruction of justice indictment, that is, causing the creation of a false and fictitious record, in violation of 18 U.S.C. § 1519, the following must be true:

a.   First, defendant knowingly caused the making of a false entry in an FBI Form 1023, a record and document; and

b.   Second, defendant acted with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter within the jurisdiction of the United States Department of Justice, a department and agency of the United States.

7.   Defendant understands that for defendant to be guilty of the crime charged in Counts One, Five and Eight in the tax evasion indictment, in violation of 26 U.S.C. § 7201, the following must be true:

a.    First, the defendant owed more federal income tax for the tax years 2020, 2021 and 2022 than was declared due on the defendant's income tax returns for each calendar year.

b.    Second, the defendant knew that more federal income tax was owed than was declared due on the defendant's income tax returns.

c.    Third, the defendant made an affirmative attempt to evade or defeat such additional tax, including at least one of the affirmative acts charged in the tax evasion indictment.

d.    Fourth, in attempting to evade or defeat such additional tax, the defendant acted willfully.

<u>PENALTIES AND RESTITUTION</u>

8.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of:

a.    18 U.S.C. § 1519 (Count Two of the obstruction of justice indictment), is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000; and a mandatory special assessment of $100; and

b.    26 U.S.C. § 7201 (Counts One, Five and Eight of the tax evasion indictment), is 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

9.    Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 35 years imprisonment; a 3-year period of supervised release; a fine of $1,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $400.

10.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all

(135 of 253), Page 135 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 135 of 253
Case 2:24-cr-00091-ODW   Document 195   Filed 12/12/24   Page 6 of 24   Page ID
#:2324

or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

12. Defendant agrees to pay restitution to the Internal Revenue Service for his federal individual income taxes in an amount to be determined by the court, pursuant to 18 U.S.C. § 3663(a)(3).

13. Defendant agrees that restitution to the IRS is due and payable immediately after the judgment is entered and is subject to immediate enforcement in full by the United States. If the Court imposes a schedule of payments, Defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

14. The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). Defendant does not have the right to challenge the amount of this restitution-based assessment. 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor Defendant's timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment.

(136 of 253), Page 136 of 253 Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 136 of 253
Case 2:24-cr-00091-ODW   Document 195   Filed 12/12/24   Page 7 of 24   Page ID
#:2325

## IMMIGRATION CONSEQUENCES

15.    Defendant understands that, if defendant is not a United States citizen, the felony convictions in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty pleas.

## FACTUAL BASIS

16.    Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the SCO-W agree to the statement of facts attached as Exhibit "B" and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 19 below, but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

## SENTENCING FACTORS AND AGREED-UPON SENTENCE

17.    Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only.

18.    Defendant and the SCO-W agree that the base offense level for Count Two in the obstruction indictment is 14, pursuant to U.S.S.G. § 2J1.2(a)(2) and the base offense level for Counts One, Five and Eight is 20, pursuant to U.S.S.G. § 2T4.1(H).  Defendant and the SCO-W reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

7

19. Defendant and the SCO-W agree that, taking into account the factors listed in 18 U.S.C. § 3553(a)(1)-(7) and the relevant sentencing guideline factors, an appropriate disposition of this case is that the Court impose a sentence of: **no less than 48 months and no greater than 72 months' imprisonment; 1 year supervised release with conditions to be fixed by the Court; $400 special assessment; $675,502 restitution and no fine.** The parties also agree that the defendant is entitled to credit in both Cr. Nos. 24-91 and 24-702 for the period of his pretrial detention since the day of his arrest and that credits that the Bureau of Prisons may allow under 18 U.S.C. § 3585(b)) may be credited against this stipulated sentence, including credit under Sentencing Guideline § 5G1.3.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

20. Defendant understands that by pleading guilty, defendant gives up the following rights:

    a. The right to persist in a plea of not guilty.

    b. The right to a speedy and public trial by jury.

    c. The right to be represented by counsel—and, if necessary, have the Court appoint counsel—at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel—and, if necessary, have the Court appoint counsel —- at every other stage of the proceeding.

    d. The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

    e. The right to confront and cross-examine witnesses against defendant.

    f. The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

    g. The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

    h. Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

8

## WAIVER OF APPEAL OF CONVICTION

21.     Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

22.     Defendant agrees that, provided the Court imposes the sentence specified in paragraph 19 above, including a sentence within the agreed upon range, the agreed upon restitution, the agreed upon supervised release term and the agreement for no fine, defendant gives up the right to appeal any portion of that sentence, and the procedures and calculations used to determine and impose any portion of that sentence.

23.     The SCO-W agrees that, provided the Court imposes the sentence specified in paragraph 19 above, including a sentence within the agreed upon range, the agreed upon restitution, the agreed upon supervised release term and the agreement for no fine, the SCO-W gives up its right to appeal any portion of that sentence, and the procedures and calculations used to determine and impose any portion of that sentence.

## WAIVER OF COLLATERAL ATTACK

24.     Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

ER_138

## RESULT OF WITHDRAWAL OF GUILTY PLEA

25.    Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the SCO-W will be relieved of all of its obligations under this agreement; and (b) should the SCO-W choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the withdrawal of the plea; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement, or as a result of the additional time lapse after the plea is withdrawn.

## EFFECTIVE DATE OF AGREEMENT

26.    This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant Special Counsel.

## BREACH OF AGREEMENT

27.    Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant Special Counsel, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the SCO-W may declare this agreement breached.  All of defendant's obligations are material, and therefore a single breach of this agreement is sufficient for the SCO-W to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the SCO-W in writing.  If the SCO-W declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, (b) the SCO-W will be relieved of all its obligations under this agreement, and (c) the Court's failure to

10

1  follow any recommendation or request regarding the sentence set forth in this agreement

2  will not provide a basis for defendant to withdraw defendant's guilty pleas.

3      28.   Following the Court's finding of a knowing breach of this agreement by

4  defendant, should SCO-W  choose to pursue any charge or any civil, administrative, or

5  regulatory action that was either dismissed or not filed as a result of this agreement, then:

6          a.   Defendant agrees that any applicable statute of limitations is tolled

7  between the date of defendant's signing of this agreement and the court's finding of a

8  breach.

9          b.   Defendant waives and gives up all defenses based on the statute of

10  limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to

11  any such action, except to the extent that such defenses existed as of the date of defendant's

12  signing this agreement or as a result of the additional time lapse after the court's finding

13  of a breach.

14          c.   Except in the event that the plea is withdrawn under Federal Rule of

15  Criminal Procedure 11(c)(1)(C), defendant agrees that: (i) any statements made by

16  defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the

17  breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence

18  derived from such statements, shall be admissible against defendant in any such action

19  against defendant, and defendant waives and gives up any claim under the United States

20  Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the

21  Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any

22  evidence derived from the statements should be suppressed or are inadmissible.

23        COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

24                OFFICE NOT PARTIES

25      29.   Defendant understands that the Court and the United States Probation and

26  Pretrial Services Office are not parties to this agreement and need not accept any of the

27  parties' agreements to facts, sentencing factors, or sentencing.  Defendant understands that

28  the Court will determine the facts, sentencing factors, and other considerations relevant to

11

ER_140

1   sentencing and will decide for itself whether to accept and agree to be bound by this

2   agreement.

3        30.   Defendant understands that both defendant and the SCO-W are free to:

4   (a) supplement the facts by supplying relevant information to the United States Probation

5   and Pretrial Services Office and the Court, and (b) correct any and all factual

6   misstatements relating to the Court's Sentencing Guidelines calculations and

7   determination of sentence.  While this paragraph permits both the SCO-W and defendant

8   to submit full and complete factual information to the United States Probation and Pretrial

9   Services Office and the Court, this paragraph does not affect defendant's and the SCO-

10  W's obligations not to contest the facts agreed to in this agreement.

11                      <u>NO ADDITIONAL AGREEMENTS</u>

12       31.   Defendant understands that, except as set forth herein, there are no promises,

13  understandings, or agreements between the SCO-W and defendant or defendant's

14  attorney, and that no additional promise, understanding, or agreement may be entered into

15  unless in a writing signed by all parties or on the record in court.

16           <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

17       32.   The parties agree that this agreement will be considered part of the record of

18  defendant's guilty plea hearing as if the entire agreement had been read into the record of

19  the proceeding.

20  //

21  //

22  //

23

24

25

26

27

28

1  AGREED AND ACCEPTED:

2
OFFICE OF SPECIAL COUNSEL
3  UNITED   STATES   DEPARTMENT   OF   JUSTICE
4

5  DAVID C. WEISS
Special Counsel
6

7

8

9  _____

10  LEO J. WISE                              _____
Date
11  Principal Senior Assistant Special Counsel
DEREK E. HINES
12  Senior Assistant Special Counsel
SEAN F. MULRYNE
13  CHRISTOPHER M. RIGALI
14  Assistant Special Counsels

15  _____

16  ALEXANDER SMIRNOV                        12/16/2024
Date
17  Defendant

18  _____        12/10/24
Date
19  RICHARD A. SCHONFELD
DAVID Z. CHESNOFF
20  Attorneys for Defendant Alexander Smirnov

21

22              CERTIFICATION OF DEFENDANT

23       I have read this agreement in its entirety.  I have had enough time to review and

24  consider this agreement, and I have carefully and thoroughly discussed every part of it

25  with my attorney.  I understand the terms of this agreement, and I voluntarily agree to

26  those terms.  I have discussed the evidence with my attorney, and my attorney has advised

27  me of my rights, of possible pretrial motions that might be filed, of possible defenses that

28  might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C.

§ 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          12/10/2024  _____
ALEXANDER SMIRNOV                          Date
Defendant

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am ALEXANDER SMIRNOV's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____  *counsel cannot discuss and I confirm the remainder          12/10/24  _____
RICHARD A. SCHONFELD                        Date
DAVID Z. CHESNOFF
Attorneys for Defendant Alexander Smirnov

14

# EXHIBIT "B"

## STATEMENT OF FACTS IN SUPPORT OF PLEA AGREEMENT FOR
## DEFENDANT ALEXANDER SMIRNOV

Defendant ALEXANDER SMIRNOV was a resident of Los Angeles, California and a self-described "consultant."

Defendant was born in the U.S.S.R. and was naturalized as a U.S. citizen on July 21, 2015.

*United States v. Alexander Smirnov*, No. 2:24-CR-00091-ODW

Defendant was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI"). As a CHS, Defendant was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.

As a CHS, Defendant provided information to the Handler that was then used in various criminal investigations conducted by the FBI. Defendant knew that information he provided was used in criminal investigations because, among other reasons, the Handler advised him that he might have to testify in court based on the information he provided on multiple occasions, including, but not limited to: 10/1/2010, 5/17/2011, 11/28/2012, 04/12/2013, 8/29/2013, 7/10/2015, and 3/11/2020. Defendant also knew the information he provided was used in criminal investigations because Defendant participated in a number of operations where he was authorized to engage in criminal activity as part of an ongoing criminal investigation.

Defendant was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022, and 9/29/2023.

ER_144

In addition, when Defendant was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)." When Defendant was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020.

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, Defendant provided false derogatory information to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America.

In March 2017, Defendant reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. In reporting that conversation to the Handler, Defendant also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known. Notably, Defendant did not report in 2017 that in the preceding two years, Burisma Official 1 admitted to Defendant that he had paid Public Official 1 $5 million when Public Official 1 was still in office, as Defendant later claimed. That information was memorialized in an official record of the FBI on a Form 1023 (hereafter the "2017 1023").

Three years later, in May 2020, Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major American political parties.

16

One month later, in June 2020, Defendant reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]." Defendant was in Los Angeles, California, at the time he made these statements to the Handler.

Defendant also reported in June 2020 two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1.

The information Defendant provided the Handler was memorialized on a Form 1023 (hereafter the "2020 1023"), an official record of the FBI, which was finalized on June 30, 2020.

The events Defendant first reported to the Handler in June 2020 were fabrications. In truth and fact, Defendant had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016 — in other words, when Public Official 1 could not engage in any official act to influence U.S. policy and when the Prosecutor General was no longer in office. Defendant transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy.

When he was interviewed by FBI agents in September 2023, Defendant repeated some of his false claims, changed his story as to other of his claims, and promoted a new

17

false narrative about the son of Public Official 1 after he met with Russian intelligence officials.

*United States v. Alexander Smirnov*, No. 2:24-CR-00702-ODW

Defendant received more than two million dollars in income from multiple sources in 2020, 2021 and 2022. He used these funds to pay personal expenses for himself and his Domestic Partner, a woman that he has referred to as his girlfriend and at other times his wife, although they are not married. These expenditures included a $1.4 million Las Vegas condominium, a Bentley, and hundreds of thousands of dollars of clothes, jewelry and accessories for himself and Domestic Partner purchased at high-end retailers in Los Angeles and Las Vegas. Defendant directed the payors to wire the money to:

    a. a Bank of America (hereafter "BoA") account ending in 3928 held in the name of Avalon Group Inc. (hereafter" Avalon Account"), which the defendant controlled;

    b. a Wells Fargo account ending in 1356 held in the name of Domestic Partner, ("Domestic Partner Account") which the defendant controlled and into which the defendant also transferred approximately $1.8 million from the Avalon Account; and

    c. a Wells Fargo account ending in 1299 held in the name of Goldman Investments Group, which the defendant controlled and into which he also transferred $150,000 from the Avalon Account.

Avalon Group Inc. ("Avalon") is the defendant's alter ego. Avalon was incorporated in the State of Delaware on January 22, 2020. The defendant identified himself in a State of Delaware Annual Franchise Tax Report as the CEO of Avalon and its only officer and director. According to bank account applications, the defendant identified himself as the president of Avalon. On a business credit card application dated June 18, 2022, Smirnov listed $60,000 in total annual income and $250,000 in gross business income, identified investment income as the source of his income, and listed his current position as real estate.

18

ER_147

Despite having an IRS tax filing requirement, Avalon never filed a U.S. Corporation Income Tax Return on Form 1120.

I. Sources of Income

A. *Company 1*

In 2020, 2021 and 2022, Defendant received into the Avalon Account, $1,534,000 from Company 1.

| DATE | PAYOR | AMOUNT |
|------|-------|--------|
| 9/22/2020 | Wire – Company 1 | $600,000 |
| 12/14/2020 | Wire – Company 1 | $750,000 |
| 8/31/2021 | Wire – Company 1 | $60,000 |
| 9/29/2021 | Wire – Company 1 | $60,000 |
| 10/27/2021 | Wire – Company 1 | $64,000 |
| **TOTAL** | | **$1,534,000** |

B. *BCG, LLC and Payor 1*

In 2021 and 2022, Defendant received into the Avalon Account, $800,000 from Payor 1 and BCG, LLC ("BCG"), an entity owned and controlled by Payor 1, including the payments listed below.

| DATE | PAYOR | AMOUNT |
|------|-------|--------|
| 12/1/2021 | Wire – BCG | $500,000 |
| 3/30/2022 | Wire – Payor 1 | $250,000 |
| 8/29/2022 | Wire – BCG | $50,000 |
| **TOTAL** | | **$800,000** |

II. Transfers to the Domestic Partner Wells Fargo Account

In 2020, 2021 and 2022, the defendant transferred more than $1.8 million from the Avalon Account to the Domestic Partner Account.

The defendant co-mingled these funds with other funds in the Domestic Partner Account.

ER_148

III. Defendant Used His Unreported Income to Pay His and Domestic Partner's Personal Expenses

The defendant used unreported income he received in the Avalon Account and the Domestic Partner Account to pay various personal expenses for the defendant and for Domestic Partner.

The largest personal expense was the purchase of a million-dollar condominium where he and Domestic Partner lived in Las Vegas in 2022.

The second largest single expense occurred on October 11, 2022, when the defendant leased a Bentley using $122,360 in funds from the Domestic Partner Account. The defendant signed the check made out to Bentley Financial Services for the lease.

From 2021 to 2024, more than $400,000 in personal credit card debt on the defendant's Citi credit card was paid off from funds from the Domestic Partner Account.

IV. False and Fictitious Tax Returns

In order to conceal the millions of dollars he received in income in 2020, 2021 and 2022, the defendant created and filed false Forms 1040, U.S. Individual Income Tax Returns, for himself and in Domestic Partner's name that included false and fictitious income and expenses. The defendant used a professional tax return preparer to create these returns. The professional tax return preparer, who worked in Los Angeles, used a tax preparation software to create returns for the defendant. The defendant provided the professional tax return preparer with the income and expense figures included in the returns filed on his own behalf and the ones filed in Domestic Partner's name. The defendant did not provide any documents that substantiated any of these figures. As a result, the professional tax return preparer refused to sign the returns. The defendant told the professional tax return preparer that he would not disclose how he earned any income and that the professional tax return preparer should not inquire about how he earned his income. The defendant also instructed the tax return preparer to delete any emails or messages with the defendant, which the professional tax return preparer did. The professional tax return preparer advised the defendant that the Schedule C to an U.S.

20

Individual Income Tax Return was the most audited part of a tax return because it was often used to cheat on taxes and that, as a result, the defendant should collect and maintain records that supported all the income and expenses he instructed the professional tax return preparer to include on Schedule C.  The defendant provided income and expense numbers to the professional tax return preparer both for his Form 1040 and the Form 1040 that he submitted in Domestic Partner's name.  The professional tax return preparer never spoke to or interacted with Domestic Partner in 2020, 2021 or 2022.

In addition, on or about March 19, 2021, the defendant prepared and filed a false Form 1120-S, U.S. Income Tax Return for an S Corporation, for Goldman Investments Group in 2020.  This return included false and fictious income and expenses for Goldman Investments Group.  The Defendant did not use the services of the professional tax return preparer in the creation of this return.

*A. Alexander Smirnov Forms 1040*

Defendant filed false Forms 1040, U.S. Individual Income Tax Returns, for himself where he falsely claimed on the Schedules C attached to each return that he received:

    a.  $40,000, in gross receipts for "consulting" in 2020,

    b.  $40,000 in gross receipts for "consulting" in 2021, and

    c.  $50,000 in gross receipts for "consulting" in 2022.

The Defendant did not pay taxes on this fictitious income.  Instead, on those Schedules C, he claimed fictitious expenses in the following amounts in the following tax years:

    a.  In 2020, $31,980;

    b.  In 2021, $39,878; and

    c.  In 2022, $26,768.

As a result, the defendant falsely self-assessed owing the U.S. Treasury:

    a.  In 2020, only $1,133 in taxes; defendant further reduced his tax obligations by falsely claimed a $600 COVID-19 pandemic rebate for persons who

earned $75,000 or less, and $538 in earned income credit (EIC) which he falsely claimed entitled him to a refund of $5;

b. In 2021, $0 in taxes; defendant again further reduced his tax obligations by falsely claiming a $1,400 COVID-19 pandemic rebate for persons who earned less than $80,000, and $19 in EIC, which he then claimed entitled him to a refund in the amount of $1,419; and

c. In 2022, only $4,136 in taxes.

B. *Domestic Partner Forms 1040*

To further conceal the millions of dollars in income he received and used to pay his and Domestic Partner's personal expenses, including income deposited into the Domestic Partner Account from which his personal expenses were paid, defendant also prepared and filed false Forms 1040 in the name of Domestic Partner in 2020, 2021 and 2022 where he falsely claimed on the Schedules C attached to each return that Domestic Partner received:

a. $40,000, in gross receipts for "consulting" in 2020;

b. $40,000 in gross receipts for "consulting" in 2021; and

c. $60,000 in gross receipts for "consulting" in 2022.

Like his own Form 1040, defendant claimed on those Schedules C similar fictitious expenses in the following amounts in the following tax years:

a. In 2020, $31,314;

b. In 2021, $36,689; and

c. In 2022, $31,553.

As a result, the defendant falsely assessed that Domestic Partner owed the U.S. Treasury:

a. In 2020, $1,228 in taxes; the defendant further reduced any tax obligations by falsely claiming that Domestic Partner was entitled to a $538 EIC which he claimed resulted in Domestic Partner owing the U.S. Treasury only $690;

b. In 2021, $468 in taxes; the defendant again further reduced any tax obligations by falsely claiming that Domestic Partner was entitled to $470 EIC, which he then claimed entitled her to a refund in the amount of $2; and

c. In 2022, $5,933 in taxes.

### C. Goldman Investments Group Forms 1120

To further conceal the millions of dollars in income he received into a bank account held in the name of Goldman Investments Group, the defendant filed a Form 1120-S, U.S. Income Tax Return for an S Corporation, in the name of Goldman Investments Group in 2021. The defendant falsely reported that Goldman had $89,282 in gross sales and $92,300 in total deductions.

### D. Defendant Signed the False Returns

In 2021, the defendant signed his own false return and the false returns he prepared in the name of Domestic Partner and Goldman Investments Group for tax year 2020.

In 2022, the defendant signed his own false Form 1040 and signed the false Form 1040 that he prepared for Domestic Partner for tax year 2021

In 2023, the defendant prepared a false and fictious Form 1040 for Domestic Partner and while he signed his own false and fictitious Form 1040, his signature did not appear on Domestic Partner's return for tax year 2022.

## CERTIFICATION OF DEFENDANT

I have read this STATEMENT OF FACTS IN SUPPORT OF PLEA AGREEMENT ("statement of facts") in its entirety.  I have had enough time to review and consider this statement of facts, and I have carefully and thoroughly discussed every part of it with my attorney.  I agree that this statement of facts is accurate and correct, and is sufficient to support a plea of guilty to the charges described in the plea agreement and to establish the Sentencing Guidelines factors forth in paragraph 19 of the plea agreement.


_____          12/10/2024
ALEXANDER SMIRNOV                          Date
Defendant


## CERTIFICATION OF DEFENDANT'S ATTORNEYS

We are ALEXANDER SMIRNOV's attorneys.  We have carefully and thoroughly discussed every part of this statement of facts with my client and agree that it is sufficient to support a plea of guilty to the charges described in the plea agreement and to establish the Sentencing Guidelines factors set forth in paragraph 19 of the plea agreement.


_____          12/10/24
RICHARD A. SCHONFELD                       Date
DAVID Z. CHESNOFF
Attorneys    for    Defendant    ALEXANDER
SMIRNOV

24

```
                                        F I L E D
                                  CLERK, U.S. DISTRICT COURT

                                     11/21/2024

                                  CENTRAL DISTRICT OF CALIFORNIA
                                  BY: _____ASI_____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| UNITED STATES OF AMERICA, | No. 2:24-cr-00702-HDV |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [26 U.S.C. § 7201: evasion of assessment; 26 U.S.C. § 7206: false or fraudulent tax return] |
| ALEXANDER SMIRNOV, | |
| Defendant. | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.      Defendant ALEXANDER SMIRNOV was a resident of Los Angeles, California and a self-described "consultant."

2.      Defendant was born in the U.S.S.R. and was naturalized as a U.S. citizen on July 21, 2015.

3.      Defendant received more than two million dollars in income from multiple sources in 2020, 2021 and 2022.  He used these funds to pay personal expenses for himself and his Domestic Partner, a woman that he has referred to as his girlfriend and at other times his wife,

although they are not married.  These expenditures included a $1.4 million Las Vegas condominium, a Bentley, and hundreds of thousands of dollars of clothes, jewelry and accessories for himself and Domestic Partner purchased at high-end retailers in Los Angeles and Las Vegas. Defendant directed the payors to wire the money to

      a. a Bank of America (hereafter "BoA") account ending in 3928 held in the name of Avalon Group Inc. (hereafter "Avalon Account"), which the defendant controlled;

      b. a Wells Fargo account ending in 1356 held in the name of Domestic Partner, ("Domestic Partner Account") which the defendant controlled and into which the Defendant also transferred approximately $1.8 million from the Avalon Account; and

      c. a Wells Fargo account ending in 1299 held in the name of Goldman Investments Group, which the defendant controlled and into which he also transferred $150,000 from the Avalon Account.

4.      Avalon Group Inc. ("Avalon") is the Defendant's alter ego. Avalon was incorporated in the State of Delaware on January 22, 2020. The Defendant identified himself in a State of Delaware Annual Franchise Tax Report as the CEO of Avalon and its only officer and director.  According to bank account applications, the Defendant identified himself as the president of Avalon. On a business credit card application dated June 18, 2022, Smirnov listed $60,000 in total annual income and $250,000 in gross business income, identified investment income as the source of his income, and listed his current position as real estate. Despite having an IRS tax filing requirement, Avalon never filed a U.S. Corporation Income Tax Return on Form 1120.

I. <u>Sources of Income</u>

*A. Company 1*

5.     In 2020, 2021 and 2022, Defendant received into the Avalon Account, $1,534,000 from Company 1, including the payments listed below.

| DATE | PAYOR | AMOUNT |
|------|-------|--------|
| 9/22/2020 | Wire — Company 1 | $600,000 |
| 12/14/2020 | Wire — Company 1 | $750,000 |
| 8/31/2021 | Wire — Company 1 | $60,000 |
| 9/29/2021 | Wire — Company 1 | $60,000 |
| 10/27/2021 | Wire — Company 1 | $64,000 |
| **TOTAL** | | **$1,534,000** |

B. *BCG, LLC and Payor 1*

6.     In 2021 and 2022, Defendant received into the Avalon Account, $800,000 from Payor 1 and BCG, LLC ("BCG"), an entity owned and controlled by Payor 1, including the payments listed below.

| DATE | PAYOR | AMOUNT |
|------|-------|--------|
| 12/1/2021 | Wire — BCG | $500,000 |
| 3/30/2022 | Wire — Payor 1 | $250,000 |
| 8/29/2022 | Wire — BCG | $50,000 |
| | **TOTAL** | **$800,000** |

II.   <u>Transfers to the Domestic Partner Wells Fargo Account</u>

7.     In 2020, 2021 and 2022, the Defendant transferred more than $1.8 million from the Avalon Account to the Domestic Partner Account. Specifically,

a.   The Defendant wired the following amounts on the dates listed below:

| DATE | AMOUNT |
|------|--------|
| 12/21/2020 | $740,000 |
| 12/6/2022 | $45,000 |

ER_156

b.    On the following dates, the Defendant purchased BoA cashiers' checks in the amounts listed below, which were drawn on the Avalon Account and then deposited into the Domestic Partner Account.

| DATE | AMOUNT |
|------|--------|
| 3/6/2020 | $150,000 |
| 6/25/2020 | $99,500 |
| 10/13/2020 | $599,000 |
| 7/29/2021 | $14,500 |
| 8/31/2021 | $50,000 |
| 9/2/2021 | $50,000 |
| 9/7/2021 | $60,000 |
| 10/4/2021 | $59,500 |
| 11/5/2021 | $60,000 |
| 11/22/2021 | $60,000 |
| 11/29/2021 | $45,000 |
| 12/6/2021 | $30,000 |
| 2/24/2022 | $50,000 |
| 3/11/2022 | $150,000 |
| 3/23/2022 | $150,000 |
| 4/5/2022 | $50,000 |
| 5/2/2022 | $150,000 |
| 11/25/2022 | $45,000 |
| **TOTAL** | **$1,872,500** |

8.    The Defendant co-mingled these funds with other funds in the Domestic Partner Account.

III. Defendant Used His Unreported Income to Pay His and Domestic Partner's Personal Expenses

9.    The Defendant used unreported income he received in the Avalon Account and the Domestic Partner Account to pay various personal expenses for the Defendant and for Domestic Partner.

10.    The largest personal expense was the purchase of a million dollar condominium where he and Domestic Partner lived in Las Vegas in 2022.

4

ER_157

11.    The second largest single expense occurred on October 11, 2022, when the Defendant leased a Bentley using $122,360 in funds from the Domestic Partner Account.  The Defendant signed the check made out to Bentley Financial Services for the lease:



12.    From 2021 to 2024, more than $400,000 in personal credit card debt on the Defendant's Citi credit card was paid off from funds from the Domestic Partner Account.

IV.   False and Fictitious Tax Returns

13.    In order to conceal the millions of dollars he received in income in 2020, 2021 and 2022, the Defendant created and filed false Forms 1040, U.S. Individual Income Tax Returns, for himself and in Domestic Partner's name that included false and fictitious income and expenses.  The Defendant used a professional tax return preparer to create these returns.  The professional tax return preparer, who worked in Los Angeles, used a tax preparation software to create returns for the Defendant.  The Defendant provided the professional tax return preparer with the income and expense figures included in the returns

5

1   filed on his own behalf and the ones filed in Domestic Partner's name.

2   The Defendant did not provide any documents that substantiated any of

3   these figures.   As a result, the professional tax return preparer

4   refused to sign the returns.   The Defendant told the professional tax

5   return preparer that he would not disclose how he earned any income

6   and that the professional tax return preparer should not inquire about

7   how he earned his income.   The Defendant also instructed the tax return

8   preparer to delete any emails or messages with the Defendant, which

9   the professional tax return preparer did.   The professional tax return

10  preparer advised the Defendant that the Schedule C to an U.S. Individual

11  Income Tax Return was the most audited part of a tax return because it

12  was often used to cheat on taxes and that, as a result, the Defendant

13  should collect and maintain records that supported all the income and

14  expenses he instructed the professional tax return preparer to include

15  on Schedule C.   The Defendant provided income and expense numbers to

16  the professional tax return preparer both for his Form 1040 and the

17  Form 1040 that he submitted in Domestic Partner's name.   The

18  professional tax return preparer never spoke to or interacted with

19  Domestic Partner in 2020, 2021 or 2022.

20  14.   In addition, on or about March 19, 2021, the Defendant

21  prepared and filed a false Form 1120-S, U.S. Income Tax Return for an

22  S Corporation, for Goldman Investments Group in 2020.   This return

23  included false and fictious income and expenses for Goldman Investments

24  Group.   The Defendant did not use the services of the professional tax

25  return preparer in the creation of this return.

26

27

28

1    *A. Alexander Smirnov Forms 1040*

2    15.   Defendant filed false Forms 1040, U.S. Individual Income Tax

3    Returns, for himself where he falsely claimed on the Schedule C attached

4    to each return that he received:

5         a.   $40,000, in gross receipts for "consulting" in 2020,

6         a.   $40,000 in gross receipts for "consulting" in 2021, and

7         b.   $50,000 in gross receipts for "consulting" in 2022.

8    16.   The Defendant did not pay taxes on this fictitious income.

9    Instead, on those Schedules C, he claimed fictitious expenses in the

10   following amounts in the following tax years:

11        a.   In 2020, $31,980;

12        b.   In 2021, $39,878; and

13        c.   In 2022, $26,768.

14   17.   As a result, the Defendant falsely self-assessed owing the

15   U.S. Treasury:

16        a.   In 2020, only $1,133 in taxes; Defendant further reduced his

17             tax obligations by falsely claimed a $600 COVID-19 pandemic rebate

18             for persons who earned $75,000 or less, and $538 in earned income

19             credit(EIC) which he falsely claimed entitled him to a refund of

20             $5;

21        b.   In 2021, $0 in taxes; Defendant again further reduced his

22             tax obligations by falsely claiming a $1,400 COVID-19 pandemic

23             rebate for persons who earned less than $80,000, and $19 in EIC,

24             which he then claimed entitled him to a refund in the amount of

25             $1,419; and

26        c.   In 2022, only $4,136 in taxes.

27   *B. Domestic Partner Forms 1040*

28

ER_160

18.  To further conceal the millions of dollars in income he received and used to pay his and Domestic Partner's personal expenses, including income deposited into the Domestic Partner Account from which his personal expenses were paid, Defendant also prepared and filed false Forms 1040 in the name of Domestic Partner in 2020, 2021 and 2022 where he falsely claimed on the Schedule C attached to each return that Domestic Partner received:

    d.  $40,000, in gross receipts for "consulting" in 2020,

    e.  $40,000 in gross receipts for "consulting" in 2021, and

    f.  $60,000 in gross receipts for "consulting" in 2022.

19.  Like his own Form 1040, Defendant claimed on those Schedules C similar fictitious expenses in the following amounts in the following tax years:

    a.  In 2020, $31,314;

    b.  In 2021, $36,689; and

    c.  In 2022, $31,553.

20.  As a result, the Defendant falsely assessed that Domestic Partner owed the U.S. Treasury:

    a. In 2020, $1,228 in taxes; the Defendant further reduced any tax obligations by falsely claiming that Domestic Partner was entitled to a $538 EIC which he claimed resulted in Domestic Partner owing the U.S. Treasury only $690;

    b. In 2021, $468 in taxes; the Defendant again further reduced any tax obligations by falsely claiming that Domestic Partner was entitled to $470 EIC, which he then claimed entitled her to a refund in the amount of $2; and

    c. In 2022, $5,933 in taxes.

1    *C. Goldman Investments Group Forms 1120*

2    21.    To further conceal the millions of dollars in income he

3    received into a bank account held in the name of Goldman Investments

4    Group, the Defendant filed a Form 1120-S, U.S. Income Tax Return for

5    an S Corporation, in the name of Goldman Investments Group in 2021.

6    The Defendant falsely reported that Goldman had $89,282 in gross sales

7    and $92,300 in total deductions.

8    *D. Defendant Signed the False Returns*

9    22.    In 2021, the Defendant signed his own false return and the

10   false returns he prepared in the name of Domestic Partner and Goldman

11   Investments Group for tax year 2020.

12        a.    2020 Alexander Smirnov Form 1040



17        b.    2020 Domestic Partner Form 1040



23        c.    2020 Goldman Investments Group Form 1120



9

1    23.    In 2022, the Defendant signed his own false Form 1040 and

2  signed the false Form 1040 that he prepared for Domestic Partner for

3  tax year 2021:

4          a.    2021 Alexander Smirnov Form 1040



5

6

7

8

9          b.    2021 Domestic Partner Form 1040

10



11

12

13

14

15

16

17

18

19

20

21                    [this space intentionally left blank]

22

23

24

25

26

27

28

ER_163

24.    In 2023, the Defendant prepared a false and fictious Form 1040 for Domestic Partner and while he signed his own false and fictitious Form 1040 his signature did not appear on Domestic Partner's return for tax year 2022:

a.    2022 Alexander Smirnov Form 1040



b.    2022 Domestic Partner Form 1040



[this space intentionally left blank]

11

1                            COUNT ONE

2                [26 U.S.C. § 7201: 2020 tax evasion]

3       1.      The Grand Jury re-alleges paragraphs 1 through 20 of the

4    Introductory Allegations in this Indictment here.

5       2.      On February 10, 2020, the Defendant caused the opening of

6    the Avalon Bank Account, in the name of Avalon Group Inc., which he

7    identified on the account opening document as an "S Corporation."  An

8    individual (hereafter "Bookkeeper") was identified as "president" of

9    Avalon and the Defendant was identified as a "signer" on the account

10   opening document.  Bookkeeper agreed to be listed on the account

11   because the Defendant had told her he wanted to use her services as a

12   bookkeeper for Avalon's business and having signatory authority on

13   the account meant she could access its statements for bookkeeping

14   purposes.  Bookkeeper never accessed any of the funds in the Avalon

15   Account.  Later the Defendant told Bookkeeper that he didn't need her

16   services because Avalon wasn't operating.  On July 21, 2021, the

17   Defendant submitted a revised signature card to Bank of America that

18   removed Bookkeeper, making him the sole signatory on the account.

19      3.      On August 5, 2020, the Defendant submitted to Wells Fargo

20   an "Addendum to Certificate of Authority," for the Goldman

21   Investments Group account ending in 1299, adding himself as an

22   authorized signer.  The Defendant had previously, on June 27, 2018,

23   caused Domestic Partner's adult son to open the Goldman Investments

24   Group account ending in 1299 at Wells Fargo.

25      4.      On August 24, 2020, the Defendant entered into a stock

26   purchase agreement with Company 1.  The defendant signed the stock

27   purchase agreement on behalf of "Avalon Group Inc., a Delaware

28   corporation" as its "President" and "Authorized Officer."  Pursuant

                                    12

ER_165

1   to that agreement, Company 1 purchased 51% of Avalon's common stock

2   for a cash payment of $1,350,000 "at Closing," and 1,500,000 shares

3   of Company 1 "after closing."

4      5.      The Defendant never delivered to Company 1 any stock

5   certificates for Avalon because it was his alter ego.

6      6.      In order to cause Company 1 to purchase 51% of Avalon's

7   common stock, the Defendant represented that Avalon owned valuable

8   intellectual property.  Specifically, in the stock purchase

9   agreement, the Defendant represented that "Avalon has all rights,

10   without encumbrance, to the Best Finex System and Ai Trading

11   Algorithms."  The Defendant never provided Company 1 with access to

12   the "Best Finex System and Ai Trading Algorithms."

13      7.      Further, in that agreement, the Defendant represented that:

14         a.   "Avalon has provided to Company 1 financial statements

15   for the year ended December 31, 2019 (collectively, the "Financial

16   Statements")."  The Defendant did not, in fact, provide any financial

17   statements for Avalon to Company 1 because Avalon had none, as it was

18   the Defendant's alter ego.

19         b.   Avalon has "timely filed all tax returns and reports

20   (including information returns and reports) as required by law."  In

21   fact, the Defendant had never filed tax returns on behalf of Avalon

22   Group Inc. because it was his alter ego.

23         c.   "No employee, officer, director or shareholder of

24   Avalon or member of his or her immediate family (together, "Related

25   Parties") is indebted to Avalon, nor is Avalon indebted (or committed

26   to make loans or extend or guarantee credit) to the Related Parties

27   in the aggregate in excess of $10,000."  Thus, the money that the

28

(167 of 253) Page 167 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 167 of 253
Case 2:24-cr-00702-ODW   Document 1   Filed 11/21/24   Page 14 of 27   Page ID #:14

1  Defendant took from Avalon's BoA account ending in 3928 was not the

2  repayment of a loan from him to Avalon.

3       d.   "Avalon has furnished to Company 1 true and complete

4  copies of … (b) the minute books of Avalon and (c) the stock transfer

5  books of Avalon."  The Defendant did not, in fact, provide Company 1

6  with the minute books of Avalon or the stock transfer books of Avalon

7  because neither existed since it was his alter ego.

8  8.    On September 22, 2020, Company 1 wired the Defendant

9  $600,000 and on December 14, 2020, Company 1 wired the Defendant

10 $750,000, for a total of $1.35 million, the amount contained in the

11 stock purchase agreement.  Both wires were made into the Avalon

12 Account at BoA ending in 3928.

13 9.    When the Avalon Account was opened on February 10, 2020,

14 $100 was deposited into it.  On July 9, 2024, the balance in the

15 Avalon Account was $31.12.  The next transaction in the account was

16 when Company 1 wired $600,000 into the account on September 22, 2020,

17 pursuant to the stock purchase agreement.  The Defendant then paid

18 various personal expenses totaling $617 out of the Avalon Account.

19 10.   On October 13, 2020, less than 30 days after he received

20 the $600,000 payment from Company 1, the Defendant withdrew $599,000

21 and purchased a cashier's check in the same amount, which was then

22 deposited in Domestic Partner Account.  Various personal expenses

23 were then paid out of the Wells Fargo account for the Defendant's and

24 Domestic Partner's benefit including property taxes and homeowner's

25 association fees for their home in California at the time, utilities

26 for that home, healthcare costs, personal credit cards and other

27 expenses.  Similarly, on December 21, 2020, less than one week after

28 the Defendant received a $750,000 wire from Company 1 into the Avalon

1   Account, he wired $740,000 to the Domestic Partner Account.  After

2   December 21, 2020, personal expenses were paid out of the Domestic

3   Partner Account for the benefit of the Defendant and Domestic

4   Partner.

5                            The Charge

6     11.    From on or about January 1, 2020, through on or about April

7   21, 2021, in the Central District of California and elsewhere, the

8   Defendant ALEXANDER SMIRNOV, willfully attempted to evade and defeat

9   income tax due and owing by him to the United States of America, for

10  the calendar year 2020, by committing the following affirmative acts

11  among others:

12          a.    On March 13, 2021, the Defendant prepared and caused

13  to be prepared, and signed, a false and fraudulent U.S. Income Tax

14  Return for an S Corporation, Form 1120-S, for Goldman Investments

15  Group, which was submitted to the Internal Revenue Service.

16          b.    On April 21, 2021, the Defendant prepared and caused

17  to be prepared, and signed, a false and fraudulent U.S. Individual

18  Income Tax Return, Form 1040, for himself, which was submitted to the

19  Internal Revenue Service.

20          c.    On April 21, 2021, the Defendant prepared and caused

21  to be prepared, and signed, a false and fraudulent U.S. Individual

22  Income Tax Return, Form 1040, for Domestic Partner, which was

23  submitted to the Internal Revenue Service.

24     In violation of Title 26, United States Code, Section 7201.

25

26

27

28

                                15

                              COUNT TWO

                [26 U.S.C. § 7206: Smirnov false 2020 1040]

     1.      The Grand Jury re-alleges paragraphs 1 through 20 of the
Introductory Allegations in this Indictment here.

     2.      On or about April 21, 2021, in the Central District of
California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully
made and subscribed and filed and caused to be filed with the
Internal Revenue Service, a Form 1040, U.S. Individual Income Tax
Return, which was verified by a written declaration that it was made
under the penalties of perjury and which Defendant did not believe to
be true and correct as to every material matter. Specifically, among
other items,

         a.    "total income," in the amount of $8,020 at line 9;

         b.    "Earned Income Credit" in the amount of $538 at line 27;
         and

         c.    "Recovery rebate credit," in the amount of $600 at line 30.

         In violation of Title 26, United States Code, Section 7206(1).

                                    16

1                          COUNT THREE

2          [26 U.S.C. § 7206: Domestic Partner false 2020 1040]

3     1.      The Grand Jury re-alleges paragraphs 1 through 20 of the

4   Introductory Allegations in this Indictment here.

5     2.      On or about April 21, 2021, in the Central District of

6   California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully

7   made and subscribed and filed and caused to be filed with the

8   Internal Revenue Service, a U.S. Individual Income Tax Return, on

9   Form 1040, in the name of Domestic Partner, which was verified by a

10  written declaration that it was made under the penalties of perjury

11  and which Defendant did not believe to be true and correct as to

12  every material matter. Specifically, among other items:

13        a.   "total income," in the amount of $8,686 at line 9; and

14        b.   "earned income credit," in the amount of $538 on line 27.

15    3.      The return also contained the Defendant's signature, rather

16  than Domestic Partner's:

17        a.   2020 Alexander Smirnov Form 1040

18

19  

20

21

22        b.   2020 Domestic Partner Form 1040

23

24  

25

26

27         In violation of Title 26, United States Code, Section 7206(1).

28

                                17

1                           COUNT FOUR

2    [26 U.S.C. § 7206: Goldman Investments Group's false 2020 1120-S]

3    1.     The Grand Jury re-alleges paragraphs 1 through 20 of the

4    Introductory Allegations in this Indictment here.

5    2.     On or about March 13, 2021, in the Central District of

6    California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully

7    made and subscribed and filed and caused to be filed with the

8    Internal Revenue Service, a U.S. Income Tax Return for an S

9    Corporation, on Form 1120-S, in the name of Goldman Investments

10   Group, which was verified by a written declaration that it was made

11   under the penalties of perjury and which Defendant did not believe to

12   be true and correct as to every material matter. Specifically, among

13   other items:

14       a.   "gross receipts or sales," in the amount of $89,282 on line

15       1a; and

16       b.   "Total deductions," in the amount of $92,300 on line 20.

17   3.   The return also contained the Defendant's signature:

18       a.   2020 Alexander Smirnov Form 1040

19

20   

21

22

23       b.   2020 Goldman Investments Group Form 1120

24

25   

26

27

28       In violation of Title 26, United States Code, Section 7206(1).

COUNT FIVE

[26 U.S.C. § 7201: 2021 tax evasion]

1. The Grand Jury re-alleges paragraphs 1 through 20 of the Introductory Allegations in this Indictment here.

2. On September 27, 2021, the Defendant submitted a "Business Signature Card and Substitute Form W-9" to BoA for the Avalon Account ending in 3928 where he identified himself as "president" of Avalon.

3. On August 31, 2021, the Defendant received in the Avalon Account a $60,000 wire from Company 1.

4. On September 7, 2021, the Defendant purchased a BoA cashiers' check in the amount of $60,000 drawn on the Avalon Account, which was deposited into the Domestic Partner Account. These funds were co-mingled with other funds in the Domestic Partner Account and used to pay the Defendant's and Domestic Partner's personal expenses.

5. On September 29, 2021, the Defendant received in the Avalon Account a $60,000 wire from Company 1.

6. On October 4, 2021, the Defendant purchased a BoA cashiers' check in the amount of $59,500 drawn on the Avalon Account, which was deposited into the Domestic Partner Account. These funds were co-mingled with other funds in the Domestic Partner Account and used to pay the Defendant's and Domestic Partner's personal expenses.

7. On October 27, 2021, the Defendant received in the Avalon Account a $64,000 wire from Company 1.

8. On November 5, 2021, the Defendant purchased a BoA cashiers' check in the amount of $60,000 drawn on the Avalon Account, which was deposited into the Domestic Partner Account. These funds were co-mingled with other funds in the Domestic Partner Account and used to pay the Defendant's and Domestic Partner's personal expenses.

9.      The Defendant caused Company 1 to make these payments--$60,000 on August 31, 2021, $60,000 on September 29, 2021, and $64,000 on October 27, 2021--on the representation that he would use them to pay marketing expenses associated with Avalon's intellectual property.  The Defendant did not use these funds to pay marketing expenses associated with Avalon's intellectual property.  Instead, the Defendant used these funds to pay personal expenses for himself and Domestic Partner.

10.     On December 1, 2021, BCG LLC wired the Defendant $500,000 into the Avalon Account.  The Defendant used the funds from BCG LLC to pay personal expenses for himself and Domestic Partner.

11.     On the following dates, the Defendant purchased BoA cashiers' checks in the amounts listed below, which were drawn on the Avalon Account and then deposited into the Domestic Partner Account.

| DATE | AMOUNT |
|------|--------|
| 2/24/2022 | $50,000 |
| 3/11/2022 | $150,000 |
| 3/23/2022 | $150,000 |
| **TOTAL** | **$350,000** |

These funds were co-mingled with other funds in the Domestic Partner Account and used to pay the Defendant's and Domestic Partner's personal expenses.

<u>The Charge</u>

12.     From on or about January 1, 2021, through on or about March 23, 2022, in the Central District of California and elsewhere, the Defendant ALEXANDER SMIRNOV, willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2021, by committing the following affirmative acts among others:

ER_173

1          a.   On March 23, 2022, the Defendant prepared and caused
2   to be prepared, and signed, a false and fraudulent U.S. Individual
3   Income Tax Return, Form 1040, for himself, which was submitted to the
4   Internal Revenue Service.

5          b.   On March 23, 2022, the Defendant prepared and caused
6   to be prepared, and signed, a false and fraudulent U.S. Individual
7   Income Tax Return, Form 1040, for Domestic Partner, which was
8   submitted to the Internal Revenue Service.

9      In violation of Title 26, United States Code, Section 7201.

21

COUNT SIX

[26 U.S.C. § 7206: Smirnov false 2021 1040]

1.    The Grand Jury re-alleges paragraphs 1 through 20 of the Introductory Allegations in this Indictment here.

2.    On or about March 23, 2022, in the Central District of California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, a U.S. Individual Income Tax Return, on Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and which Defendant did not believe to be true and correct as to every material matter. Specifically, among other items:

        a. "total income," in the amount of $122 at line 9;

        b. "Earned Income Credit in the amount of $19 at line 27a; and

        c. "Recovery rebate credit," in the amount of $1,400 at line 30.

    In violation of Title 26, United States Code, Section 7206(1).

22

ER_175

```
1                           COUNT SEVEN

2           [26 U.S.C. § 7206: Domestic Partner false 2021 1040]

3      1.      The Grand Jury re-alleges paragraphs 1 through 20 of the

4  Introductory Allegations in this Indictment here.

5      2.      On or about March 23, 2022, in the Central District of

6  California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully

7  made and subscribed and filed and caused to be filed with the

8  Internal Revenue Service, a U.S. Individual Income Tax Return, on

9  Form 1040, in the name of Domestic Partner, which was verified by a

10 written declaration that it was made under the penalties of perjury

11 and which Defendant did not believe to be true and correct as to

12 every material matter. Specifically,

13          a. "total income," in the amount of $3,311 at line 9; and

14          b. "Earned income credit" in the amount of $470 at line 27.

15     3.      The return also contained the Defendant's signature, rather

16 than Domestic Partner's:

17          a.    2021 Alexander Smirnov Form 1040
```



```
22          b.    2021 Domestic Partner Form 1040
```



```
27      In violation of Title 26, United States Code, Section 7206(1).
```

COUNT EIGHT

[26 U.S.C. § 7201: 2022 tax evasion]

1.      The Grand Jury re-alleges paragraphs 1 through 20 of the
Introductory Allegations in this Indictment here.

2.      On March 30, 2022, the Defendant received in the Avalon
Account a $250,000 wire from Payor 1.

3.      On August 29, 2022, the Defendant received in the Avalon
Account a $50,000 wire from BCG LLC, an entity owned and controlled
by Payor 1.

4.      Defendant told Payor 1, that the money Payor 1 was wiring
to the Avalon Account was to pay marketing, software developers, and
payroll in connection with a business venture Payor 1 had with the
Defendant.  The Defendant did not use the funds for that purpose and
instead used Payor 1's funds to pay various personal expenses of the
Defendant and Domestic Partner.

5.      On the following dates, the Defendant purchased BoA
cashiers' checks in the amounts listed below, which were drawn on the
Avalon Account and then deposited into the Domestic Partner Account:

| DATE | AMOUNT |
|------|--------|
| 4/5/2022 | $50,000 |
| 4/18/2022 | $150,000 |
| 5/2/2022 | $50,000 |
| 10/18/2022 | $40,000 |
| 11/25/2022 | $45,000 |
| 12/6/2022 | $45,000 |
| TOTAL | $380,000 |

6.      On December 6, 2022, the Defendant wired $45,000 from the
Avalon Account to the Domestic Partner Account.

24

ER_177

(178 of 253) Page 178 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 178 of 253
Case 2:24-cr-00702-ODW   Document 1   Filed 11/21/24   Page 25 of 27   Page ID #:25

7.      The funds the Defendant transferred to the Domestic Partner Account were co-mingled with funds in that account and used to pay the Defendant's and Domestic Partner's personal expenses.

The Charge

8.      From on or about January 1, 2022, through on or about April 14, 2023, in the Central District of California and elsewhere, the Defendant ALEXANDER SMIRNOV, willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2022, by committing the following affirmative acts among others:

a.      On April 14, 2023, the Defendant prepared and caused to be prepared, and signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for himself, which was submitted to the Internal Revenue Service.

b.      On April 14, 2023, the Defendant prepared and caused to be prepared, and signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for Domestic Partner, which was submitted to the Internal Revenue Service.

In violation of Title 26, United States Code, Section 7201.

COUNT NINE

[26 U.S.C. § 7206: Smirnov false 2022 1040]

1.     The Grand Jury re-alleges paragraphs 1 through 20 of the Introductory Allegations in this Indictment here.

2.     On or about April 14, 2023, in the Central District of California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, a U.S. Individual Income Tax Return, on Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and which Defendant did not believe to be true and correct as to every material matter. Specifically, among other items, "total income," in the amount of $23,232 at line 9.

In violation of Title 26, United States Code, Section 7206(1).

ER_179

                              COUNT TEN

            [26 U.S.C. § 7206: Domestic Partner false 2022 1040]

    1.    The Grand Jury re-alleges paragraphs 1 through 20 of the
Introductory Allegations in this Indictment here.

    2.    On or about April 14, 2023, in the Central District of
California, and elsewhere, the Defendant ALEXANDER SMIRNOV willfully
made and subscribed and filed and caused to be filed with the
Internal Revenue Service, a U.S. Individual Income Tax Return, on
Form 1040, in the name of Domestic Partner, which was verified by a
written declaration that it was made under the penalties of perjury
and which Defendant did not believe to be true and correct as to
every material matter. Specifically, among other items, "total
income," in the amount of $28,447 at line 9

    In violation of Title 26, United States Code, Section 7206(1).



                                        A TRUE BILL


                                        /S/
                                        Foreperson

DAVID C. WEISS
Special Counsel


LEO J. WISE
Principal Senior Assistant Special
Counsel

DEREK E. HINES
Senior Assistant Special Counsel

United States Department of Justice

**F I L E D**
CLERK, U.S. DISTRICT COURT

2/14/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>                    v.<br><br>ALEXANDER SMIRNOV,<br><br>          Defendant. | No.  2:24-cr-00091-ODW<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1001: false statement; 18 U.S.C. § 1519: creating a false and fictitious record] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1.    Defendant ALEXANDER SMIRNOV was a resident of Los Angeles, California in 2020.

A. The Defendant was an FBI Confidential Human Source.

2.    The Defendant was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI"). As a CHS, the Defendant was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.

3. As a CHS, the Defendant provided information to the Handler that was then used in various criminal investigations conducted by the FBI. The Defendant knew that information he provided was used in criminal investigations because, among other reasons, the Handler advised him that he might have to testify in court based on the information he provided on multiple occasions, including, but not limited to: 10/1/2010, 5/17/2011, 11/28/2012, 04/12/2013, 8/29/2013, 7/10/2015 and 3/11/2020. The Defendant also knew the information he provided was used in criminal investigations because the Defendant participated in a number of operations where he was authorized to engage in criminal activity as part of an on-going criminal investigation.

4. The Defendant was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022 and 9/29/2023.

5. In addition, when the Defendant was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)." When the Defendant was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020.

2

1   6.   Despite repeated admonishments that he must provide truthful

2   information to the FBI and that he must not fabricate evidence, the

3   Defendant provided false derogatory information to the FBI about Public

4   Official 1, an elected official in the Obama-Biden Administration who

5   left office in January 2017, and Businessperson 1, the son of Public

6   Official 1, in 2020, after Public Official 1 became a candidate for

7   President of the United States of America.

8        a.   As described in greater detail below, in March 2017,

9   the Defendant reported to the Handler that he had had a phone call with

10  the owner of Ukrainian industrial conglomerate Burisma Holdings,

11  Limited (hereafter "Burisma Official 1") concerning Burisma's interest

12  in acquiring a U.S. company and making an initial public offering

13  ("IPO") on a U.S.-based stock exchange.  In reporting that conversation

14  to the Handler, the Defendant also noted that Businessperson 1, Public

15  Official 1's son, was a member of Burisma's Board, a fact that was

16  publicly known.

17       b.   Three years later, in June 2020, the Defendant reported,

18  for the first time, two meetings in 2015 and/or 2016, during the Obama-

19  Biden Administration, in which he claimed executives associated with

20  Burisma, including Burisma Official 1, admitted to him that they hired

21  Businessperson 1 to "protect us, through his dad, from all kinds of

22  problems," and later that they had specifically paid $5 million each

23  to Public Official 1 and Businessperson 1, when Public Official 1 was

24  still in office, so that "[Businessperson 1] will take care of all

25  those issues through his dad," referring to a criminal investigation

26  being conducted by the then-Ukrainian Prosecutor General into Burisma

27  and to "deal with [the then-Ukrainian Prosecutor General]."

28

3

1    c. The Defendant also reported two purported phone calls

2 between himself and Burisma Official 1 wherein Burisma Official 1

3 stated that he had been forced to pay Public Official 1 and

4 Businessperson 1 and that it would take investigators 10 years to find

5 records of illicit payments to Public Official 1.

6    d. As alleged herein, the events the Defendant first

7 reported to the Handler in June 2020 were fabrications.  In truth and

8 fact, the Defendant had contact with executives from Burisma in 2017,

9 after the end of the Obama-Biden Administration and after the then-

10 Ukrainian Prosecutor General had been fired in February 2016, in other

11 words, when Public Official 1 had no ability to influence U.S. policy

12 and when the Prosecutor General was no longer in office.  In short,

13 the Defendant transformed his routine and unextraordinary business

14 contacts with Burisma in 2017 and later into bribery allegations

15 against Public Official 1, the presumptive nominee of one of the two

16 major political parties for President, after expressing bias against

17 Public Official 1 and his candidacy.

18    e. When he was interviewed by FBI agents in September 2023,

19 the Defendant repeated some of his false claims, changed his story as

20 to other of his claims, and promoted a new false narrative after he

21 said he met with Russian officials.

22 B. In 2017, the Defendant provided the FBI Handler with information

23   that Burisma was interested in acquiring an American oil and gas

24   company.

25  7. On or about March 1, 2017, the Defendant provided information

26 to the Handler concerning Burisma for the first time.  That information

27 was memorialized in an official record of the FBI on a Form 1023

28 (hereafter the "2017 1023").  The following is the entirety of what

4

1  the Defendant told the Handler in March 2017 that was memorialized in

2  the 2017 1023:

3       During the week of 2/27/2017, CHS received a telephone call
         from [Associate 1] (a subject of prior CHS reporting
4        regarding ties to ROC). Also on the call was [Burisma
         Official 1], whom CHS understood is the "CEO or owner" of
5        Burisma Holdings - Ukraine. During the call, [Associate 1]
         mentioned they are interested in acquiring a U.S.-based
6        petroleum business with a market capitalization between $50-
         $100 million. They would then use this US-based entity as
7        the parent company for Burisma Holdings (or a subdivision
         thereof), which they would then seek to register on a US
8        exchange.
9
         This CEO and [Associate 1] made statements that led CHS to
10       believe that Burisma Holdings has overstated its corporate
         assets in various public filings in Ukraine (NFI).
11
         The individual in Ukraine who is currently assigned to manage
12       this acquisition is [Burisma Official 2], whose title is
         "Board Advisor - Director for International Cooperation and
13       Strategic Development", email [] @burisma.com, 10-A Ryleyeva
         Str., Kyiv 04073, Ukraine, office phone [], fax: []. During
14       the week of March 6, 2017, [Burisma Official 2] plans to
         travel to Washington D.C. (NFI), and may meet with the CHS
15       sometime thereafter on the West Coast.
16
         **During this call, there was a brief, non-relevant discussion**
17       **about [Public Official 1]'s son, [Businessperson 1], who is**
         **currently on the Board of Directors for Burisma Holdings [No**
18       **Further Information].**
19
20  (emphasis added).  Notably, the Defendant did not report in 2017 that

21  in the preceding two years, Burisma Official 1 admitted to the Defendant

22  that he had paid Public Official 1 $5 million when Public Official 1

23  was still in office, as the Defendant later claimed.

24

25

26

27

28

                                   5

C. Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major political parties.

8. On May 19, 2020, the Defendant messaged the Handler the following:



It's all over the news in Russia and Ukraine as well as live calls between Public Official 1 and President of Ukraine
5:37 PM

Smells bad for Public Official 1 5:37 PM

9. On that day, May 19, 2020, it was publicly reported that:

A Ukrainian lawmaker who met with [] late last year released recordings of private phone calls several years ago between [Public Official 1] and [], then Ukraine's president, in a new broadside against the presumptive [] nominee for U.S. president that has raised questions about foreign interference in the 2020 election.

10.   Approximately 20 minutes after his first message on May 19, 2020, the Defendant volunteered his view that:



Public Official 1 going to jail )))) 5:56 PM

11.   One minute later, the Defendant opined:



May 19, 2020

Dems tried to impeacn Public Official 2 for same   5:57 PM

Even less   5:57 PM

All those polititions same shit   5:57 PM

Jail for all of them   5:57 PM

Plus bribe of Public Official 1 should be soon in the news)))   5:57 PM

7

1    12.   To which the Handler responded:

??? Only if you believe that his request to get rid of **Prosecutor General** was only because of Burisma...which my all accounts it was not

5:58 PM ✓✓

13.   The Defendant offered the following:

For sure yes   5:58 PM

I'll try to prove it for you bro

5:58 PM

14.   To which the Handler responded:

Bride payment to **Public Official 1** Or are you talking about the aid withheld unless they fired **Prosecutor General** 5:59 PM ✓✓

8

ER_188

15.   The Defendant then further offered the following:



16.   To which the Handler responded:



17.   The Defendant then stated:



The Defendant did not indicate who "the guys" were.

[this space intentionally left blank]

9

ER_189

18.  The following day, May 20, 2020, the Defendant messaged the Handler a link to an article titled, "Senate Republicans issue first subpoena in [Public Official 1]-Burisma probe":



19.  The Handler did not respond.

[this space intentionally left blank]

10

ER_190

20. The next day, May 21, 2020, the Defendant messaged the Handler the following:



[this space intentionally left blank]

ER_191

21.  Less than thirty minutes later, the Defendant messaged the Handler the following:



Contrary to the Defendant's representation, this was not, in fact, a photograph of Public Official 1 and Businessperson 1 with the CEO of Burisma.

D. <u>One month later, and three years after first reporting on Burisma, the Defendant reported bribery allegations against Businessperson 1 and Public Official 1</u>.

22. In June 2020, the Handler reached out to the Defendant concerning the 2017 1023. This was done at the request of the FBI's Pittsburgh Field Office (hereafter "FBI Pittsburgh"). In the first half of 2020, the United States Attorney's Office for the Western District of Pennsylvania (hereafter "USAO WDPA") had been tasked by the Deputy Attorney General of the United States to assist in the "receipt, processing, and preliminary analysis of new information provided by the public that may be relevant to matters relating to Ukraine." As part of that process, FBI Pittsburgh opened an assessment, 58A-PG-3250958, and in the course of that assessment identified the 2017 1023 in FBI holdings and shared it with USAO WDPA. USAO WDPA then asked FBI Pittsburgh to reach out to the Handler to ask for any further information about the reference in his 2017 1023 that stated, "During this call, there was a brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings [No Further Information]".

23. On or about June 26, 2020, FBI Pittsburgh contacted the Handler regarding the 2017 1023. That same day, the Handler spoke with the Defendant, who was in Los Angeles, by telephone. The information the Defendant provided the Handler was memorialized on a Form 1023 (hereafter the "2020 1023"), an official record of the FBI, which was finalized on June 30, 2020.

13

24.   During their call on June 26, 2020, when the Handler asked the Defendant about the "brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings," the Defendant described, for the first time, two purported meetings and two purported phone calls with various Burisma executives where Businessperson 1 and Public Official 1 were discussed.  The two phone calls were in addition to the one the Defendant reported on in the 2017 1023.  This time, rather than a passing reference to Businessperson 1 being on Burisma's Board, the Defendant claimed that Burisma executives at two meetings in 2015 and/or 2016, during the Obama-Biden Administration, told him that they were paying Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1, when he was in office, and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with" the then-Ukrainian Prosecutor General.  In describing the phone calls, the Defendant claimed that Burisma Official 1 said he was "pushed to pay" Public Official 1 and Businessperson 1, had text messages and recordings that show he was coerced to make such payments, and it would take investigators ten years to find the records of illicit payments to Public Official 1.  The Defendant made these statements to the Handler in June 2020, when Public Official 1 was a candidate for President of the United States and the presumptive nominee of one of the two major political parties.

25.   Critically, the payments the Defendant described occurred, according to the Defendant, during the Obama-Biden Administration in

14

2016, when Public Official 1 was in a position to influence U.S. policy
towards Ukraine, and prior to February 2016 when the then-Ukrainian
Prosecutor General was fired and, in any event, prior to the change in
Administrations in January 2017.

    26.  Specifically, the Defendant claimed the following about the
first and second meetings:

> First Meeting with Burisma Executives in Kyiv, Ukraine
> 2015/2016. **In late 2015 or 2016, during the Obama/Biden
> administration, CHS was first introduced to officials at
> Ukraine natural gas business Burisma Holdings ("Burisma")
> through CHS's associate, [Associate 1]** (alternate
> transliteration - [Associate 1]; for full identification of
> [Associate 1], see attachments to [], a FD-1023 by CHS
> serialized on 1/2/2018).
>
> CHS and [Associate 1] traveled to Ukraine and went to
> Burisma's office that was located 20 minutes away from the
> City Center. The purpose of the meeting was to discuss
> Burisma's interest in purchasing a US-based oil and gas
> business, for purposes of merging it with Burisma for
> purposes of conducting an IPO in the US. Burisma was willing
> to purchase a US-based entity for $20-30 million.
>
> **At this meeting was CHS, CHS's former business partner,
> [Associate 2] (an USPER who does not speak Russian),
> [Associate 1], Burisma's CFO, [Burisma Official 2]** (email
> []@Burisma.com, telephone []), **[Burisma Official 3] (the
> daughter to Burisma's CEO and founder [Burisma Official 1)
> and her husband (FNU LNU)]** The conversation was in Russian,
> and thus [Associate 2] did not participate therein.
>
> During the meeting, [Burisma Official 2] asked CHS whether
> CHS was aware of Burisma's Board of Directors. CHS replied
> "no", and [Burisma Official 2] advised the board members
> included: 1) the former President or Prime Minister of
> Poland; and, 2) **[Public Official 1]'s son, [Businessperson
> 1].** [Burisma Official 2] said Burisma hired the former
> President or Prime Minister of Poland to leverage his
> contacts in Europe for prospective oil and gas deals, **and
> they hired [Businessperson 1] to "protect us, through his
> dad, from all kinds of problems"** (CHS was certain [Burisma
> Official 2] provided no further/specific details about what
> that meant).

15

ER_195

1   CHS asked why they (Burisma) needed to get CHS's assistance
2   regarding the purchase/merger of a US-based company when
    [Businessperson 1] was on their board. [Burisma Official 2]
3   replied that [Businessperson 1] was not smart, and they
    wanted to get additional counsel. The group then had a general
4   conversation about whether the purchase/merger with a US
    company would be a good business decision.
5
6   Meeting with CHS, [Associate 1], and [Burisma Official 1] in
    Vienna, Austria in 2016. **Approximately one or two months**
7   **after the aforementioned Burisma meeting in Ukraine, CHS**
    **traveled to Vienna, Austria with [Associate 1] and met with**
8   **[Burisma Official 1] at an outside coffee shop.** The trio
    continued to talk about the feasibility of Burisma acquiring
9   a US-based entity. **CHS recalled this meeting took place**
    **around the time [Public Official 1] made a public statement**
10  **about [the then-Ukrainian Prosecutor General] being corrupt,**
    **and that he should be fired/removed from office.** CHS told
11  [Burisma Official 1] that **due to [the then-Ukrainian**
    **Prosecutor General]'s investigation into Burisma,** which was
12  made public at this time, **it would have a substantial**
    **negative impact on Burisma's prospective IPO in the United**
13  **States. [Burisma Official 1] replied something to the effect**
    **of, "Don't worry [Businessperson 1] will take care of all of**
14  **those issues through his dad."** CHS did not ask any further
    questions about what that specifically meant.
15
16  CHS asked [Burisma Official 1] why Burisma would pay $20-30
17  million to buy a US company for IPO purposes when it would
    be cheaper to just form a new US-entity, or purchase a
18  corporate shell that was already listed on an exchange.
    [Burisma Official 1] responded that [Businessperson 1]
19  advised Burisma it could raise much more capital if Burisma
    purchased a larger US-based business that already had a
20  history in the US oil and gas sector. CHS recalled [Burisma
    Official 1] mentioned some US-based gas business(es) in
21  Texas, the names of which CHS did not recall. **CHS advised**
22  **[Burisma Official 1] it would be problematic to raise capital**
    **in the US given [the then-Ukrainian Prosecutor General]'s**
23  **investigation into Burisma as nobody in the US would invest**
    **in a company that was the subject of a criminal**
24  **investigation.** CHS suggested it would best if Burisma simply
    litigate the matter in Ukraine, and pay some attorney
25  $50,000. [Burisma Official 1] said he/Burisma would likely
    lose the trial because he could not show that Burisma was
26  innocent; [Burisma Official 1] also laughed at CHS's number
    of $50,000 (not because of the small amount, but because the
27  number contained a "5") **and said that "it cost 5 (million)**
28  **to pay [Public Official 1], and 5 (million) to**

**[Businessperson 1].**" CHS noted that at this time, **it was unclear to CHS whether these alleged payments were already made.**

CHS told [Burisma Official 1] that **any such payments to [Public Official 1 and Businessperson 1]** would complicate matters, and Burisma should hire "some normal US oil and gas advisors" because [Public Official 1 and Businessperson 1] have no experience with that business sector. [Burisma Official 1] made some comment that although [Businessperson 1] "was stupid, and his ([Burisma Official 1]'s) dog was smarter," **[Burisma Official 1] needed to keep [Businessperson 1] (on the board) "so everything will be okay." CHS inquired whether [Businessperson 1] or [Public Official 1] told [Burisma Official 1] he should retain [Businessperson 1]; [Burisma Official 1] replied, "They both did."** CHS reiterated CHS's opinion that [Burisma Official 1] was making a mistake and he should fire [Businessperson 1] and deal with [**the then-Ukrainian Prosecutor General]'s investigation** directly so that the matter will remain an issue in Ukraine, and not turn in to some international matter. [Burisma Official 1] responded something to the effect of, **"Don't worry, this thing will go away anyway."** CHS replied that, notwithstanding [the then-Ukrainian Prosecutor General]'s investigation, it was still a bad decision for Burisma to spend $20-$30 million to buy a US business, and that CHS didn't want to be involved with the [Public Official 1 and Businessperson 1] matter. [Burisma Official 1] responded that he appreciated CHS's advice, but that "it's too late to change his decision." **CHS understood this to mean that [Burisma Official 1] had already had [sic.] paid [Public Official 1 and Businessperson 1], presumably to "deal with [the then-Ukrainian Prosecutor General]."**

(emphases added).

E. The Defendant's 2020 story was a fabrication.

27. The Defendant's claim that "in late 2015/2016 during the Obama/Biden Administration" he first met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems" was false, as he knew.

28.  Similarly, the Defendant's claims that he met with Burisma Official 1 "one or two months later," around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million each so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with [the then-Ukrainian Prosecutor General]," were false, as the Defendant knew.

29.  No such statements were made to the Defendant because, in truth and fact, Defendant met with officials from Burisma for the first time in 2017, *after* Public Official 1 left office in January 2017, and *after* the then-Ukrainian Prosecutor General had been fired in February 2016.  The first meeting the Defendant had with officials from Burisma occurred at a time when Public Official 1 no longer had the ability to influence U.S. policy and after the then-Ukrainian Prosecutor General was out of office.  The Defendant's story to the FBI was a fabrication, an amalgam of otherwise unremarkable business meetings and contacts that had actually occurred but at a later date than he claimed and for the purpose of pitching Burisma on the Defendant's services and products, not for discussing bribes to Public Official 1 when he was in office.

30.  The Defendant began to pursue business opportunities with Burisma in spring 2017, at the earliest, through two associates of his.

a.  Associate 1 was a Ukrainian business consultant.  He was introduced to the Defendant by a mutual acquaintance who told

18

ER_198

Associate 1 that the Defendant was an expert in IPOs in the United States. The Defendant and Associate 1 subsequently met in Kiev, Ukraine, and the Defendant asked Associate 1 to connect him to businesses in Ukraine interested in IPOs in the United States. Associate 1 subsequently identified Burisma as such a company.

b. Associate 2 was an American who owned a cryptocurrency business. In the spring of 2017, the Defendant presented Burisma to Associate 2 as a company that might be interested in a cryptocurrency product Associate 2 was trying to commercialize. Around this time, the Defendant sent Associate 2 a link to the Board of Directors of Burisma. The Defendant specifically called out the fact that Businessperson 1 was on the Board and indicated that because Businessperson 1 was on the Board, the Defendant thought Burisma was a company with which they could do business.

31. Between March 2017, when the Defendant first reported on Burisma to the Handler, and June 2020, when he first made his false claims about bribes paid to Public Official 1 when he was in office, directly and through his son Businessperson 1, the Defendant had a series of routine business contacts with executives at Burisma. All of these contacts occurred in 2017 and 2018, when Public Official 1 was out of office and after the then-Ukrainian Prosecutor General had been fired. Specifically:

19

a.    The same day that he first reported on Burisma, March 1, 2017, the Defendant messaged the Handler a photograph of a business card for Burisma Official 2.



b.    In response, on that same day, the Handler asked the Defendant, "How's [Burisma Official 2] fit into the story", to which the Defendant responded, "This is the guy that will do the public company from there [sic.] side."

c.    The Handler then messaged the Defendant, "Looks like the CEO or Owner might be [Burisma Official 1] or []. Either sound familiar?", to which the Defendant responded with the first name of Burisma Official 1.  The Handler then asked the Defendant whether he was meeting with Burisma Official 1, to which the Defendant responded, "No.  The guy that I send [sic.] you the business card."

d.    On April 13, 2017, the Handler messaged the Defendant asking him, "U know who from Burisma will be in the meeting," to which

1  the Defendant responded, "Not yet Will know after we [sic.] I will get

2  the email."

3          e.    Four days later, on April 17, 2017, Associate 1 sent

4  the Defendant and Burisma Official 2 an email introducing them to each

5  other.

6          f.    That same day, Associate 1 sent another email to Burisma

7  Official 2 summarizing, in general terms, how a company could undertake

8  an IPO in the United States.

9          g.    On or about April 27, 2017, Burisma Official 2 responded

10  to Associate 1's April 17, 2017, email.  Burisma Official 2 thanked

11  Associate 1 for introducing him to the Defendant and promised to send

12  the Defendant and Associate 1 information about Burisma's desire to

13  buy an oil and gas company in the United States.

14          h.    On or around May 11, 2017, Burisma Official 4, another

15  Burisma executive, emailed Associate 1 telling him that Burisma was

16  not interested in pursuing an IPO in the United States and that their

17  priority was acquiring a U.S.-based oil and gas company.

18          i.    Seven days later, on or about May 18, 2017, Associate 1

19  forwarded Burisma Official 3's email to the Defendant.

20          j.    On July 24, 2017, the Defendant messaged the Handler,

21  "Cutting a deal with Burisma  Will update you soon bro" and "It's gonna

22  be a contract so we can review it first."

23          k.    On September 16, 2017, Associate 2, the individual whom

24  the Defendant claimed in the 2020 1023 attended the first meeting the

25  Defendant had with Burisma executives in late 2015 or 2016, flew from

26  New York to Kiev, via London.  Associate 2 remained in Ukraine until

27  September 23, 2017, when he returned to the United States through

28  London.

21

l.    During the six (6) day period that Associate 2 was in Ukraine, he and the Defendant met with representatives from Burisma, including Burisma Official 3, the daughter of Burisma's owner Burisma Official 1, to discuss a cryptocurrency product.  The meeting was in Russian, and on the drive back from Burisma's headquarters, the Defendant described to Associate 2 what had been discussed.  The Defendant told Associate 2 that the Burisma representatives were not interested in the cryptocurrency product the Defendant and Associate 2 were selling and were instead trying to find an oil and gas company in the United States that Burisma could purchase.  The Defendant did not describe to Associate 2 any discussion of Businessperson 1 or Public Official 1 during this meeting.

m.    On September 19, 2017, the Defendant messaged the Handler photographs of business cards for Burisma Official 3, the



person the Defendant claimed he met at the first meeting in late 2015 or 2016 during the Obama-Biden Administration, and Burisma Official 4, the individual who had sent an email to Associate 1, which Associate 1 then forwarded to the Defendant, in May 2017, as described above.

ER_202

1          n.   After the September 2017 meeting, Associate 2 prepared

2   a document outlining steps that Burisma could take in order to acquire

3   a company in the United States and use it for an IPO.  Associate 2 sent

4   this document to the Defendant on September 22, 2017.

5          o.   Associate 2's trip to Kiev in September 2017 was the

6   first time he had left North America since 2011.  Thus, he could not

7   have attended a meeting in Kiev, as the Defendant claimed, in late 2015

8   or 2016, during the Obama-Biden Administration.  His trip to Ukraine

9   in September 2017 was more than seven months after Public Official 1

10  had left office and more than a year after the then-Ukrainian Prosecutor

11  General had been fired.

12         p.   On January 23, 2018, Associate 2 flew from Los Angeles

13  to London.  During the previous week, on January 16, 2018, the Defendant

14  messaged Associate 2 asking him, "Brother Send me the name of the place

15  in London please," to which Associate 2 replied, "Baglioni." On January

16  25, 2018, the Defendant attempted to call Associate 2.  Associate 2

17  responded, "Downstairs getting breakfast," and the Defendant responded,

18  "Cool.  See you in a few."  Both the Defendant and Associate 2 were

19  staying at the Hotel Baglioni in London at that time.  When Associate

20  2 was with the Defendant in London, the Defendant told Associate 2 that

21  he had received a call from the owner of Burisma, Burisma Official 1,

22  and that Burisma Official 1 was interested in doing business with them.

23         q.   On January 26, 2018, Associate 2 flew from London to

24  Kiev, staying until January 30, 2018.

25         r.   During that five (5) day time period, the Defendant and

26  Associate 2 traveled to Burisma's headquarters.  Once there, they had

27  a brief meeting with Burisma Official 2, who told them that Burisma

28  was not interested in their cryptocurrency product.  Burisma Official

1  2 spoke English during the meeting, and Associate 2 was able to
2  participate.  At no point during this meeting between the Defendant,
3  Associate 2, and Burisma Official 2 did Burisma Official 2 tell the
4  Defendant that Burisma had hired Businessperson 1 to "protect us,
5  through his dad, from all kinds of problems."

6      32.  As described above, all the contacts that the Defendant had
7  with Burisma occurred no earlier than spring 2017, after the end of
8  the Obama-Biden Administration.  Notably, the Defendant was only
9  introduced to Burisma Official 2, via email, on or about April 17,
10 2017.  Therefore, the Defendant's claim that he had met with Burisma
11 Official 2 in "late 2015 or 2016, during the Obama/Biden
12 administration," was false because if the Defendant had met Burisma
13 Official 2 then, he would not have needed Associate 1 to introduce him
14 to Burisma Official 2 in April 2017, and Burisma Official 2 would not
15 have thanked Associate 1 for introducing them in April 2017.

16     33.  As to the second meeting, the one that supposedly happened
17 in Vienna, contrary to what the Defendant told the Handler, Associate
18 1 did not meet with the Defendant and Burisma Official 1 at a café in
19 Vienna around the time that Public Official 1 "made a public statement
20 about [the then-Ukrainian Prosecutor General] being corrupt, and that
21 he should be fired/removed from office," which occurred in December
22 2015.  In fact, Associate 1 has never met or spoken with Burisma
23 Official 1.

24     34.  Further, the Defendant did not travel to Vienna "around the
25 time [Public Official 1] made a public statement about [the then-
26 Ukrainian Prosecutor General] being corrupt, and that he should be
27 fired/removed from office," which occurred in December 2015.

28

(205 of 253), Page 205 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 205 of 253
Case 2:24-cr-00091-ODW   Document 1   Filed 02/14/24   Page 25 of 37   Page ID #:25

35.   When the Handler interviewed the Defendant on June 26, 2020, the Defendant also falsely told the Handler that he had two phone calls with Burisma Official 1, one in "2016/2017" shortly after the U.S. election but before the end of the Obama-Biden Administration and a second one in 2019.   The following is what the Defendant told the Handler about those two calls that was also memorialized in the 2020 1023:

Subsequent Telephone Calls Between CHS and [Burisma Official 1].

2016/2017 Telephone Call. Shortly after the 2016 US election and during [Public Official 2] transition period, CHS participated in a conference call with [Associate 1] and [Burisma Official 1]. CHS inquired whether [Burisma Official 1] was happy with the US election results. [Burisma Official 1] replied that he was not happy [Public Official 2] won the election. CHS asked [Burisma Official 1] **whether he was concerned about Burisma's involvement with [Public Official 1 and Businessperson 1]. [Burisma Official 1] stated he didn't want to pay the [Public Official 1 and Businessperson 1] and he was "pushed to pay"** them. (CHS explained the Russian term [Burisma Official 1] used to explain the payments was "poluchili" (transliterated by the CHS), which literally translates to got it" or "received it", but is also used in Russian-criminal-slang for being "forced or coerced to pay." [Burisma Official 1] stated [the then-Ukrainian Prosecutor General] had already been fired, and no investigation was currently going on, **and that nobody would find out about his financial dealings with the [Public Official 1 and Businessperson 1]. CHS then stated, "I hope you have some back-up (proof) for your words (namely, that [Burisma Official 1] was 'forced' to pay [Public Official 1 and Businessperson 1]). [Burisma Official 1] replied he has many text messages and "recordings" that show that he was coerced to make such payments** (See below, subsequent CHS reporting on 6/29/2020). CHS told [Burisma Official 1] he should make certain that he should retain those recordings. [Burisma Official 1] asked whether it would make any (legal) difference whether he voluntarily made such payments, or if he was "forced" to make them.

[Burisma Official 1] then asked CHS whether CHS could provide any assistance in Ukraine (with the [] regime) if something

25

1    were to happen to [Burisma Official 1] in the future. CHS
2    replied that CHS didn't want to get involved in any such
     matters.

3    [Note: See previous CHS report dated 3/1/2017 Serial 7,
4    wherein CHS reported the foregoing, and stated the call took
     place during the week of 2/27/2017. At that time, CHS stated
5    that [Burisma Official 1] briefly discussed [Businessperson
     1], but the topic was not relevant to Burisma's interest in
6    acquiring a US-based petroleum business for $50-$100 million.
     At this time CHS also reported aforementioned [Burisma
7    Official 2] (alternate transliteration [Burisma Official 2])
8    was assigned by Burisma to manage the acquisition, and he
     was planning to travel to Washington, D.C. in March, 2017.

9
10   2019 Telephone call. After the aforementioned 2016 telephone
     call, CHS had no Interactions with [Burisma Official
11   1]/Burisma whatsoever, until 2019. In 2019, CHS met with
     [Associate 1] in London to discuss various business matters
12   (which had nothing to do with [Burisma Official 1], Burisma,
13   or the gas/oil industry; CHS noted that CHS's meeting with
     [Associate 1] took place at a "Russian coffee house near
14   Knightsbridge Street located near Harrods department store,"
     and that [Associate 1]'s fiancée lives in London). **At some
15   point during this meeting, [Associate 1] advised CHS he was
     going to call [Burisma Official 1].** At this time, CHS
16   understood [Burisma Official 1] was living somewhere in
     Europe (NFI). During the call, [Burisma Official 1] asked
17   CHS and/or [Associate 1] if they read the recent news reports
     about the investigations into [Public Official 1 and
18   Businessperson 1] and Burisma, and [Burisma Official 1]
     jokingly asked CHS if CHS was an "oracle" (due to CHS's prior
19   advice that [Burisma Official 1] should not pay [Public
     Official 1 and Businessperson 1] and instead to hire an
20   attorney to litigate the allegations concerning [the then-
21   Ukrainian Prosecutor General]'s investigation). **CHS
     mentioned [Burisma Official 1] might have difficulty
22   explaining suspicious wire transfers that may evidence any
     (illicit) payments to [Public Official 1 and Businessperson
23   1]. [Burisma Official 1] responded he did not send any funds
24   directly to the "Big Guy" (which CHS understood was a
     reference to [Public Official 1]). CHS asked [Burisma
25   Official 1] how many companies/bank accounts [Burisma
     Official 1] controls; [Burisma Official 1] responded it would
26   take them (investigators) 10 years to find the records (i.e.
     illicit payments to [Public Official 1]).** CHS told [Burisma
27   Official 1] if he ever needed help in the future and wanted
     to speak to somebody in the US government about that matter,
28   that CHS could introduce him to someone.

26

ER_206

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

> Regarding the seemingly open and unsolicited admissions by [Burisma Official 2] and [Burisma Official 1] about the purpose for their retention of [Businessperson 1], and the "forced" payments [Burisma Official 1] made to [Public Official 1 and Businessperson 1], CHS explained it is very common for business men in post-Soviet countries to brag or show-off. Additionally, it is extremely common for businesses in Russia and Ukraine to make **"bribe" payments** to various government officials. CHS noted that in corporate budgets for other Russian and Ukrainian businesses which CHS has inspected in the past, CHS observed budget-line-items in Russian called "Podmazat" (transliterated by CHS), which literally translates to "oil, lubricate, or make things run smoothly," which companies routinely use to account for anticipated **bribe payments**. As such, given the pervasive necessity to **bribe government officials** in Ukraine and Russia, CHS did not perceive [Burisma Official 2]'s or [Burisma Official 1]'s statements to be unusual, self-serving, or pretextual. Additionally, regarding important business meetings, it is also common in Ukraine and Russia for persons to make covert recordings. However, CHS has only met [Burisma Official 1] in person on one occasion and has spoken to him only twice on the telephone; as such, CHS is not able to provide any further opinion as to the veracity of [Burisma Official 1]'s aforementioned statements.

(emphases added).

17

18

19

20

  36. Associate 1 never spoke to Burisma Official 1 on the phone, or in person. Therefore, the Defendant's claim that Associate 1 called Burisma Official 1 in 2019 is false for that reason as well.

21

22

23

24

25

26

27

28

  37. Moreover, at no point when the Defendant was messaging the Handler in May 2020 about Public Official 1 did he mention that he had had two purported meetings when Public Official 1 was in office in the United States where Burisma executives told him that they paid Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a

1  criminal investigation being conducted by the then-Ukrainian Prosecutor

2  General into Burisma, and to "deal with" the then-Ukrainian Prosecutor

3  General. Nor did he tell the Handler he had two subsequent phone calls

4  where Burisma Official 1 told him that he had been forced to pay Public

5  Official 1 and Businessperson 1 and that it would take investigators

6  10 years to find records of illicit payments to Public Official 1.

7  This was despite the Defendant's stated interest in proving to the

8  Handler that the bribe had occurred and his offer to go to Ukraine to

9  "meet with the guys" to obtain incriminating recordings of

10 Businessperson 1 telling Burisma officials that his father would "take

11 care" of the then-Ukrainian Prosecutor General.

12    38. On June 29, 2020, the Defendant provided further supplemental

13 information to the Handler concerning his allegations. These were

14 memorialized in the 2020 1023 before it was finalized and consisted of

15 the following:

16    Regarding CHS's aforementioned reporting that [Burisma
   Official 1] said – "he has many text messages and
17   'recordings' that show he was coerced to make such payments
   ' – CHS clarified [Burisma Official 1] said he had a total
18   of "17 recordings" involving [Public Official 1 and
   Businessperson 1]; two of the recordings included [Public
19   Official 1], and the remaining 15 recordings only included
   [Businessperson 1]. CHS reiterated that, per [Burisma
20   Official 1], these recordings evidence **[Burisma Official 1]
   was somehow coerced into paying [Public Official 1 and
21   Businessperson 1] to ensure [the then-Ukraine Prosecutor
   General] was fired.** [Burisma Official 1] stated he has two
22   "documents (which CHS understood to be wire transfer
   statements, bank records, etc.), that evidence some
23   payment(s) to [Public Official 1 and Businessperson 1] were
   made, presumably in exchange for [the then-Ukrainian
24   Prosecutor General]'s firing.
25

26    Regarding aforementioned [Associate 1] (alternate spelling,
   [Associate 1]), who originally introduced CHS into this
27   matter, [Associate 1] currently "works in some office for
   the administration of [] (NFI)", and also works for [], who
28

28

is the founder/CEO of cryptocurrency and blockchain technology business [].

(emphasis added)

39. After the Defendant made these reports, the FBI asked him for travel records, which he provided, in an attempt to determine whether the information he provided was accurate.

40. By August 2020, FBI Pittsburgh concluded that all reasonable steps had been completed regarding the Defendant's allegations and that their assessment, 58A-PG-3250958, should be closed. On August 12, 2020, FBI Pittsburgh was informed that the then-FBI Deputy Director and then-Principal Associate Deputy Attorney General of the United States concurred that it should be closed.

F. The Defendant was interviewed by FBI investigators in September 2023, and repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after meeting with Russian officials.

41. In July 2023, the FBI requested that the U.S. Attorney's Office for the District of Delaware assist the FBI in an investigation of allegations related to the 2020 1023. At that time, the United States Attorney's Office for the District of Delaware was handling an investigation and prosecution of Businessperson 1.

42. On August 11, 2023, the Attorney General appointed David C. Weiss, the United States Attorney for the District of Delaware, as Special Counsel. The Special Counsel was authorized to conduct the investigation and prosecution of Businessperson 1, as well as "any matters that arose from that investigation, may arise from the Special Counsel's investigation, or that are within the scope of 28 C.F.R. § 600.4(a)."

43.   On August 29, 2023, FBI investigators spoke with the Handler in reference to the 2020 1023.  During that conversation, the Handler indicated that he and the Defendant had reviewed the 2020 1023 following its public release by members of Congress in July 2023, and the Defendant reaffirmed the accuracy of the statements contained in it.

44.   The Handler provided investigators with messages he had with the Defendant, including the ones described above.  Additionally, the Handler identified and reviewed with the Defendant travel records associated with both Associate 2 and the Defendant.  The travel records were inconsistent with what the Defendant had previously told the Handler that was memorialized in the 2020 1023.  The Defendant also provided email communications with both Associate 2 and Burisma personnel beginning in 2017 to the Handler, which the Handler reviewed with the Defendant and shared with FBI investigators.

45.   The Defendant was interviewed by FBI investigators on September 27, 2023.  At the start of the interview, the Defendant was warned of his duty to tell the truth pursuant 18 U.S.C. § 1001.

46.   The Defendant repeated his claim that his first meeting with Burisma was much earlier than 2017.  He further told investigators that the first meeting was arranged after Associate 1 called him and said that a company wanted to enter the U.S. market either through an IPO or an acquisition.  The Defendant repeated the claim that Burisma Official 2 was at this meeting and possibly Burisma Official 4, based on the Defendant's recent review of his messages with the Handler that included an image of Burisma Official 4's business card, as described above.  The Defendant told investigators that, during this meeting, Burisma Official 2 said something to the effect of "Did you see my Board, I'm not going to be fucked," and that one member of the Board

30

1    was the son of Public Official 1.   The Defendant told investigators

2    that Burisma Official 2 said, "I am paying for familia," which the

3    Defendant said was a reference to family or a last name.   Later in the

4    interview, the Defendant said he was 100 percent certain that Associate

5    1 attended the first meeting.

6         47.   The Defendant also told investigators that while he had

7    initially recalled two Burisma meetings, after reviewing Associate 2's

8    travel records provided by the Handler, along with an email the

9    Defendant found, the Defendant concluded that there were maybe two to

10   five meetings.   Later in the interview, the Defendant said he did

11   recall that Associate 2 was present for two meetings.

12        48.   The Defendant told investigators that he had a meeting with

13   Burisma Official 1 at a coffee shop in a German speaking country,

14   possibly Vienna as he had previously reported, after the 2016 election,

15   so in late 2016.   Then he told investigators he could not recall when

16   it occurred, and then, when shown the emails he had with Associate 1

17   as described above, stated he thought it was after those, which would

18   put it in 2017.   Notably, these new and inconsistent statements arose

19   only after the Defendant had reviewed messages, emails, and travel

20   information that were in direct conflict with what he reported in the

21   2020 1023.   The Defendant also told investigators that the meeting in

22   the German speaking country, possibly Vienna, occurred because

23   Associate 1 told the Defendant that Burisma Official 1 wanted to meet,

24   and the Defendant agreed.   Later in the interview, he told investigators

25   that this meeting occurred before the then-Ukrainian Prosecutor General

26   resigned, which was in early 2016.

27        49.   The Defendant told investigators he did not recall talking

28   to Burisma Official 1 ever again after the meeting in the German

31

ER_211

speaking country and did not have any phone calls with Burisma Official 1 after this meeting.

50.  The Defendant told investigators that he had asked the then-Ukrainian President to arrange a meeting between himself and the then-Ukrainian Prosecutor General to talk about Burisma.  The Defendant told investigators that this meeting occurred before the then-Ukrainian Prosecutor General resigned, which was early 2016.  The Defendant also told investigators this meeting occurred before his meeting with Burisma Official 1 in the coffee shop in a German speaking country. The Defendant told investigators that after he met with the then-Ukrainian Prosecutor General, he met with the then-Ukrainian President. The Defendant did not provide any of this information to the Handler in 2020.

51.  The Defendant also shared a new story with investigators.  He wanted them to look into whether Businessperson 1 was recorded in a hotel in Kiev called the Premier Palace.  The Defendant told investigators that the entire Premier Palace Hotel is "wired" and under the control of the Russians.  The Defendant claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel.

52.  The Defendant suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians.  The Defendant claimed to have obtained this information a month earlier by calling a high-level official in a foreign country.  The Defendant also claimed to have learned this information from four different Russian officials.

ER_212

53. The Defendant told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent. These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. The Defendant told investigators he is involved in negotiations over ending the war and had been for the previous four months. According to the Defendant, the Russians want Ukraine to assist in influencing the U.S. election, and the Defendant thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. The Defendant told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel.

54. Businessperson 1 has never traveled to Ukraine. The few Burisma Board meetings that Businessperson 1 did attend were all outside of Ukraine.

55. At the conclusion of the interview, the Defendant was asked if he wanted to clarify or correct anything he had stated during this interview, and the Defendant said that he did not need to clarify or correct anything he had stated.

COUNT ONE

[18 U.S.C. § 1001: false statement to a government agent]

56. The Grand Jury re-alleges paragraphs 1 through 55 of this Indictment here.

57. That on or about June 26, 2020, the defendant ALEXANDER SMIRNOV, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to a special agent of the Federal Bureau of Investigation at Los Angeles, California, in the Central District of California, that is to say:

a. The Defendant's claims that "in late 2015/2016 during the Obama/Biden Administration" he met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that Burisma hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," were false, as he knew.

b. The Defendant's claims that he met with Burisma Official 1 "one or two months later," in Vienna, Austria, around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with" the then-Ukrainian Prosecutor General, were false, as the Defendant knew.

34

ER_214

1          c.    The Defendant's claims that he had a telephone call with

2    Burisma Official 1 in 2016 or 2017 wherein Burisma Official 1 stated

3    he did not want to pay Public Official 1 and Businessperson 1 and he

4    was "pushed to pay" them; that nobody would find out about his financial

5    dealings with Public Official 1 and Businessperson 1; and that Burisma

6    Official 1 had many text messages and "recordings" that show that he

7    was coerced to make such payments, were false, as he knew.

8          d.    The Defendant's claims that in 2019 he was present when

9    Associate 1 called Burisma Official 1 and Burisma Official 1 stated

10   that he did not send any funds directly to the "Big Guy" (which the

11   Defendant understood was a reference to Public Official 1) and that

12   Burisma Official 1 stated it would take them (investigators) 10 years

13   to find the records (i.e., illicit payments to Public Official 1), were

14   false, as he knew.

15     58.   The statements and representations were false because, as

16   ALEXANDER SMIRNOV then and there knew:

17         a.    The Defendant met with officials from Burisma for the

18   first time in 2017, after the end of the Obama-Biden Administration.

19   Thus, Public Official 1, then a private citizen, had no ability to

20   "protect" Burisma from "all kinds of problems."   And, there was no

21   discussion of Public Official 1 or Businessperson 1 at this first

22   meeting with Burisma.

23         b.    The Defendant's second meeting with officials from

24   Burisma also occurred in 2017, not at the end of 2015 when Public

25   Official 1 made public statements critical of the Ukrainian Prosecutor

26   General's Office.   The second meeting also occurred *after* Public

27   Official 1 left office and *after* the then-Ukrainian Prosecutor General

28   had been fired in February 2016.   Like the first meeting, the second

1  meeting the Defendant had with officials from Burisma occurred at a

2  time when Public Official 1 no longer had the ability to influence U.S.

3  policy.   The Defendant also did not travel to Vienna, Austria in

4  December 2015, as he claimed.  And, there was no discussion of Public

5  Official 1 or Businessperson 1 at this second meeting.

6      c.   As to phone calls with Burisma Official 1 in 2016 or

7  2017 and then in 2019, in a subsequent interview with law enforcement

8  in 2023, the Defendant told investigators he had never spoken to Burisma

9  Official 1 on the phone after meeting with Burisma Official 1 in a

10  German speaking country in 2016, and that his last contact with Burisma

11  Official 1 was that meeting in early 2016.

12      d.   Further, Associate 1 never spoke to Burisma Official 1

13  on the phone or in person, in 2019 or at any other time.

14

15     In violation of Title 18, United States Code, Section 1001.

16

17

18

19

20

21

22

23

24

25

26

27

28

(217 of 253), Page 217 of 253    Page 217 of 253
Case: 25-400, 04/25/2025, DktEntry: 11.1, Page 217 of 253
Case 2:24-cr-00091-ODW   Document 1   Filed 02/14/24   Page 37 of 37   Page ID #:37

1                               COUNT TWO

2    [18 U.S.C. § 1519: falsification of records in federal investigation]

3         1.   The Grand Jury re-alleges paragraphs 1 through 55 of this

4    Indictment here.

5         2.   Between on or about June 26 and 30, 2020, in the Central

6    District of California, the defendant, ALEXANDER SMIRNOV, did knowingly

7    cause the making of a false entry in an FBI Form 1023, a record and

8    document, with the intent to impede, obstruct, and influence a matter

9    that the Defendant knew and contemplated was within the jurisdiction

10   of the United States Department of Justice, a department and agency of

11   the United States, in violation of Title 18, United States Code, Section

12   1519, and Title 18, United States Code, Section 2.

13

14                                    A TRUE BILL

15

16                                    _____/S/_____
                                      Foreperson

17

18   DAVID C. WEISS
     Special Counsel

19

20   _____

21   LEO J. WISE
     Principal Senior Assistant Special

22   Counsel

23   DEREK E. HINES
     Senior Assistant Special Counsel

24

25   SEAN F. MULRYNE
     CHRISTOPHER M. RIGALI
     Assistant Special Counsels

26   United States Department of Justice

27

28

                                      37

DAVID Z. CHESNOFF, ESQ.
Pro Hac Vice
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

\* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALEXANDER SMIRNOV, )<br><br>Defendant. )<br>_____ ) | CASE NOS. 2:24-CR-00091-ODW<br><br>DEFENDANT'S NOTICE OF APPEAL |

Notice is hereby given that ALEXANDER SMIRNOV, Defendant herein, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the sentence imposed upon him on January 8, 2025, and the Amended Judgment and Commitment Order entered against him on January 16, 2025 (which withdrew the Judgment and Commitment Order that was entered on January 8, 2025). Specifically, Defendant limits his appeal to the Court's refusal to include in the

1

Judgment and Commitment Order that Defendant receive "credit in both Cr. Nos. 24-91 and 24-702 for the period of his pretrial detention since the day of his arrest…" as provided for in paragraph 19 of the Guilty Plea Agreement.

The Guilty Plea Agreement was entered pursuant to Rule 11(c)(1)(C), and when the Court accepted the Plea and sentenced the Defendant, the Court accepted the stipulated terms of paragraph 19 and therefore erred in refusing to order in the Judgment and Commitment that Defendant receive said credit.

Defendant has the right to appeal this aspect of his sentencing pursuant to paragraph 22, as the Court did not sentence Defendant as specified in paragraph 19 as a result of not including in the Judgment and Commitment Order the language

/ / /

/ / /

/ / /

identified above.

Dated this 21st day of January 2025.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice*
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

ER_220

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of January 2025, I caused to be served via the Court's e-filing/e-service system a true and correct copy of the foregoing Notice of Appeal to all parties listed on the Court's Service List.

/s/ Camie Linnell
Employee of Chesnoff Schonfeld

ER_221

WESTERN,APPEAL,CLOSED,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CRIMINAL DOCKET FOR CASE #: 2:24-cr-00091-ODW-1

Case title: USA v. Smirnov

Date Filed: 02/14/2024

Date Terminated: 01/08/2025

Assigned to: Judge Otis D. Wright, II

Appeals court case numbers: 24-1133 9th
CCA, 24-4040 9th CCA, 25-400 9th CCA

**Defendant (1)**

**Alexander Smirnov**
*TERMINATED: 01/08/2025*

represented by **Mark A. Byrne**
Byrne and Nixon LLP
2437 Huntington Drive
San Marino, CA 91108
213-620-8003
Email: markbyrne@byrnenixon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard A Schonfeld**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101-6593
702-384-5563
Fax: 702-598-1425
Email: rschonfeld@cslawoffice.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Z Chesnoff**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101
702-384-5563
Email: dzchesnoff@cslawoffice.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Naser J. Khoury**
Naser J. Khoury Law Offices
14427 Sylvan Street
Van Nuys, CA 91401-2649
818-654-0001

ER_222

Fax: 818-654-0007
Email: naseratlaw@gmail.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1519: Creating a False and Fictitious Record (2) | Defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months on Count 2 in case CR 24-00091. Supervised release for One (1) year. Pay special assessment of $400, all Fines waived. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1001: False Statement (1) | Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA**                            represented by   **David Ransom Friedman**
                                                    AUSA - Office of US Attorney
                                                    Ciminal Appeals Section
                                                    312 North Spring Street 12th Floor
                                                    Los Angeles, CA 90012
                                                    213-894-7418
                                                    Fax: 213-894-8513
                                                    Email: david.friedman@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    Designation: Assistant US Attorney

                                                    **Christopher Michael Rigali**
                                                    Office of Special Counsel, U.S. Dept. of Justice
                                                    950 Pennsylvania Avenue NW, Room B-200
                                                    Washington, DC 20530
                                                    202-616-2652
                                                    Email: christopher.rigali2@usdoj.gov
                                                    *TERMINATED: 04/10/2025*
                                                    Designation: Assistant US Attorney

**Derek E. Hines**
US Department of Justice
Senior Assistant Special Counsel
950 Pennsylvania Avenue, NW, Room B-200
Washington, DC 20530
771-217-6091
Email: derek.hines@usdoj.gov
*TERMINATED: 04/10/2025*
*Designation: Assistant US Attorney*

**Leo J. Wise**
US Department of Justice
Principal Senior Assistant Special Counsel
950 Pennsylvania Avenue, NW, Room B-200
Washington, DC 20530
771-217-6091
Email: leo.wise@usdoj.gov
*TERMINATED: 04/10/2025*
*Designation: Assistant US Attorney*

**Sean F Mulryne**
Office of the Special Counsel - Weiss
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
202-430-4880
Email: sean.mulryne@usdoj.gov
*TERMINATED: 04/10/2025*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2024 | 1 | INDICTMENT filed as to Alexander Smirnov (1) count(s) 1, 2. Offense occurred in LA. (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 2 | CASE SUMMARY filed by AUSA Leo J Wise as to Defendant Alexander Smirnov; defendants Year of Birth: 1980 (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 4 | EX PARTE APPLICATION to Seal Case Filed by Plaintiff USA as to Defendant Alexander Smirnov. (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 5 | ORDER by Magistrate Judge Michael R. Wilner: granting 4 EX PARTE APPLICATION to Seal Case as to Alexander Smirnov (1) (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 6 | Notice of Appearance or Withdrawal of Counsel: Adding Derek E Hines as counsel of record for Alexander Smirnov for the reason indicated in the G-123 Notice. Filed by plaintiff USA. (mhe) (Entered: 02/15/2024) |
| 02/15/2024 | 7 | SEALED EX PARTE APPLICATION to Unseal Case Filed by Plaintiff USA as to Defendant Alexander Smirnov. (mhe) (Entered: 02/15/2024) |
| 02/15/2024 | 8 | SEALED ORDER UNSEALING INDICTMENT AND RELATED DOCUMENTS by Magistrate Judge Michael R. Wilner: granting 7 EX PARTE APPLICATION to Unseal Case as to Alexander Smirnov (1) (mhe) (Entered: 02/15/2024) |

| 02/15/2024 | 9 | Notice of Appearance or Withdrawal of Counsel: for attorney Sean F Mulryne counsel for Plaintiff USA. Adding Sean Francis Mulryne as counsel of record for United States of America for the reason indicated in the G-123 Notice. Filed by Plaintiff United States of America. (Attorney Sean F Mulryne added to party USA(pty:pla))(Mulryne, Sean) (Entered: 02/15/2024) |
| --- | --- | --- |
| 02/15/2024 | 10 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Christopher Michael Rigali on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney Christopher Michael Rigali added to party USA(pty:pla))(Rigali, Christopher) (Entered: 02/15/2024) |
| 02/21/2024 | 11 | APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION Filed by Plaintiff USA as to Defendant Alexander Smirnov. (Attachments: # 1 Exhibit 2, # 2 Exhibit 8, # 3 Exhibit 9) (Hines, Derek) (Entered: 02/21/2024) |
| 02/21/2024 | 12 | EX PARTE APPLICATION for Leave to File Government's Ex Parte Application for Order Sealing Certain Exhibits to Government's Application for Review of Magistrate Judge's Bail Order. Filed by Plaintiff USA as to Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order) (Hines, Derek) (Entered: 02/21/2024) |
| 02/21/2024 | 13 | ORDER SEALING CERTAIN EXHIBITS TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER as to Alexander Smirnov (1) 12 by Judge Otis D. Wright, II: Pursuant to Local Criminal Rule 49-1.2(b)(3), exhibits 1, 3, 4, 5, 6, 7,10 and 11 shall be kept under seal. (lc) (Entered: 02/21/2024) |
| 02/21/2024 | 14 | NOTICE OF APPEARANCE of attorney Richard A Schonfeld, (Retained), appearing on behalf of Defendant Alexander Smirnov, filed by Defendant Alexander Smirnov. (Schonfeld, Richard) (Entered: 02/21/2024) |
| 02/21/2024 | 17 | SEALED - EXHIBIT 1 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 18 | SEALED - EXHIBIT 3 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 19 | SEALED - EXHIBIT 4 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 20 | SEALED - EXHIBIT 5 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 21 | SEALED - EXHIBIT 6 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 22 | SEALED - EXHIBIT 7 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 23 | SEALED - EXHIBIT 10 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 24 | SEALED - EXHIBIT 11 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/22/2024 | 15 | *RESTRICTED DOCUMENT AND ENTRY* IN CAMERA PROCEEDINGS (bm) (Entered: 02/22/2024) |
| 02/22/2024 | 16 | Arrest Warrant Issued by Judge Otis D. Wright, II as to Defendant Alexander Smirnov. (Not for Public View pursuant to the E-Government Act of 2002) (lc) (Main Document 16 replaced on 3/12/2024) (rolm). (Entered: 02/22/2024) |

ER_225

| 02/22/2024 | 25 | APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36960987) Filed by Defendant Alexander Smirnov. Application set for hearing on 2/22/2024 at 03:29 PM before Judge Otis D. Wright II. (Attorney Naser J. Khoury added to party Alexander Smirnov(pty:dft)) (Khoury, Naser) (Entered: 02/22/2024) |
| 02/22/2024 | 26 | NOTICE OF APPEARANCE of attorney David Z. Chesnoff, (Retained), appearing on behalf of Defendant Alexander Smirnov, filed by Defendant Alexander Smirnov. (Khoury, Naser) (Entered: 02/22/2024) |
| 02/22/2024 | 27 | ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER by Judge Otis D. Wright (bm) Modified on 2/23/2024 (bm). (Entered: 02/22/2024) |
| 02/22/2024 | 55 | SEALED UNREDACTED Arrest Warrant filed as to Defendant Alexander Smirnov re: Warrant of Arrest Issued - NFPV 16 (rolm) (Entered: 03/12/2024) |
| 02/23/2024 | 28 | COUNSEL ARE NOTIFIED, the Application for Non Resident 25 was set for a hearing (2-22-24) which is invalid and VACATED. The parties were emailed an order with the correct date and time: (2-26-24 @ 9am).THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 02/23/2024) |
| 02/23/2024 | 29 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36960987) 25 . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. Local Rule 83-2.1.3.3(b) Proposed order not attached. (ak) (Entered: 02/23/2024) |
| 02/23/2024 | 30 | Second APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Previously Paid on 2/22/2024, Receipt No. 36960987) Filed by Defendant Alexander Smirnov. Application set for hearing on 2/26/2024 at 09:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order) (Khoury, Naser) (Entered: 02/23/2024) |
| 02/23/2024 | 31 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: Second APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Previously Paid on 2/22/2024, Receipt No. 36960987) 30 . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. (sbou) (Entered: 02/23/2024) |
| 02/23/2024 | 32 | NOTICE OF CLERICAL ERROR, as to Defendant Alexander Smirnov: Due to clerical error the Notice of Deficiency was issued in error. Re: Notice of Deficiency in Electronically filed Pro Hac Vice Application (G-112C) - optional html form, 31 (sbou) (Entered: 02/23/2024) |
| 02/23/2024 | 33 | OPPOSITION to APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION 11 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Schonfeld, Richard) (Entered: 02/23/2024) |
| 02/23/2024 | 35 | ORDER GRANTING APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (1) and designating Naser I. Khoury as local counsel 30 by Judge Otis D. Wright, II. (lc) (Entered: 02/26/2024) |

ER_226

| | | |
|---|---|---|
| 02/26/2024 | 34 | SUPPLEMENT to APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION 11 (Schonfeld, Richard) (Entered: 02/26/2024) |
| 02/26/2024 | 36 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 02/26/2024) |
| 02/26/2024 | 37 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Schonfeld, Richard) (Entered: 02/26/2024) |
| 02/26/2024 | 40 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1) Count 1,2. Defendant arraigned, states true name is the name on the charging document. Defendant entered not guilty plea to all counts as charged. Attorney: David Z. Chesnoff, Retained present. Case assigned to Judge Otis D. Wright,II. Jury Trial set for 4/23/2024 09:00 AM before Judge Otis D. Wright II.. Judge Wright is located in 5D, Los Angeles - United States Courthouse, 350 W 1st Street, CA 90012-4565. Court Smart: 02/26/2024. (tba) (Entered: 02/27/2024) |
| 02/26/2024 | 43 | MINUTES OF ARREST ON INDICTMENT HEARING held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov. Court issues Order under Fed. R. Crim. P. 5(f) concerning prosecutor's disclosure obligations;see General Order 21-02 (written order). Defendant states true name as charged. Attorney: David Z Chesnoff, Retained, present. Defendant remanded to the custody of the USM. Court Smart: CS 2/26/24. (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 44 | ABSTRACT OF COURT PROCEEDING Issued by Judge Otis D. Wright, II as to Alexander Smirnov. Defendant be provided with a medical examination and/or medical treatment. (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 45 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Alexander Smirnov. (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 46 | ORDER OF DETENTION by Judge Otis D. Wright, II as to Defendant Alexander Smirnov, (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 47 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Richard A Schonfeld, David Z Chesnoff appearing for Alexander Smirnov (mhe) (Entered: 03/01/2024) |
| 02/27/2024 | 38 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 02/26/2024. Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 3/19/2024. Redacted Transcript Deadline set for 3/29/2024. Release of Transcript Restriction set for 5/28/2024.(yja) (Entered: 02/27/2024) |
| 02/27/2024 | 39 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 02/26/2024 re Transcript 38 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yja) TEXT ONLY ENTRY (Entered: 02/27/2024) |
| 02/29/2024 | 41 | NOTICE OF APPEAL to Appellate Court re: Conditions of Release filed by Defendant Alexander Smirnov Filing fee $605, receipt number ACACDC-37009687. (Schonfeld, Richard) (Entered: 02/29/2024) |

| 02/29/2024 | 42 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Alexander Smirnov; defendants Year of Birth: 1980; date of arrest: 2/14/2024 (mhe) (Entered: 03/01/2024) |
| 03/01/2024 | 48 | NOTICE of and Request to Designate a Classified Information Security Officer filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Proposed Order) (Rigali, Christopher) (Entered: 03/01/2024) |
| 03/01/2024 | 50 | NOTIFICATION by Circuit Court of Appellate Docket Number 24-1133 as to Defendant Alexander Smirnov, 9th CCA regarding Notice of Appeal - Conditions of Release to 9th Circuit Court of Appeals 41 . (mat) (Entered: 03/04/2024) |
| 03/04/2024 | 49 | ORDER DESIGNATING A CLASSIFIED INFORMATION SECURITY OFFICER AND ALTERNATE CLASSIFIED INFORMATION SECURITY OFFICERS as to Defendant Alexander Smirnov 48 by Judge Otis D. Wright, II : The Court HEREBY APPOINTS W. Scooter Slade, Supervisory Security Specialist, for the position of ClassifiedInformation Security Officer in the above-captioned matter. The Court FURTHER APPOINTS Jennifer H. Campbell, Daniel O. Hartenstine, Daniella M. Medel, Matthew W. Mullery, and Harry J. Rucker as Alternate Classified Information Security Officers in the above captioned matter. (lc) (Entered: 03/04/2024) |
| 03/05/2024 | 51 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Mark A. Byrne appearing for Alexander Smirnov (Attorney Mark A. Byrne added to party Alexander Smirnov(pty:dft))(Byrne, Mark) (Entered: 03/05/2024) |
| 03/11/2024 | 52 | Emergency EX PARTE APPLICATION for Medical Treatment *Medical Furlough* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 03/11/2024) |
| 03/11/2024 | 53 | MINUTES (IN CHAMBERS) by Judge Otis D. Wright, II: as to Defendant Alexander Smirnov.The Court orders the clerk's office to unseal docket nos. 15 and 16 immediately. (rolm) (Entered: 03/11/2024) |
| 03/11/2024 | 57 | AMENDED ORDER OF DETENTION by Judge Otis D. Wright, II as to Defendant Alexander Smirnov, (rolm) (Entered: 03/14/2024) |
| 03/12/2024 | 54 | OPPOSITION to Emergency EX PARTE APPLICATION for Medical Treatment *Medical Furlough* 52 (Attachments: # 1 Exhibit 1)(Hines, Derek) (Entered: 03/12/2024) |
| 03/13/2024 | 56 | ORDER by Judge Otis D. Wright, II. Denying 52 EX PARTE APPLICATION for Medical Treatment as to Alexander Smirnov (1) (rolm) (Entered: 03/13/2024) |
| 03/15/2024 | 58 | Joint STIPULATION for Order Protective Order filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Proposed Order)(Mulryne, Sean) (Entered: 03/15/2024) |
| 03/19/2024 | 59 | PROTECTIVE ORDER UPON STIPULATION REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION; PRIVACY ACT INFORMATION; GRAND JURY INFORMATION; AND SENSITIVE U.S. GOVERNMENT INFORMATION as to Defendant Alexander Smirnov 58 by Judge Otis D. Wright, II. (lc) (Entered: 03/19/2024) |
| 03/25/2024 | 60 | Emergency EX PARTE APPLICATION for Reconsideration re Order on Motion for Medical Treatment 56 *Regarding Medical Furlough for the Next Thirty Days Pursuant to 18 U.S.C. 3142 or in the Alternative for an Order Requiring the United States Marshal Service to Transport Defendant for Surgery and Post-Operative Care with Dr. Tanaka in San Francisco, California* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 03/25/2024) |

ER_228

| | | |
|---|---|---|
| 03/25/2024 | [61](#) | SUPPLEMENT to Emergency EX PARTE APPLICATION for Reconsideration re Order on Motion for Medical Treatment [56](#) *Regarding Medical Furlough for the Next Thirty Days Pursuant to 18 U.S.C. 3142 or in the Alternative for an Order Requiring the United States Marshal* [60](#) *filed by Defendant Alexander Smirnov.* (Chesnoff, David) (Entered: 03/25/2024) |
| 03/26/2024 | [62](#) | OPPOSITION to Emergency EX PARTE APPLICATION for Reconsideration re Order on Motion for Medical Treatment [56](#) *Regarding Medical Furlough for the Next Thirty Days Pursuant to 18 U.S.C. 3142 or in the Alternative for an Order Requiring the United States Marshal* [60](#) *filed by Plaintiff USA as to Defendant Alexander Smirnov.* (Mulryne, Sean) (Entered: 03/26/2024) |
| 03/26/2024 | [63](#) | ORDER by Judge Otis D. Wright, II: As to defendant Alexander Smirnov (1). Upon reviewing Defendant's Emergency Ex Parte Motion for Reconsideration regarding request for Medical Furlough for the Next 30 Days pursuant to 18 U.S.C. § 3142(i) [ 60], and having given careful reconsideration to theCourt's earlier determination, said Motion is again DENIED. (lc) (Entered: 03/26/2024) |
| 04/12/2024 | [64](#) | Joint STIPULATION to Continue Trial Date from 04/23/2024 to 12/02/2024 filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # [1](#) Proposed Order Proposed Order Continuing Trial Date and Excluding Time under the Speedy Trial Act) (Rigali, Christopher) (Entered: 04/12/2024) |
| 04/12/2024 | [65](#) | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT as to Defendant Alexander Smirnov by Judge Otis D. Wright, II: Jury Trial set for 12/3/2024 09:00 AM is continued from April 23, 2024 to December 3, 2024 at 9:00 a.m. The Court will set a pretrial conference if necessary. (lc) (Entered: 04/12/2024) |
| 05/01/2024 | [66](#) | ORDER of USCA filed as to Defendant Alexander Smirnov, Notice of Appeal [41](#) , CCA #24-1133. Accordingly, we affirm the district court's pretrial detention order and its order denying temporary release. Appellant's renewed request for reassignment to a different district judge is denied. AFFIRMED. [See Order for further information.] (car) (Entered: 05/06/2024) |
| 05/10/2024 | [67](#) | Emergency EX PARTE APPLICATION for Medical Treatment *Renewed Motion for (1) Provision of Pain-Reducing Eye Drops, and (2) A Court Order Scheduling Eye Surgery Forthwith With A Government-Contracted Doctor, or For A Medical Furlough Under 19 U.S.C. § 3142(i) For Eye Surgery With Dr. H. George Tanaka* Filed by Defendant Alexander Smirnov. (Attachments: # [1](#) Proposed Order Proposed Order) (Chesnoff, David) (Entered: 05/10/2024) |
| 05/13/2024 | [68](#) | OPPOSITION to Emergency EX PARTE APPLICATION for Medical Treatment *Renewed Motion for (1) Provision of Pain-Reducing Eye Drops, and (2) A Court Order Scheduling Eye Surgery Forthwith With A Government-Contracted Doctor, or For A Medical Furlough Under 19 U.S.C. &* [67](#) (Mulryne, Sean) (Entered: 05/13/2024) |
| 05/15/2024 | [69](#) | IN CAMERA PROCEEDINGS ON EX PARTE EMERGENCY MOTION TO BE PROVIDED WITH EYE DROPS AND FOR IMMEDIATE SURGERY [67](#) ESSENTIALLY A MOTION FOR RECONSIDERATION OF PRIOR MOTION FOR MEDICAL FURLOUGH OR TRANSPORT TO SAN FRANCISCO FOR EYE SURGERY as to Alexander Smirnov (1) by Judge Otis D. Wright, II: Having once again given further consideration of the earlier filings and especially noting the Declaration of Sean F. Mulryne, co-counsel for the United States, submitted in support of the government's opposition to the motion, in which counsel states that surgery has been scheduled to take place in less than two weeks, the instant motion is again DENIED as moot. (lc) Modified on 5/15/2024 (lc). (Entered: 05/15/2024) |

ER_229

| 05/21/2024 | 70 | Emergency EX PARTE APPLICATION for Medical Treatment *Second Renewed Motion For (1) Provision of Eye Drops, and (2) A Court Ordered Medical Furlough Under 18 U.S.C. § 3142(i) For Eye Surgery With Dr. H. George Tanaka* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 05/21/2024) |
| 05/22/2024 | 71 | SUPPLEMENT to Emergency EX PARTE APPLICATION for Medical Treatment *Second Renewed Motion For (1) Provision of Eye Drops, and (2) A Court Ordered Medical Furlough Under 18 U.S.C. § 3142(i) For Eye Surgery With Dr. H. George Tanaka* 70 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 05/22/2024) |
| 05/22/2024 | 72 | OPPOSITION to Emergency EX PARTE APPLICATION for Medical Treatment *Second Renewed Motion For (1) Provision of Eye Drops, and (2) A Court Ordered Medical Furlough Under 18 U.S.C. § 3142(i) For Eye Surgery With Dr. H. George Tanaka* 70 filed by Plaintiff USA as to Defendant Alexander Smirnov. (Rigali, Christopher) (Entered: 05/22/2024) |
| 05/23/2024 | 73 | (STRICKEN PER 5/24/2024 ORDER DOCKET NO. 74). NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to impose Conditions of Pretrial Release* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Proposed Order Proposed Order) (Chesnoff, David) Modified on 5/24/2024 (lc). (Entered: 05/23/2024) |
| 05/24/2024 | 74 | ORDER by Judge Otis D. Wright, II: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing* 73 , for the following reasons: *Hearing information is missing, incorrect or not timely. (lc) (Entered: 05/24/2024)* |
| 05/24/2024 | 75 | NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* Filed by Defendant Alexander Smirnov. Motion set for hearing on 6/24/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 05/24/2024) |
| 05/31/2024 | 76 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* 75 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 05/31/2024) |
| 05/31/2024 | 77 | OPPOSITION to NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* 75 filed by Plaintiff USA as to Defendant Alexander Smirnov. (Mulryne, Sean) (Entered: 05/31/2024) |
| 06/05/2024 | 78 | MANDATE of the 9th CCA filed as to Defendant Alexander Smirnov re Notice of Appeal - Conditions of Release to 9th Circuit Court of Appeals 41 , USCA CCA #24-1133. The judgment of this Court, entered May 01, 2024, takes effect this date. This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. [See Order, 66 AFFIRMED.](mat) (Entered: 06/05/2024) |
| 06/06/2024 | 79 | EX PARTE APPLICATION to Shorten Time for Hearing, re: NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* 75 to 6/17/2024 Filed by Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order) (Chesnoff, David) (Entered: 06/06/2024) |

| 06/07/2024 | 80 | REPLY NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* 75 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 06/07/2024) |
| --- | --- | --- |
| 06/07/2024 | 81 | ORDER DENYING REQUEST 79 by Judge Otis D. Wright, II: As to Alexander Smirnov (1). Upon reviewing Defendant's Ex Parte Motion for an Order Shortening Time to be heard on his Motion to Reopen Detention Hearing and Impose Conditions of Release (Dkt 75), and with no good cause appearing, said Motion is DENIED. The Court ORDERS that the hearing on Defendants Motion (Dkt 75) currently scheduled for June 24, 2024, at 10:00 AM will remain. (lc) (Entered: 06/07/2024) |
| 06/20/2024 | 82 | filed by Plaintiff USA as to Defendant Alexander Smirnov *Supplement* Re: Opposition to Motion (CR) 77 (Mulryne, Sean) (Entered: 06/20/2024) |
| 06/20/2024 | 83 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Detention *Reopen Detention Hearing and to Impose Conditions of Pretrial Release* 75 filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit Exhibit 1)(Chesnoff, David) (Entered: 06/20/2024) |
| 06/21/2024 | 84 | ON THE COURT'S OWN MOTION, the MOTION for Detention Reopen Detention Hearing and to Impose Conditions of Pretrial Release 75 is CONTINUED to 7/1/2024 at 8:00 AM before Judge Otis D. Wright II. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 06/21/2024) |
| 06/21/2024 | 85 | The Court feels it would not be aided by oral argument regarding the Motion for Detention Reopen Detention Hearing and to Impose Conditions of Pretrial Release 75 , scheduled for July 1, 2024 is hereby VACATED, and taken off calendar. The matter stands submitted, and will be decided upon without oral argument.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 06/21/2024) |
| 06/24/2024 | 86 | NOTICE of Manual Filing of Classified Motion for a Protective Order Pursuant to CIPA Section 4 and Fed. R. Crim. P. 16(d)(1) filed by Plaintiff USA as to Defendant Alexander Smirnov (Rigali, Christopher) (Entered: 06/24/2024) |
| 06/24/2024 | 87 | APPLICATION for Leave to File Excess Pages as to Classified Motion and Memorandum of Law In Support of a Protective Order Pursuant to CIPA Section 4 and Fed. R. Crim. P. 16(d)(1) Filed by Plaintiff USA as to Defendant Alexander Smirnov. Application set for hearing on 7/15/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order) (Rigali, Christopher) (Entered: 06/24/2024) |
| 06/25/2024 | 88 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Plaintiff USA's APPLICATION for Leave to File Excess Pages as to Classified Motion and Memorandum of Law In Support of a Protective Order Pursuant to CIPA Section 4 and Fed. R. Crim. P. 16(d)(1) 87 . The following error(s) was/were found: Hearing information is missing, incorrect, or untimely. Filer Erroneously set the Application for hearing on Judge's Calendar for 7/16/2024 10:00 AM. No such hearing appears on the Pdf document, nor is a hearing required for the format used. Clerk notes a Proposed order was submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 06/25/2024) |
| 06/25/2024 | 89 | ORDER GRANTING GOVERNMENTS APPLICATION FOR PERMISSION TO FILE AN OVERSIZED BRIEF 87 by Judge Otis D. Wright, II: : The Court will accept the Governments ex parte, in camera, and sealed Motion and Memorandum of Law in |

ER_231

|  |  | Support for a Protective Order as filed with the Classified Information Security Officer (lc) (Entered: 06/25/2024) |
|---|---|---|
| 06/25/2024 | 90 | MINUTES (IN CHAMBERS) by Judge Otis D. Wright, II: ORDER ON DEFENDANTS SEVENTH MOTION TO REOPEN HEARING ON HIS MOTION TO REOPEN DETENTION HEARING[DE-79] AND TO MODIFY CONDITIONS OF HIS PRETRIAL RELEASE 75 as to Alexander Smirnov (1) /On February 26, 2024 following Defendants arrest in Las Vegas, NV, he was ordered detained. [DE-46.] Three days later he filed a Notice of Appeal from that Order. [DE-41]. On May 1, 2024 the Court of Appeals affirmed the District Courts Order [DE-66.] Since that time Defendant has filed six Emergency Ex Parte Applications for either Medical Furlough or the Re-opening of the Detention Hearing. The arguments have essentially been the same until recently when he has proposed a modification to the conditions for release. He has proposed to be under full-time surveillance of a security company who will promise not to let defendant leave the country. That security company is not under the jurisdiction of this court and unlike a bond surety, would suffer no consequence should Defendant leave the country without permission. Given Defendants international contacts the Court finds no comfort in the proposed modification of the terms of pretrial release. The Court's concerns about his leaving the jurisdiction remain and once again his requests, all of which appear to have a common goal, to be released from custody, are again DENIED. (lc) (Entered: 06/25/2024) |
| 07/01/2024 | 91 | NOTICE OF APPEAL to Appellate Court re: Conditions of Release filed by Defendant Alexander Smirnov re MINUTES (IN CHAMBERS) by Judge Otis D. Wright, II: ORDER ON DEFENDANTS SEVENTH MOTION TO REOPEN HEARING ON HIS MOTION TO REOPEN DETENTION HEARING[DE-79] AND TO MODIFY CONDITIONS OF HIS PRETRIAL RELEASE 75 as to Alexander Smirnov (1) /On February 26, 2024 following Defendants arrest in Las Vegas, NV, he was ordered detained. [DE-46.] Three days later he filed a Notice of Appeal from that Order. [DE-41]. On May 1, 2024 the Court of Appeals affirmed the District Courts Order [DE-66.] Since that time Defendant has filed six Emergency Ex Parte Applications for either Medical Furlough or the Re-opening of the Detention Hearing. The arguments have essentially been the same until recently when he has proposed a modification to the conditions for release. He has proposed to be under full-time surveillance of a security company who will promise not to let defendant leave the country. That security company is not under the jurisdiction of this court and unlike a bond surety, would suffer no consequence should Defendant leave the country without permission. Given Defendants international contacts the Court finds no comfort in the proposed modification of the terms of pretrial release. The Court's concerns about his leaving the jurisdiction remain and once again his requests, all of which appear to have a common goal, to be released from custody, are again DENIED. (lc) 90 Filing fee $605, receipt number ACACDC-37753708. (Chesnoff, David) (Entered: 07/01/2024) |
| 07/01/2024 | 92 | NOTIFICATION by Circuit Court of Appellate Docket Number 24-4040 as to Defendant Alexander Smirnov, 9th CCA regarding Notice of Appeal - Conditions of Release to 9th Circuit Court of Appeals, 91 . (mat) (Entered: 07/05/2024) |
| 07/15/2024 | 93 | NOTICE OF MOTION AND MOTION to Disqualify Counsel as to Special Counsel , NOTICE OF MOTION AND MOTION to Dismiss Case Filed by Defendant Alexander Smirnov. Motion set for hearing on 8/26/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 07/15/2024) |
| 07/17/2024 | 94 | ORDER GRANTING GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER PURSUANT TO SECTION 4 OF THE CLASSIFIED INFORMATION PROCEDURES ACT AND FEDERAL RULE OF CRIMINAL PROCEDURE 16(d)(1) by Judge Otis D. Wright, II as to Defendant Alexander Smirnov. (rolm) (Entered: 07/22/2024) |

ER_232

| 08/02/2024 | 95 | ON THE COURT'S OWN MOTION, the MOTION to Disqualify Counsel as to Special Counsel and MOTION to Dismiss Case 93 , set on 8/26/2024, will be HEARD at 11:30am THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 08/02/2024) |
|---|---|---|
| 08/02/2024 | 96 | NOTICE OF MOTION AND MOTION for Protective Order *Pursuant to Section 3 of CIPA* Filed by Plaintiff USA as to Defendant Alexander Smirnov. Motion set for hearing on 9/9/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Protective Order Pursuant to Section 3 of CIPA) (Rigali, Christopher) (Entered: 08/02/2024) |
| 08/05/2024 | 97 | STIPULATION to Continue Modify Briefing Schedule Re: Stipulation to Continue, 64 filed by Defendant Alexander Smirnov (Attachments: # 1 Proposed Order)(Schonfeld, Richard) (Entered: 08/05/2024) |
| 08/05/2024 | 98 | NOTICE OF MOTION AND MOTION for Order for Access to CIPA § 4 Filing Filed by Defendant Alexander Smirnov. Motion set for hearing on 9/9/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 08/05/2024) |
| 08/05/2024 | 99 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Disqualify Counsel as to Special Counsel NOTICE OF MOTION AND MOTION to Dismiss Case 93 (Wise, Leo) (Entered: 08/05/2024) |
| 08/05/2024 | 100 | ORDER of USCA filed as to Defendant Alexander Smirnov, CCA #24-4040. Appellant has not shown any error in the courts conclusion that appellants proposal did not warrant revisiting or changing the courts decision that appellant poses a risk of flight and that no condition or combination of conditions will reasonably assure his appearance. (mat) (Entered: 08/06/2024) |
| 08/08/2024 | 101 | OPPOSITION to NOTICE OF MOTION AND MOTION for Protective Order *Pursuant to Section 3 of CIPA* 96 (Schonfeld, Richard) (Entered: 08/08/2024) |
| 08/09/2024 | 102 | REPLY NOTICE OF MOTION AND MOTION to Disqualify Counsel as to Special Counsel NOTICE OF MOTION AND MOTION to Dismiss Case 93 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 08/09/2024) |
| 08/14/2024 | 103 | EX PARTE APPLICATION for Leave to File Sur-Reply in Opposition to Defendant's Motion to Disqualify the Special Counsel and Dismiss the Indictment. *(Unopposed)* Filed by Plaintiff USA as to Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order, # 2 Exhibit 1) (Hines, Derek) (Entered: 08/14/2024) |
| 08/14/2024 | 104 | REPLY (Sur-Reply) in Opposition to NOTICE OF MOTION AND MOTION to Disqualify Counsel as to Special Counsel NOTICE OF MOTION AND MOTION to Dismiss Case 93 filed by Plaintiff USA as to Defendant Alexander Smirnov. (Hines, Derek) (Entered: 08/14/2024) |
| 08/14/2024 | 105 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Reply (Motion Related)(CR), 104 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. Sur-Reply filed before the Court has Ruled on the " Unopposed" Pending ex parte application docket no. 103. It should have been submitted as a separate attachment to the ex parte application. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 08/14/2024) |

ER_233

| | | |
|---|---|---|
| 08/15/2024 | 106 | ORDER that the United States Unopposed Ex Parte Application to file a Sur-Reply in Opposition to Defendant's Motion to Disqualify the Special Counsel and Dismiss the Indictment in this Case is DENIED 103 by Judge Otis D. Wright, II. (lc) (Entered: 08/15/2024) |
| 08/19/2024 | 107 | NOTICE OF MOTION AND MOTION to Dismiss Counts Count Two Filed by Defendant Alexander Smirnov. Motion set for hearing on 9/23/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 08/19/2024) |
| 08/19/2024 | 108 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Order for Access to CIPA § 4 Filing 98 filed by Plaintiff USA as to Defendant Alexander Smirnov. (Rigali, Christopher) (Entered: 08/19/2024) |
| 08/20/2024 | 109 | COUNSEL ARE NOTIFIED, the MOTION for Order for Access to CIPA § 4 98 , set for September 9, 2024, will be HEARD at 11:30a.m. as to Defendant Alexander Smirnov. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 08/20/2024) |
| 08/22/2024 | 110 | REPLY in support NOTICE OF MOTION AND MOTION for Order for Access to CIPA § 4 Filing 98 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 08/22/2024) |
| 08/26/2024 | 111 | MINUTES OF Motion to Disqualify Counsel as to Special Counsel and Motion to Dismiss Case 93 Hearing held before Judge Otis D. Wright, II: As to Defendant Alexander Smirnov. Case called, appearances made. The Court having carefully considered the papers, and having heard oral argument of counsel, the motion is DENIED. Court Smart: Court Smart. (lc) (Entered: 08/26/2024) |
| 08/26/2024 | 112 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Marshall Cohen at marshall.cohen@cnn.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (aa) (Entered: 08/26/2024) |
| 08/26/2024 | 113 | REPLY In support NOTICE OF MOTION AND MOTION for Protective Order *Pursuant to Section 3 of CIPA* 96 filed by Plaintiff USA as to Defendant Alexander Smirnov. (Rigali, Christopher) (Entered: 08/26/2024) |
| 08/26/2024 | 114 | NOTICE of Manual Filing of Classified Supplement In Support of Government's Motion for a Protective Order Pursuant to Section 3 of CIPA filed by Plaintiff USA as to Defendant Alexander Smirnov (Rigali, Christopher) (Entered: 08/26/2024) |
| 08/27/2024 | 115 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Disqualify Counsel as to Special Counsel NOTICE OF MOTION AND MOTION to Dismiss Case 93 *Defendant's Supplement to Motion to Disqualify the Special Counsel and Dismiss the Indictment in this Case Defendant's Supplement to Motion to Disqualify the Special Counsel and Dismiss the Indictment in this Case* (Schonfeld, Richard) (Entered: 08/27/2024) |
| 08/27/2024 | 116 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 08/27/2024) |
| 08/27/2024 | 117 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Mulryne, Sean) (Entered: 08/27/2024) |

ER_234

| 08/29/2024 | 118 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on Monday, August 26, 2024 11:19 a.m. to 12:12 p.m.. Court Reporter/Electronic Court Recorder: Exceptional Reporting Services, Inc, phone number 361-949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/19/2024. Redacted Transcript Deadline set for 9/30/2024. Release of Transcript Restriction set for 11/27/2024.(mci) (Entered: 08/29/2024) |
| --- | --- | --- |
| 08/29/2024 | 119 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on Monday, August 26, 2024 11:19 a.m. to 12:12 p.m. re Transcript 118 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 08/29/2024) |
| 08/30/2024 | 120 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss Counts Count Two 107 filed by Plaintiff USA as to Defendant Smirnov. (Mulryne, Sean) (Entered: 08/30/2024) |
| 09/03/2024 | 121 | MANDATE of the 9th CCA filed as to Defendant Alexander Smirnov re Notice of Appeal - Conditions of Release to 9th Circuit Court of Appeals, 91 , CCA #24-4040. The judgment of this Court, entered August 05, 2024, takes effect this date. This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. [See USCA Order, 100 , Affirmed. ](mat) (Entered: 09/04/2024) |
| 09/05/2024 | 122 | RESPONSE in Support of NOTICE OF MOTION AND MOTION to Dismiss Counts Count Two 107 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 09/05/2024) |
| 09/06/2024 | 123 | NOTICE of Manual Filing of Classified Notice of Errata (Letter Format) Regarding Change in Classification Status to a Court-Approved Substitution filed by Plaintiff USA as to Defendant Alexander Smirnov (Rigali, Christopher) (Entered: 09/06/2024) |
| 09/09/2024 | 124 | MEMORANDUM OF UNDERSTANDING REGARDING RECEIPT OF CLASSIFIED INFORMATION filed by Defendant Alexander Smirnov. (lc) (Entered: 09/09/2024) |
| 09/09/2024 | 125 | MINUTES OF MOTIONS Hearing held before Judge Otis D. Wright, II : As to Defendant Alexander Smirnov. Case called, appearances made. The Court having carefully considered the papers and the evidence submitted by the parties, and having heard the oral argument of counsel. The Court rules as follows: MOTION for Order for Access to CIPA § 4 Filing 98 - DENIED. MOTION for Protective Order Pursuant to Section 3 of CIPA 96 - GRANTED. Court Smart: Court Smart. (lc) (Entered: 09/10/2024) |
| 09/09/2024 | 128 | MEMORANDUM OF UNDERSTANDING REGARDING RECEIPT OF CLASSIFIED INFORMATION of filed by Defendant Alexander Smirnov (lc) (Entered: 09/23/2024) |
| 09/10/2024 | 126 | ORDER GRANTING STIPULATION TO MODIFY BRIEFING SCHEDULE 97 as to Defendant Alexander Smirnov by Judge Otis D. Wright, II: The briefing schedule in Dkt 64 is modified as follows: i.Defendant's CIPA Section 5 notice is due no later than:Two weeks after the government provides Defendants counsel access to the classified information discovery; ii. Governments Objections to Defendant's CIPA Section 5 and government's CIPA Section 6(a) filing is due no later than: Three weeks after Defendant's CIPA Section 5 notice. iii.Defendants Reply in CIPA Section 5 and Response to government's CIPA Section 6(a) is due no later than: Two weeks after government's CIPA Section 6 filing. The remaining briefing schedule in Dkt 64 is not impacted by this Order. (lc) (Entered: 09/10/2024) |

ER_235

| 09/23/2024 | 127 | MINUTES OF MOTION TO DISMISS COUNTS TWO 107 Hearing held before Judge Otis D. Wright, II : As to Defendant Alexander Smirnov. The Court having carefully considered the papers and the evidence submitted by the parties, and having heard the oral argument of counsel. The Court DENIES the motion. Court Smart: Court Smart. (lc) (Entered: 09/23/2024) |
|---|---|---|
| 09/24/2024 | 129 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 09/24/2024) |
| 09/24/2024 | 130 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 09/24/2024) |
| 09/26/2024 | 131 | EX PARTE APPLICATION to Continue Trial from December 3, 2024 to April 1, 2025. RE: Order to Continue Trial, Change of Plea or Sentencing, 65 . *And for Finding to Exclude Certain Time Periods under the Speedy Trial Act* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 09/26/2024) |
| 09/26/2024 | 132 | EXHIBIT to EX PARTE APPLICATION to Continue Trial from December 3, 2024 to April 1, 2025. RE: Order to Continue Trial, Change of Plea or Sentencing, 65 . *And for Finding to Exclude Certain Time Periods under the Speedy Trial Act* 131 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 09/26/2024) |
| 09/26/2024 | 133 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 9/23/2024 (9:54 a.m. to 10:03 a.m.). Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC., phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 10/17/2024. Redacted Transcript Deadline set for 10/28/2024. Release of Transcript Restriction set for 12/26/2024.(ls) (Entered: 09/26/2024) |
| 09/26/2024 | 134 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 9/23/2024 re Transcript 133 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 09/26/2024) |
| 09/27/2024 | 135 | OPPOSITION to EX PARTE APPLICATION to Continue Trial from December 3, 2024 to April 1, 2025. RE: Order to Continue Trial, Change of Plea or Sentencing, 65 . *And for Finding to Exclude Certain Time Periods under the Speedy Trial Act* 131 (Attachments: # 1 Declaration, # 2 Exhibit)(Hines, Derek) (Entered: 09/27/2024) |
| 10/15/2024 | 137 | ORDER DENYING DEFENDANT'S REQUEST FOR CONTINUANCE OF TRIAL as to Alexander Smirnov (1) 131 by Judge Otis D. Wright, II. (lc) (Entered: 10/15/2024) |
| 10/15/2024 | 140 | SEALED - MINUTES OF (In Chambers) Order Modifying Briefing Schedule (bm) (Entered: 10/22/2024) |
| 10/16/2024 | 138 | MINUTES (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge Otis D. Wright, II as to Defendant Alexander Smirnov: At the request of defense counsel, the Court orders the clerk's office to seal docket no. 136 , due to sensitive information disclosed. (jp) (Entered: 10/16/2024) |
| 10/16/2024 | 139 | NOTICE OF MOTION AND MOTION to Compel Production of Discovery Filed by Defendant Alexander Smirnov. Motion set for hearing on 11/18/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 |

| | | |
|---|---|---|
| | | Exhibit 4, # [5] Exhibit 5, # [6] Proposed Order Proposed Order) (Chesnoff, David) (Entered: 10/16/2024) |
| 10/28/2024 | [141] | OPPOSITION to NOTICE OF MOTION AND MOTION to Compel Production of Discovery [139] (Attachments: # [1] Exhibit 1, # [2] Exhibit 2)(Hines, Derek) (Entered: 10/28/2024) |
| 10/30/2024 | [142] | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 10/30/2024) |
| 10/30/2024 | [143] | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Rigali, Christopher) (Entered: 10/30/2024) |
| 10/30/2024 | [144] | NOTICE of Manual Filing of Classified Motion for a Hearing and Notice Pursuant to CIPA Sections 5 and 6 filed by Plaintiff USA as to Defendant Alexander Smirnov (Rigali, Christopher) (Entered: 10/30/2024) |
| 10/31/2024 | [145] | REPLY NOTICE OF MOTION AND MOTION to Compel Production of Discovery [139] filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 10/31/2024) |
| 10/31/2024 | [146] | NOTICE OF MOTION AND MOTION in Limine to Preclude Any References to Defendant's Lawfully Owned Firearms Filed by Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Proposed Order Proposed Order)(Chesnoff, David) (Entered: 10/31/2024) |
| 10/31/2024 | [147] | NOTICE OF MOTION AND MOTION in Limine to Preclude Any References to Defendant's Alleged Disloyalty Filed by Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Proposed Order Proposed Order)(Chesnoff, David) (Entered: 10/31/2024) |
| 10/31/2024 | [148] | NOTICE OF MOTION AND MOTION to Admit Judicial Notice of Contents of Hearing Transcript Filed by Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Exhibit 1, # [2] Proposed Order Proposed Order)(Chesnoff, David) (Entered: 10/31/2024) |
| 11/01/2024 | [149] | NOTICE OF MOTION AND MOTION in Limine to Preclude Evidence from Defendant's FBI Interview on September 27, 2023 Filed by Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Proposed Order Proposed Order)(Chesnoff, David) (Entered: 11/01/2024) |
| 11/01/2024 | [150] | NOTICE OF MOTION AND MOTION in Limine to Preclude Proposed Defense Expert Gregory Scott Rogers Filed by Plaintiff USA as to Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Declaration of Leo J. Wise, # [2] Exhibit 1, # [3] Exhibit 2, # [4] Proposed Order)(Wise, Leo) (Entered: 11/01/2024) |
| 11/01/2024 | [151] | NOTICE OF MOTION AND MOTION in Limine to Exclude Second Motion in Limine to Exclude FBI Handling Agent's Alleged Mistakes Filed by Plaintiff USA as to Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # [1] Declaration of Leo J. Wise, # [2] Proposed Order)(Wise, Leo) (Entered: 11/01/2024) |
| 11/01/2024 | [152] | NOTICE OF MOTION AND MOTION in Limine to Exclude Third Motion in Limine to Exclude Impermissible "Specific Instances of Conduct" Evidence Filed by Plaintiff USA as to Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM |

| | | before Judge Otis D. Wright II. (Attachments: # 1 Declaration of Leo J. Wise, # 2 Proposed Order)(Wise, Leo) (Entered: 11/01/2024) |
|---|---|---|
| 11/01/2024 | 153 | NOTICE OF MOTION AND MOTION in Limine to Exclude Fourth Motion in Limine to Exclude Alleged Defects in the Prosecution Filed by Plaintiff USA as to Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Declaration of Leo J. Wise, # 2 Exhibit 1, # 3 Proposed Order)(Wise, Leo) (Entered: 11/01/2024) |
| 11/01/2024 | 154 | NOTICE OF MOTION AND MOTION in Limine to Exclude Fifth Motion in Limine to Exclude Irrelevant Factual Issues Filed by Plaintiff USA as to Defendant Alexander Smirnov Motion set for hearing on 11/25/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Declaration of Leo J. Wise, # 2 Proposed Order)(Wise, Leo) (Entered: 11/01/2024) |
| 11/01/2024 | 155 | DECLARATION of Richard A. Schonfeld filed by Defendant Alexander Smirnov RE: MOTION in Limine to Preclude Any References to Defendant's Lawfully Owned Firearms 146 (Chesnoff, David) (Entered: 11/01/2024) |
| 11/01/2024 | 156 | DECLARATION of Richard A. Schonfeld filed by Defendant Alexander Smirnov RE: MOTION in Limine to Admit Judicial Notice of Contents of Hearing Transcript 148 (Chesnoff, David) (Entered: 11/01/2024) |
| 11/01/2024 | 157 | DECLARATION of Richard A. Schonfeld filed by Defendant Alexander Smirnov RE: MOTION in Limine to Preclude Any References to Defendant's Alleged Disloyalty 147 (Chesnoff, David) (Entered: 11/01/2024) |
| 11/01/2024 | 158 | DECLARATION of Richard A. Schonfeld filed by Defendant Alexander Smirnov RE: MOTION in Limine to Preclude Evidence from Defendant's FBI Interview on September 27, 2023 149 (Chesnoff, David) (Entered: 11/01/2024) |
| 11/04/2024 | 159 | Second EX PARTE APPLICATION to Continue Trial from December 3, 2024 to April 1, 2025. Filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 11/04/2024) |
| 11/05/2024 | 160 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on Monday, September 9, 2024. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC, phone number 858-453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/26/2024. Redacted Transcript Deadline set for 12/6/2024. Release of Transcript Restriction set for 2/3/2025.(mci) (Entered: 11/05/2024) |
| 11/05/2024 | 161 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings Monday, September 9, 2024 re Transcript 160 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 11/05/2024) |
| 11/05/2024 | 162 | NOTICE OF MOTION AND MOTION to Dismiss Case *For Discovery Violation* Filed by Defendant Alexander Smirnov. Motion set for hearing on 12/2/2024 at 10:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 11/05/2024) |
| 11/05/2024 | 163 | NOTICE of Manual Filing of CIPA Filing filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 11/05/2024) |

ER_238

| | | |
|---|---|---|
| 11/05/2024 | 164 | OPPOSITION to Second EX PARTE APPLICATION to Continue Trial from December 3, 2024 to April 1, 2025. 159 filed by Plaintiff USA as to Defendant Smirnov. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Proposed Order)(Hines, Derek) (Entered: 11/05/2024) |
| 11/08/2024 | 165 | MINUTES (IN CHAMBERS) by Judge Otis D. Wright, II: As to Alexander Smirnov (1). On October 19, 2024, Defendant Alexander Smirnov filed a motion to compel production of discovery 139 . The United States filed an opposition, and Defendant submitted a reply in support of the Motion. Defendant fails to clearly articulate to the Court what discovery he is seeking to compel. Instead, Defendant reprints a letter he sent to the United States, without providing the Court additional detail or context. The Court refuses to guess at what discovery Defendant seeks and develop arguments on his behalf. Accordingly, the Court DENIES Defendant's Motion to Compel. (lc) (Entered: 11/08/2024) |
| 11/12/2024 | 166 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss Case *For Discovery Violation* 162 (Attachments: # 1 Declaration Declaration, # 2 Exhibit 1)(Hines, Derek) (Entered: 11/12/2024) |
| 11/15/2024 | 167 | OPPOSITION to MOTION in Limine to Preclude Proposed Defense Expert Gregory Scott Rogers 150 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 168 | OPPOSITION to MOTION in Limine to Exclude Second Motion in Limine to Exclude FBI Handling Agent's Alleged Mistakes 151 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 169 | OPPOSITION to MOTION in Limine to Exclude Third Motion in Limine to Exclude Impermissible "Specific Instances of Conduct" Evidence 152 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 170 | OPPOSITION to MOTION in Limine to Exclude Fourth Motion in Limine to Exclude Alleged Defects in the Prosecution 153 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 171 | OPPOSITION to MOTION in Limine to Exclude Fifth Motion in Limine to Exclude Irrelevant Factual Issues 154 filed by Defendant Alexander Smirnov. (Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 172 | OPPOSITION to MOTION in Limine to Preclude Any References to Defendant's Lawfully Owned Firearms 146 (Attachments: # 1 Proposed Order)(Wise, Leo) (Entered: 11/15/2024) |
| 11/15/2024 | 173 | OPPOSITION to MOTION in Limine to Preclude Any References to Defendant's Alleged Disloyalty 147 (Attachments: # 1 Proposed Order)(Wise, Leo) (Entered: 11/15/2024) |
| 11/15/2024 | 174 | NOTICE OF LODGING filed by Defendant Alexander Smirnov *Defendant's Notice of Lodging Proposed Orders Denying Government's Motions In Limine* (Attachments: # 1 Proposed Order Proposed Order for ECF 167, # 2 Proposed Order Proposed Order for ECF 168, # 3 Proposed Order Proposed Order for ECF 169, # 4 Proposed Order Proposed Order for ECF 170, # 5 Proposed Order Proposed Order for ECF 171)(Chesnoff, David) (Entered: 11/15/2024) |
| 11/15/2024 | 175 | OPPOSITION to MOTION in Limine to Admit Judicial Notice of Contents of Hearing Transcript 148 (Attachments: # 1 Proposed Order)(Wise, Leo) (Entered: 11/15/2024) |
| 11/15/2024 | 176 | OPPOSITION to MOTION in Limine to Preclude Evidence from Defendant's FBI Interview on September 27, 2023 149 (Attachments: # 1 Declaration of Leo J. Wise, # 2 Proposed Order)(Wise, Leo) (Entered: 11/15/2024) |

ER_239

| 11/18/2024 | 177 | STATEMENT filed by Plaintiff USA as to Defendant Alexander Smirnov (Hines, Derek) (Entered: 11/18/2024) |
| --- | --- | --- |
| 11/18/2024 | 178 | PROPOSED VOIR DIRE QUESTIONS filed by Plaintiff USA as to Defendant Alexander Smirnov (Hines, Derek) (Entered: 11/18/2024) |
| 11/18/2024 | 179 | PROPOSED JURY INSTRUCTIONS (JOINT set) filed by Plaintiff USA as to Defendant Alexander Smirnov (Hines, Derek) (Entered: 11/18/2024) |
| 11/18/2024 | 180 | PROPOSED JURY INSTRUCTIONS (DISPUTED set) filed by Plaintiff USA as to Defendant Alexander Smirnov (Hines, Derek) (Entered: 11/18/2024) |
| 11/18/2024 | 181 | PROPOSED JURY VERDICT filed by Plaintiff USA as to Defendant Alexander Smirnov (Hines, Derek) (Entered: 11/18/2024) |
| 11/18/2024 | 182 | PROPOSED VOIR DIRE QUESTIONS filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 11/18/2024) |
| 11/19/2024 | 183 | NOTICE OF LODGING filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 11/19/2024) |
| 11/20/2024 | 184 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Defendant Alexander Smirnov's Notice of Lodging 183 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice : Manual Filing (G-92). The cited correct event Corresponds to the Form used. Other error(s) with document(s): Note: To assist in a search for correct events, please use the "SEARCH" option for a "key word" to narrow the selection process. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 11/20/2024) |
| 11/20/2024 | 185 | NOTICE of Manual Filing of Ltr. to Hon. Otis D. Wright II and Supplemental Exhibits to Govts. CIPA Section 6(a) Motion filed by Plaintiff USA as to Defendant Alexander Smirnov (Rigali, Christopher) (Entered: 11/20/2024) |
| 11/21/2024 | 186 | RESPONSE IN OPPOSITION to Notice of Lodging 183 , filed by Plaintiff USA as to Defendant Alexander Smirnov *Opposition to Motion to Compel and for Issuance of Subpoenas (see ECF No. 183)* (Attachments: # 1 Declaration Decl. of Christopher M. Rigali)(Rigali, Christopher) (Entered: 11/21/2024) |
| 11/25/2024 | 187 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 11/25/2024) |
| 11/25/2024 | 188 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 11/25/2024) |
| 11/25/2024 | 189 | MINUTES OF STATUS CONFERENCE RE: MOTIONS IN LIMINE/PRETRIAL held before Judge Otis D. Wright, II : As to Defendant Alexander Smirnov (1). Case called, appearances made. The Court speaks with counsel off the record. Later: The Court hears oral argument from counsel regarding the motions in limine 146 , 147 , 148 , 149 , 150 , 151 , 152 , 153 , 154 . The matter is submitted on the motions in limine The Motion to Dismiss case 162 is MOOT. An order will issue. The Court addresses trial issues with counsel, including scheduling and conduct. The trial is CONTINUED to Wednesday, January 8, 2025 at 9:00 a.m.taking under advisement 159 . Court Smart: Court Smart. (lc) (Entered: 11/26/2024) |

ER_240

| | | |
|---|---|---|
| 11/26/2024 | 190 | NOTICE of Manual Filing of CIPA Filing filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 11/26/2024) |
| 11/26/2024 | 191 | ORDER RE MOTIONS IN LIMINE [146-154] as to defendant Alexander Smirnov (1) by Judge Otis D. Wright, II: For the reasons discussed above, the Court rules as follows on the parties' Motions in Limine: Defendant's MIL No. 1, to preclude reference to Defendants lawfully owned firearms, ECF No. 146 : GRANTED; Defendants MIL No. 2, to preclude reference to Defendant's allegeddisloyalty, ECF No. 147 : GRANTED IN PART, DENIED IN PART; Defendant's MIL No. 3, to take judicial notice of hearing transcript, ECF No. 148 : DENIED; Defendant's MIL No. 4, to preclude evidence from Defendant's FBI interview on September 27, 2023, ECF No. 149 : DENIED; Government's MIL No. 1, to preclude proposed defense expert witness Gregory Scott Rogers, ECF No. 150 : GRANTED; Governments MIL No. 2, to exclude FBI handling agent's alleged mistakes,ECF No. 151 : GRANTED IN PART, DEFERRED IN PART; Government's MIL No. 3, to exclude impermissible "specific instances of conduct" evidence, ECF No. 152 : GRANTED; Government's MIL No. 4, to exclude alleged defects in prosecution, ECF No. 153 : GRANTED; and Government's MIL No. 5, to exclude irrelevant factual issues, ECF No. 154 : GRANTED IN PART, DENIED IN PART. (lc) (Entered: 11/26/2024) |
| 12/02/2024 | 192 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 11/25/2024. Electronic Court Recorder: ECHO REPORTING, INC., phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/23/2024. Redacted Transcript Deadline set for 1/2/2025. Release of Transcript Restriction set for 3/3/2025.(yja) (Entered: 12/02/2024) |
| 12/02/2024 | 193 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 11/25/2024 re Transcript 192 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yja) TEXT ONLY ENTRY (Entered: 12/02/2024) |
| 12/03/2024 | 194 | MINUTES OF IN CHAMBERS ORDER by Judge Otis D. Wright, II: As to Defendant Alexander Smirnov. Notice of Order. The Court has issued its Order re In Camera, Under Seal Motion for a Hearing and Notice Pursuant to CIPA Sections 5(a), 6(a), and 6(b). The Order has been filed with the Classified Information Security Officer. (lc) (Entered: 12/03/2024) |
| 12/12/2024 | 195 | PLEA AGREEMENT filed by Plaintiff USA as to Defendant Alexander Smirnov (Wise, Leo) (Entered: 12/12/2024) |
| 12/13/2024 | 196 | AT THE REQUEST OF COUNSEL, a Change of Plea Hearing is set for 12/16/2024 at 8:00 AM before Judge Otis D. Wright II, as to Defendant Alexander Smirnov.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 12/13/2024) |
| 12/16/2024 | 197 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 12/16/2024) |
| 12/16/2024 | 198 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 12/16/2024) |
| 12/16/2024 | 199 | MINUTES OF Change of Plea Hearing held before Judge Otis D. Wright, II: As to Defendant Alexander Smirnov. Defendant sworn. Court questions defendant regarding the |

ER_241

| | | |
|---|---|---|
| | | plea. The Defendant Alexander Smirnov (1) pleads GUILTY to Count 2. The plea is accepted. The Court ORDERS the preparation of an EXPEDITED Presentence Report. Sentencing set for 1/8/2025 10:30 AM. Position papers are due 2 weeks before the sentencing. If the papers are NOT submitted in time,they will not be considered. All dates other than the sentencing hearing date are vacated as to this defendant. Court Smart: Court Smart. (lc) (Entered: 12/16/2024) |
| 12/20/2024 | 200 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 12-16-2024 8:04a.m.. Court Reporter/Electronic Court Recorder: ECHO Reporting, Inc, phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/10/2025. Redacted Transcript Deadline set for 1/21/2025. Release of Transcript Restriction set for 3/20/2025.(ss) (Entered: 12/20/2024) |
| 12/20/2024 | 201 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 12-16-2024 8:04 a.m. re Transcript 200 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ss) TEXT ONLY ENTRY (Entered: 12/20/2024) |
| 12/24/2024 | 202 | APPLICATION for Leave to File Unredacted Sentencing Memo and Exhibits 1 and 2 Under Seal. Filed by Defendant Alexander Smirnov. Application set for hearing on 1/8/2025 at 10:30 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 12/24/2024) |
| 12/24/2024 | 203 | SENTENCING MEMORANDUM filed by Defendant Alexander Smirnov (Attachments: # 1 Exhibit 1-Redacted, # 2 Exhibit 2-Redacted, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Chesnoff, David) (Entered: 12/24/2024) |
| 12/24/2024 | 204 | NOTICE of Manual Filing of Unredacted Sentencing Memorandum in Mitigation of Punishment including Exhibit 1 and Exhibit 2 filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 12/24/2024) |
| 01/01/2025 | 205 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Wise, Leo) (Entered: 01/01/2025) |
| 01/02/2025 | 206 | SEALED (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 207 | SEALED (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 208 | SEALED DOCUMENT (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 209 | SEALED - EXHIBIT 1 (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 210 | SEALED - EXHIBIT 2 (bm) (Entered: 01/03/2025) |
| 01/02/2025 | 211 | SEALED - EXHIBITS 3-10 (bm) (Entered: 01/03/2025) |
| 01/07/2025 | 212 | DISCLOSED RECOMMENDATION LETTER as to Defendant Alexander Smirnov (shu) (Entered: 01/07/2025) |
| 01/07/2025 | 213 | PRESENTENCE REPORT as to Defendant Alexander Smirnov (shu) (Entered: 01/07/2025) |
| 01/07/2025 | 214 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 01/07/2025) |

ER_242

| 01/08/2025 | 215 | MINUTES OF SENTENCING Hearing held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov. Refer to separate Judgment Order. Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. Defendant informed of right to appeal. Court Reporter: Court Smart. (es) (Entered: 01/08/2025) |
|---|---|---|
| 01/08/2025 | 216 | JUDGMENT AND COMMITMENT by Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1), Defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months on Count 2 in case CR 24-00091. Supervised release for a term of One (1) year on Count 2 of the Indictment in Docket No. CR 24-00091. Pay special assessment of $400. Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. [SEE JUDGMENT AND COMMITMENT FOR FURTHER INFORMATION.] (es) (Entered: 01/08/2025) |
| 01/08/2025 | 217 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 01/08/2025) |
| 01/09/2025 | 218 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Chesnoff, David) (Entered: 01/09/2025) |
| 01/09/2025 | 219 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on Wednesday, January 8, 2025. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC, phone number (858)453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/30/2025. Redacted Transcript Deadline set for 2/10/2025. Release of Transcript Restriction set for 4/9/2025.(mci) (Entered: 01/09/2025) |
| 01/09/2025 | 220 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings Wednesday, January 8, 2025 re Transcript 219 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 01/09/2025) |
| 01/13/2025 | 221 | EX PARTE APPLICATION to Amend Judgment and Commitment,, 216 Filed by Defendant Alexander Smirnov. (Attachments: # 1 Declaration Declaration of Counsel, # 2 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 01/13/2025) |
| 01/16/2025 | 222 | ORDER UPON DEFENDANT'S EX PARTE MOTION TO FILE AN AMENDED JUDGMENT OF CONVICTION as to Alexander Smirnov (1) 221 by Judge Otis D. Wright, II: Defendants Ex Parte Motion is GRANTED, as follows: 1. This Court hereby withdraws ECF No. 216 (Jan. 8, 2025). 2. This Court shall forthwith enter an Amended Judgment of Conviction stating on page one in boldface: "The sentence on Count 2 of the indictment in case number CR 24-00091 is 72 months. With respect to the indictment in case number CR 24-00702, as to Count 1, the sentence is 60 months. As to Count 5, the sentence is 60 months concurrent with Count 1. As to Count 8, the sentence is 12 months consecutive to the terms imposed on Counts 1 and 5 of that Indictment. The terms of imprisonment imposed in case number CR 24-00702 are to run concurrently with the terms of imprisonment imposed in CR 24-00091. As a result of the foregoing, the total term of imprisonment on both indictments, all four counts, is 72 months." 3. All other statements in ECF No. 216 shall remain the same. (lc) Modified on 1/16/2025 (lc). (Entered: 01/16/2025) |
| 01/16/2025 | 223 | AMENDED JUDGMENT by Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1), Count(s) 1, Government's motion, all remaining count(s)/underlying |

| | | |
|---|---|---|
| | | indictment/information, ordered dismissed.; Count(s) 2, Defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months on Count 2 in case CR 24-00091. Supervised release for One (1) year. Pay special assessment of $400, all Fines waived. (AMENDED TO INCLUDE:)***The sentence on Count 2 of the indictment in case number CR 24-00091 is 72 months. With respect to the indictment in case number CR 24-00702, as to Count 1, the sentence is 60 months. As to Count 5, the sentence is 60 months concurrent with Count 1. As to Count 8, the sentence is 12 months consecutive to the terms imposed on Counts 1 and 5 of that Indictment. The terms of imprisonment imposed in case number CR 24-00702 are to run concurrently with the terms of imprisonment imposed in CR 24-00091. As a result of the foregoing, the total term of imprisonment on both indictments, all four counts, is 72 months***. (lc) (Entered: 01/16/2025) |
| 01/21/2025 | 225 | NOTICE OF APPEAL to Appellate Court filed by Defendant Alexander Smirnov re Amended Judgment,,,, 223 , Judgment and Commitment,, 216 . Filing fee $605, receipt number ACACDC-38941515. (Chesnoff, David) (Entered: 01/21/2025) |
| 01/21/2025 | 226 | NOTIFICATION by Circuit Court of Appellate Docket Number 25-400 as to Defendant Alexander Smirnov, 9th CCA regarding Notice of Appeal to USCA - Final Judgment 225 . (car) (Entered: 01/21/2025) |
| 01/27/2025 | 227 | DESIGNATION OF RECORD ON APPEAL filed by Defendant Alexander Smirnov re Notice of Appeal to USCA - Final Judgment 225 (Chesnoff, David) (Entered: 01/27/2025) |
| 04/10/2025 | 228 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA David Ransom Friedman on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney David Ransom Friedman added to party USA(pty:pla))(Friedman, David) (Entered: 04/10/2025) |
| 04/10/2025 | 229 | Joint STIPULATION for Release of Defendant filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Proposed Order)(Friedman, David) (Entered: 04/10/2025) |
| 04/10/2025 | 230 | ORDER of USCA filed as to Defendant Alexander Smirnov, CCA #25-400. The joint motion (Docket Entry No. 6 in Appeal No. 25-400) for release pending appeal is denied. Appellant may file a new motion for release with this court if needed after presenting the motion to the district court. See Fed. R. App. P. 9(b); 9th Cir. R. 9-1.2(a) (A request for release pending appeal must first be brought in the district court.). (mat) (Entered: 04/14/2025) |
| 04/17/2025 | 231 | EX PARTE APPLICATION for Protective Order *Modification* Filed by Defendant Alexander Smirnov. (Attachments: # 1 Exhibit 1) (Chesnoff, David) (Entered: 04/17/2025) |
| 04/23/2025 | 232 | NOTICE of Submission of Proposed Order filed by Plaintiff USA as to Defendant Alexander Smirnov , Re: EX PARTE APPLICATION for Protective Order *Modification* 231 (Friedman, David) (Entered: 04/23/2025) |
| 04/23/2025 | 233 | AT THE REQUEST OF COUNSEL, a Bail Hearing is set for 4/28/2025 at 1:30 PM before Judge Otis D. Wright II, as to Defendant Alexander Smirnov.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 04/23/2025) |
| 04/24/2025 | 234 | AMENDED AND MODIFIED PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONALIDENTIFYING INFORMATION; PRIVACY ACT INFORMATION; GRAND JURY INFORMATION; ANDSENSITIVE U.S. GOVERNMENT INFORMATION UPON DEFENDANT'S UNOPPOSED EX PARTE APPLICATION 231 by Judge Otis D. Wright, II. (lc) (Entered: 04/24/2025) |

CM/ECF - California Central District

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/24/2025 09:16:21 | | | |
| **PACER Login:** | CSlawoffice | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:24-cr-00091-ODW End date: 4/24/2025 |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

ER_245

WESTERN,APPEAL,CLOSED,RELATED-G

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CRIMINAL DOCKET FOR CASE #: 2:24-cr-00702-ODW-1

Case title: USA v. Smirnov

Other court case number: 2:24-cr-00091 ODW

Date Filed: 11/21/2024

Date Terminated: 01/08/2025

Assigned to: Judge Otis D. Wright, II

Appeals court case number: 25-408 9th CCA

**Defendant (1)**

**Alexander Smirnov**
REG 99892-510
*TERMINATED: 01/08/2025*

represented by **Richard A Schonfeld**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101-6593
702-384-5563
Fax: 702-598-1425
Email: rschonfeld@cslawoffice.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad Nardiello**
Nardiello Turanchik LLP
1801 Century Park East Suite 1050
Los Angeles, CA 90067
310-201-0123
Fax: 310-201-0126
Email: chad@nt-llp.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Z Chesnoff**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101
702-384-5563
Email: dzchesnoff@cslawoffice.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

26:7201 Evasion of Assessment
(1)

**Disposition**

Defendant Alexander Smirnov, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72

months, on Count 1, 5 and 8, of the Indictment on CR 24-000702. Supervised release for a term of One (1) year, pay a special assessment of $400, Restitution in the total amount of $675,502, All Fines waived.

26:7201 Evasion of Assessment (5)

Defendant Alexander Smirnov, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months, on Count 1, 5 and 8, of the Indictment on CR 24-000702. Supervised release for a term of One (1) year, pay a special assessment of $400, Restitution in the total amount of $675,502, All Fines waived.

26:7201 Evasion of Assessment (8)

Defendant Alexander Smirnov, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months, on Count 1, 5 and 8, of the Indictment on CR 24-000702. Supervised release for a term of One (1) year, pay a special assessment of $400, Restitution in the total amount of $675,502, All Fines waived.

### Highest Offense Level (Opening)

Felony

### Terminated Counts

| Terminated Counts | Disposition |
|---|---|
| 26:7206 False or Fraudulent Tax Return (2-4) | Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. |
| 26:7206 False or Fraudulent Tax Return (6-7) | Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. |
| 26:7206 False or Fraudulent Tax Return (9-10) | Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. |

### Highest Offense Level (Terminated)

Felony

### Complaints

| Complaints | Disposition |
|---|---|
| None | |

### Plaintiff

ER_247

| | | |
|---|---|---|
| **USA** | represented by | **David Ransom Friedman**<br>AUSA - Office of US Attorney<br>Ciminal Appeals Section<br>312 North Spring Street 12th Floor<br>Los Angeles, CA 90012<br>213-894-7418<br>Fax: 213-894-8513<br>Email: david.friedman@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Assistant US Attorney* |
| | | **Derek E. Hines**<br>US Department of Justice<br>950 Pennsylvania Avenue, NW, Room B-200<br>Washington, DC 20530<br>771-217-6091<br>Email: derek.hines@usdoj.gov<br>*TERMINATED: 04/10/2025*<br>*Designation: Assistant US Attorney* |
| | | **Leo J. Wise**<br>US Department of Justice<br>Principal Senior Assistant Special Counsel<br>950 Pennsylvania Avenue, NW, Room B-200<br>Washington, DC 20530<br>771-217-6091<br>Email: leo.wise@usdoj.gov<br>*TERMINATED: 04/10/2025*<br>*Designation: Assistant US Attorney* |
| | | **Mark F. Daly**<br>US Department of Justice<br>150 M Street NE, Room 1.306<br>Washington, DC 20002<br>202-616-2245<br>Fax: 202-616-1786<br>Email: MFD@USDOJ.GOV<br>*TERMINATED: 04/10/2025*<br>*Designation: Assistant US Attorney* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/21/2024 | 1 | INDICTMENT Filed as to Alexander Smirnov (1) count(s) 1, 2-4, 5, 6-7, 8, 9-10. Offense occurred in LA. (mhe) (Entered: 11/25/2024) |
| 11/21/2024 | 2 | CASE SUMMARY filed by AUSA Leo J Wise as to Defendant Alexander Smirnov; defendants Year of Birth: 1980 (mhe) (Entered: 11/25/2024) |
| 11/21/2024 | 3 | NOTICE of Related Case(s) filed by Plaintiff USA as to Defendant Alexander Smirnov Related Case(s): 24-CR-0091-ODW (mhe) (Entered: 11/25/2024) |

ER_248

CM/ECF - California Central District

| 11/25/2024 | 4 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Derek E. Hines on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney Derek E. Hines added to party USA(pty:pla))(Hines, Derek) (Entered: 11/25/2024) |
|---|---|---|
| 11/26/2024 | 5 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Mark F. Daly on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney Mark F. Daly added to party USA(pty:pla))(Daly, Mark) (Entered: 11/26/2024) |
| 11/26/2024 | 6 | Notice of Appearance or Withdrawal of Counsel: for attorney Richard A Schonfeld. Adding Richard A. Schonfeld as counsel of record for Alexander Smirnov for the reason indicated in the G-123 Notice. Filed by Defendant Richard A. Schonfeld. (Attorney Richard A Schonfeld added to party Alexander Smirnov(pty:dft))(Schonfeld, Richard) (Entered: 11/26/2024) |
| 11/26/2024 | 7 | RESPONSE IN OPPOSITION to Notice of Related Case(s) 3 , filed by Defendant Alexander Smirnov (Attachments: # 1 Proposed Order)(Schonfeld, Richard) (Entered: 11/26/2024) |
| 12/09/2024 | 8 | ORDER RE TRANSFER PURSUANT to this Court's General Order in the Matter of Assignment of Cases and Duties to the District Judges, Related Case filed. Related Case No: 2:24-cr-00091 ODW-1. Case, as to Defendant Alexander Smirnov, transferred from Judge Hernan D. Vera to Judge Otis D. Wright, II for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:24-cr-00702 ODW. Signed by Judge Otis D. Wright, II (rn) (Entered: 12/10/2024) |
| 12/12/2024 | 9 | PLEA AGREEMENT filed by Plaintiff USA as to Defendant Alexander Smirnov (Wise, Leo) (Entered: 12/12/2024) |
| 12/13/2024 | 10 | AT THE REQUEST OF COUNSEL, a Change of Plea Hearing is set for 12/16/2024 at 8:00 AM before Judge Otis D. Wright II, as to Defendant Alexander Smirnov. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 12/13/2024) |
| 12/13/2024 | 12 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Patricia Donahue as to Defendant Alexander Smirnov (1) Count 1,2-4,5,6-7,8,9-10. Defendant arraigned, states true name is the name on the charging document. Defendant entered not guilty plea to all counts as charged. Attorney: Richard A. Schonfeld and David Chesnoff, Retained present. Case assigned to Judge Otis D. Wright,II. It is ordered that the following date(s) and time(s) are set: Change of Plea 12/16/2024 8:00 AM. Judge Wright is located in 5D, Los Angeles - United States Courthouse, 350 W 1st Street, CA 90012-4565. Court Smart: 12/13/2024. (tba) (Entered: 12/18/2024) |
| 12/13/2024 | 13 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Alexander Smirnov; defendants Year of Birth: 1980; date of arrest: 12/13/2024 USMS# REG 99892-510 (mhe) (Entered: 12/19/2024) |
| 12/13/2024 | 14 | MINUTES OF ARREST ON INDICTMENT HEARING held before Magistrate Judge Patricia Donahue as to Defendant Alexander Smirnov. Court issues Order under Fed. R. Crim. P. 5(f) concerning prosecutor's disclosure obligations;see General Order 21-02 (written order). Defendant states true name as charged. Special Appearance made by attorney David Chesnoff, Chad Nardiello. Court orders defendant Permanently detained. Defendant remanded to the custody of the USM. Defendant submits on detention at this time.PIA held, see separate PIA minutes. Court Smart: CS 12/13/24. (mhe) (Entered: 12/19/2024) |

ER_249

| 12/13/2024 | 15 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by David Z Chesnoff appearing for Alexander Smirnov (Attorney David Z Chesnoff added to party Alexander Smirnov(pty:dft))(mhe) (Entered: 12/19/2024) |
| 12/13/2024 | 16 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Chad Nardiello appearing for Alexander Smirnov (Attorney Chad Nardiello added to party Alexander Smirnov(pty:dft))(mhe) (Entered: 12/19/2024) |
| 12/13/2024 | 17 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Alexander Smirnov. (mhe) (Entered: 12/19/2024) |
| 12/13/2024 | 18 | MINUTES OF IN CHAMBERS ORDER OF DETENTION PENDING TRIAL by Magistrate Judge Patricia Donahue as to Defendant Alexander Smirnov. (mhe) (Entered: 12/19/2024) |
| 12/16/2024 | 11 | MINUTES OF Change of Plea Hearing held before Judge Otis D. Wright, II: As to Defendant Alexander Smirnov. Defendant sworn. Court questions defendant regarding the plea. The Defendant Alexander Smirnov (1) pleads GUILTY to Count 1,5,8. The plea is accepted. The Court ORDERS the preparation of an EXPEDITED Presentence Report. Sentencing set for 1/8/2025 10:30 AM. Position papers are due 2 weeks before the sentencing. If the papers are NOT submitted in time,they will not be considered. All dates other than the sentencing hearing date are vacated as to this defendant. Court Smart: Court Smart. (lc) (Entered: 12/16/2024) |
| 12/20/2024 | 19 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 12-16-2024 8:04a.m.. Court Reporter/Electronic Court Recorder: ECHO Reporting, Inc, phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/10/2025. Redacted Transcript Deadline set for 1/21/2025. Release of Transcript Restriction set for 3/20/2025.(ss) (Entered: 12/20/2024) |
| 12/20/2024 | 20 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 12-16-2024 8:04 a.m. re Transcript 19 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ss) TEXT ONLY ENTRY (Entered: 12/20/2024) |
| 12/24/2024 | 21 | APPLICATION for Leave to File Unredacted Sentencing Memo and Exhibits 1 and 2 Under Seal. Filed by Defendant Alexander Smirnov. Application set for hearing on 1/8/2025 at 10:30 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 12/24/2024) |
| 12/24/2024 | 22 | SENTENCING MEMORANDUM filed by Defendant Alexander Smirnov (Attachments: # 1 Exhibit 1-Redacted, # 2 Exhibit 2-Redacted, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Chesnoff, David) (Entered: 12/24/2024) |
| 12/24/2024 | 23 | NOTICE of Manual Filing of Unredacted Sentencing Memo and Exhibits 1 and 2 Under Seal filed by Defendant Alexander Smirnov (Chesnoff, David) (Entered: 12/24/2024) |
| 01/01/2025 | 24 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Wise, Leo) (Entered: 01/01/2025) |
| 01/02/2025 | 25 | SEALED (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 26 | SEALED (bm) (Entered: 01/02/2025) |

ER_250

| 01/02/2025 | 27 | SEALED DOCUMENT (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 28 | SEALED - EXHIBIT 1 (bm) (Entered: 01/02/2025) |
| 01/02/2025 | 29 | SEALED - EXHIBIT 2 (bm) (Entered: 01/03/2025) |
| 01/02/2025 | 30 | SEALED - EXHIBITS 3-10 (bm) (Entered: 01/03/2025) |
| 01/06/2025 | 31 | STIPULATION for Order DIRECTING THE CLERK TO ACCEPT AND DEPOSIT PRE-JUDGMENT PAYMENT FROM OR MADE ON BEHALF OF ALEXANDER SMIRNOV filed by Defendant Alexander Smirnov (Attachments: # 1 Proposed Order) (Nardiello, Chad) (Entered: 01/06/2025) |
| 01/06/2025 | 32 | ORDER DIRECTING THE CLERK TO ACCEPT AND DEPOSIT PRE-JUDGMENT PAYMENT FROM OR MADE ON BEHALF OF ALEXANDER SMIRNOV by Judge Otis D. Wright, II as to Defendant Alexander Smirnov, re Stipulation 31 : Pursuant to the stipulation between the United States and defendant Alexander Smirnov ("Defendant"), and for good cause shown, IT IS ORDERED that: 1. The stipulation is approved in its entirety. 2. The Clerk of the Court is directed to accept any payments made by or on behalf of Defendant before sentencing or entry of judgment, including for any special assessment and restitution that may be ordered. 3. The United States Department of Justice shall email this Order to the Clerk at fis_cac@cacd.uscourts.gov within one business days after its entry. (bm) (Entered: 01/06/2025) |
| 01/07/2025 | 33 | NOTICE filed by Defendant Alexander Smirnov *of Restitution Payment*, Re: Order on Stipulation,,, 32 (Attachments: # 1 Exhibit A - Clerk's Receipt)(Nardiello, Chad) (Entered: 01/07/2025) |
| 01/07/2025 | 34 | DISCLOSED RECOMMENDATION LETTER as to Defendant Alexander Smirnov (shu) (Entered: 01/07/2025) |
| 01/07/2025 | 35 | PRESENTENCE REPORT as to Defendant Alexander Smirnov (shu) (Entered: 01/07/2025) |
| 01/08/2025 | 36 | MINUTES OF SENTENCING Hearing held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov. Refer to separate Judgment Order. Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. Defendant advised of right of appeal. Court Reporter: Court Smart. (es) (Entered: 01/08/2025) |
| 01/08/2025 | 37 | JUDGMENT AND COMMITMENT by Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1). Defendant Alexander Smirnov, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months, on Count 1, 5 and 8, of the Indictment on CR 24-000702. This term consists of 60 months on Count 1 and Count 5 of the Indictment in case CR 24-00702, such terms to run concurrently, and 12 months on Count 8 of the Indictment in Docket No. CR 24-00702, to be served consecutively to Counts 1 and 5. Supervised release for a term of One (1) year, all such terms to run concurrently, pay a special assessment of $400, Restitution in the total amount of $675,502, All Fines waived. Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. [SEE JUDGMENT AND COMMITMENT FOR FURTHER INFORMATION.] (es) (Entered: 01/08/2025) |
| 01/09/2025 | 38 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on Wednesday, January 8, 2025. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC, phone number (858)453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction |

| | | |
|---|---|---|
| | | Request due 1/30/2025. Redacted Transcript Deadline set for 2/10/2025. Release of Transcript Restriction set for 4/9/2025.(mci) (Entered: 01/09/2025) |
| 01/09/2025 | 39 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings Wednesday, January 8, 2025 re Transcript 38 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 01/09/2025) |
| 01/13/2025 | 40 | EX PARTE APPLICATION to Amend Judgment and Commitment,,, 37 Filed by Defendant Alexander Smirnov. (Attachments: # 1 Declaration Declaration of Counsel, # 2 Proposed Order Proposed Order) (Chesnoff, David) (Entered: 01/13/2025) |
| 01/16/2025 | 41 | ORDER UPON DEFENDANT'S EX PARTE MOTION TO FILE AN AMENDED JUDGMENT OF CONVICTION as to Alexander Smirnov (1) 40 by Judge Otis D. Wright, II: Defendants Ex Parte Motion is GRANTED, as follows: 1. This Court hereby withdraws ECF No. 216 (Jan. 8, 2025). 2. This Court shall forthwith enter an Amended Judgment of Conviction stating on page one in boldface: "The sentence on Count 2 of the indictment in case number CR 24-00091 is 72 months. With respect to the indictment in case number CR 24-00702, as to Count 1, the sentence is 60 months. As to Count 5, the sentence is 60 months concurrent with Count 1. As to Count 8, the sentence is 12 months consecutive to the terms imposed on Counts 1 and 5 of that Indictment. The terms of imprisonment imposed in case number CR 24-00702 are to run concurrently with the terms of imprisonment imposed in CR 24-00091. As a result of the foregoing, the total term of imprisonment on both indictments, all four counts, is 72 months." 3. All other statements in ECF No. 216 shall remain the same. (lc) (Entered: 01/16/2025) |
| 01/16/2025 | 42 | AMENDED JUDGMENT by Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1) is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: 72 months, on Count 1, 5 and 8, of the Indictment on CR 24-000702. This term consists of 60 months on Count 1 and Count 5 of the Indictment in case CR 24-00702, such terms to run concurrently, and 12 months on Count 8 of the Indictment in Docket No. CR 24-00702, to be served consecutively to Counts 1 and 5. Supervised release for a term of One (1) year, all such terms to run concurrently, pay a special assessment of $400, Restitution in the total amount of $675,502, All Fines waived. Government's motion, all remaining count(s)/underlying indictment/information, ordered dismissed. (AMENDED TO INCLUDE:)***The sentence on Count 2 of the indictment in case number CR 24-00091 is 72 months. With respect to the indictment in case number CR 24-00702, as to Count 1, the sentence is 60 months. As to Count 5, the sentence is 60 months concurrent with Count 1. As to Count 8, the sentence is 12 months consecutive to the terms imposed on Counts 1 and 5 of that Indictment. The terms of imprisonment imposed in case number CR 24-00702 are to run concurrently with the terms of imprisonment imposed in CR 24-00091. As a result of the foregoing, the total term of imprisonment on both indictments, all four counts, is 72 months***. (lc) (Entered: 01/16/2025) |
| 01/16/2025 | 43 | NOTICE OF CLERICAL ERROR ISSUED, SEE DKT. No. 45 , e-filed on 1/16/2025. SEALED (bm) Modified on 1/16/2025 (bm). (Entered: 01/16/2025) |
| 01/16/2025 | 45 | NOTICE OF CLERICAL ERROR, as to Defendant Alexander Smirnov: Due to clerical error, the following docket entry has been corrected as indicated below. Re: SEALED 43 . Filed date: January 16, 2025. Other: Document was docketed to incorrect case, please disregard. (bm) (Entered: 01/16/2025) |
| 01/21/2025 | 46 | NOTICE OF APPEAL to Appellate Court filed by Defendant Alexander Smirnov re Judgment and Commitment,,, 37 , Sentencing, 36 , Amended Judgment,,,,, 42 . Filing fee $605, receipt number ACACDC-38941891. (Chesnoff, David) (Entered: 01/21/2025) |

ER_252

| 01/21/2025 | 47 | NOTIFICATION by Circuit Court of Appellate Docket Number 25-408 as to Defendant Alexander Smirnov, 9th CCA regarding Notice of Appeal to USCA - Final Judgment 46 . (car) (Entered: 01/21/2025) |
| 01/27/2025 | 48 | DESIGNATION OF RECORD ON APPEAL filed by Defendant Alexander Smirnov re Notice of Appeal to USCA - Final Judgment 46 (Chesnoff, David) (Entered: 01/27/2025) |
| 04/10/2025 | 49 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA David Ransom Friedman on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney David Ransom Friedman added to party USA(pty:pla))(Friedman, David) (Entered: 04/10/2025) |
| 04/10/2025 | 50 | Joint STIPULATION for Release of Defendant filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Proposed Order)(Friedman, David) (Entered: 04/10/2025) |
| 04/10/2025 | 51 | ORDER of USCA filed as to Defendant Alexander Smirnov, CCA #25-408. The Order is The joint motion (Docket Entry No. 6 in Appeal No. 25-400) for release pending appeal is denied. Appellant may file a new motion for release with this court if needed after presenting the motion to the district court. See Fed. R. App. P. 9(b); 9th Cir. R. 9-1.2(a) (A request for release pending appeal must first be brought in the district court.). The existing briefing schedule remains in effect. (mat) (Entered: 04/14/2025) |
| 04/23/2025 | 52 | AT THE REQUEST OF COUNSEL, a Bail Hearing is set for 4/28/2025 at 1:30 PM before Judge Otis D. Wright II, as to Defendant Alexander Smirnov.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 04/23/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/24/2025 09:14:39 | | |
| **PACER Login:** | CSlawoffice | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 2:24-cr-00702-ODW End date: 4/24/2025 |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

ER_253